

1 | DIETRICH SIBEN THORPE LLP
EDWARD P. DIETRICH (176118)
2 | MATTHEW P. SIBEN (223279)
DAVID A. THORPE (216498)
3 | SHAWN M. HAYS (137971)
2173 Salk Avenue, Suite 250
4 | Carlsbad, CA  92008
Telephone: 760/579-7368
5 | Facsimile:  760/579-7369
edward@dstlegal.com
6 | matthew@dstlegal.com
david@dstlegal.com
7 | shawn@dstlegal.com

8 | *Attorneys for Plaintiffs Children's Hospital
& Medical Center Foundation of Omaha,*
9 | *Hastings College Foundation, Peter Kiewit Foundation,*
*Weitz Value Fund, Weitz Partners Value Fund,*
10 | *Weitz Hickory Fund, Weitz Balanced Fund,*
*Research Fund, Partners III Opportunity Fund,*
11 | *and Heider Weitz Partnership*

FILED
CLERK, U.S. DISTRICT COURT

MAR 1 0 2011

CENTRAL DISTRICT OF CALIFORNIA
BY                        DEPUTY

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

CHILDREN'S HOSPITAL &
MEDICAL CENTER FOUNDATION
OF OMAHA, HASTINGS COLLEGE
FOUNDATION, PETER KIEWIT
FOUNDATION, WEITZ VALUE
FUND, WEITZ PARTNERS VALUE
FUND, WEITZ HICKORY FUND,
WEITZ BALANCED FUND,
RESEARCH FUND, PARTNERS III
OPPORTUNITY FUND, and HEIDER
WEITZ PARTNERSHIP,

Plaintiffs,

vs.

COUNTRYWIDE FINANCIAL
CORPORATION, ANGELO R.
MOZILO, DAVID SAMBOL, ERIC P.
SIERACKI, and KPMG LLP,

Defendants.

Case No. **CV11   02056** *SJO* (AGRx)

COMPLAINT FOR VIOLATIONS OF
THE FEDERAL SECURITIES LAWS
AND STATE LAW

DEMAND FOR JURY TRIAL

COMPLAINT

**TABLE OF CONTENTS**

Page

I. SUMMARY OF THE ACTION.................................................................1

II. JURISDICTION AND VENUE.............................................................10

III. THE PARTIES.......................................................................................10

IV. BACKGROUND AND OVERVIEW OF DEFENDANTS'
WRONGFUL CONDUCT...................................................................13

   A.   Countrywide's Business Model and Growth Initiative.........................13

   B.   Countrywide Misrepresented the Risks Associated with the
Company's New Business Model by Misleadingly Describing
the Credit Quality of Its Loans, Dedication to Sound
Underwriting Practices, and Internal Controls ...................................16

   C.   Countrywide Recklessly Increased Its Credit Risk...............................19

      1.   Countrywide Generally Abandoned Sound Underwriting
Practices.........................................................................................19

      2.   Countrywide Loosened Its Underwriting Guidelines and
Introduced a "Matching Strategy"................................................24

      3.   Countrywide Approved Non-Qualifying Loans Through an
Exceptions Process .......................................................................25

      4.   Countrywide Originated and Held Pay Option ARMs,
Which Defendants Knew to Be Extremely Risky Loan
Products Improperly Underwritten...............................................28

   D.   Countrywide and the Individual Defendants Were Aware of
Increased Credit Risk from Imprudent Lending and
Abandoning Sound Underwriting..........................................................30

      1.   The Late 2003 Meeting .................................................................30

      2.   The September 2004 Warnings ......................................................31

      3.   Warnings Regarding the Matching Strategy .................................32

      4.   HELOCs and Warnings Regarding 100% Financing...................33

      5.   Warnings Regarding Loan Exceptions..........................................37

      6.   Warnings Regarding Pay Option ARMs ......................................39

      7.   The Individual Defendants' Knowledge of and Failure to
Disclose Increased Credit Risk.....................................................44

   E.   Countrywide Materially Misstated Its Financial Results .......................47

      1.   Inadequate Allowances for Loan Losses.......................................51

      2.   Overvalued Retained Interests from Securitizations ....................53

COMPLAINT

3.   Overvalued Mortgage Servicing Rights ....................................53

4.   Failure to Properly Reserve for Representations and Warranties..........................................................................................55

F.   KPMG Failed to Properly Audit Countrywide.............................56

1.   The 2004 Audit.............................................................................57

2.   The 2005 Audit.............................................................................60

3.   The 2006 Audit.............................................................................62

G.   The Individual Defendants' Massive Insider Sales ....................64

H.   Countrywide's Collapse: Countrywide's Undisclosed Risky Lending Practices Cause the Company to Suffer a Liquidity Crisis and Its Stock to Collapse ......................................................65

V.   DEFENDANTS' FALSE AND MISLEADING STATEMENTS .................69

A.   Plaintiffs' Reliance Upon Defendants' Statements ...............................69

B.   Defendants' False and Misleading Statements .......................................70

C.   The Risks Concealed by Defendants Materialize, Causing Countrywide's Stock Price to Collapse, Yet Defendants Continue to Conceal the Full Truth from Investors .........................142

VI.   LOSS CAUSATION.........................................................................................164

VII.   INAPPLICABILITY OF THE STATUTORY SAFE HARBOR ...............165

VIII.   CLAIMS FOR RELIEF ...................................................................................166

IX.   PRAYER FOR RELIEF ...................................................................................175

X.   JURY TRIAL DEMAND .................................................................................176

Plaintiffs Children's Hospital & Medical Center Foundation of Omaha, Hastings College Foundation, Peter Kiewit Foundation, Weitz Value Fund, Weitz Partners Value Fund, Weitz Hickory Fund, Weitz Balanced Fund, Research Fund, Partners III Opportunity Fund, and Heider Weitz Partnership (collectively "Plaintiffs") make the following allegations based on the investigation conducted by Plaintiffs' counsel, including, but not limited to, a review and analysis of Countrywide Financial Corporation ("Countrywide" or the "Company") filings with the United States Securities and Exchange Commission (the "SEC"); media and securities analysts' reports about the Company; court filings in the SEC action against certain Defendants for violations of the federal securities laws; and other matters of public record.

## I.    SUMMARY OF THE ACTION

1.      Countrywide and its executive management portrayed the Company as primarily a prime lender that was conservatively run and employed prudent underwriting guidelines and a robust underwriting process to ensure the origination of high credit quality loans to borrowers who could and would repay. This was not the case. Defendants knew, but concealed, substantial material information concerning Countrywide's true loan quality and loan production, that Countrywide had abandoned sound underwriting practices, and the risks associated with Countrywide's unsound lending practices. These risks ultimately materialized, and the Company foreseeably experienced extremely high rates of loan delinquencies and defaults, which ultimately caused Countrywide to collapse.

2.      Plaintiffs purchased Countrywide common stock during the Relevant Period, which is defined as March 12, 2004 through the end of November 2007, when Plaintiffs sold their last Countrywide shares. Plaintiffs purchased shares at artificially inflated prices caused by Defendants' fraudulent scheme.

3.      Prior to and throughout the Relevant Period, Countrywide abandoned sound underwriting practices, which caused Countrywide to increase loan volume and publicly report inflated (albeit false) financial results that did not account for the

1  effects of Countrywide's credit decisions.   Unbeknownst to Plaintiffs and the
2  investing public, Defendants internally recognized and were repeatedly warned that,
3  among other things, (i) Countrywide's loan underwriting guidelines were among the
4  most aggressive in the Country due to an internal mandate to match any loan offered
5  by any competitor; (ii) Countrywide had originated hundreds of billions of dollars in
6  high-risk loans pursuant to unjustified exceptions to the Company's already loose
7  underwriting guidelines, with exceptions rates reaching more than 50% for one of
8  Countrywide's most significant loan products; (iii) Countrywide estimated between
9  30% to 40% of Countrywide Bank's (or referred to as the "Bank") massive loan
10 portfolio were "liar loans" in which the applicant had materially overstated his/her
11 income; and (iv) a large number of borrowers told Countrywide they could not afford
12 their loan payments once the short-term "teaser" interest rate expired (25% of
13 borrowers interviewed for a Countrywide survey said they could not afford their loan).
14 These undisclosed facts, among others, were clearly material to investors and rendered
15 Defendants' statements during the Relevant Period false and misleading.

16         4.      Prior to the Relevant Period, Defendants set the stage for Countrywide's
17 tremendous stock price growth by announcing in mid-2003 an ambitious target for the
18 Company to dominate the residential mortgage purchase market and grow market
19 share to 30% of all such loans.  This was a substantial increase over Countrywide's
20 then existing business, but Countrywide's founder and Chief Executive Officer
21 ("CEO") Angelo R. Mozilo was confident in Countrywide's ability to do so.

22         5.      Around the time that Mozilo announced Countrywide's goal to grow its
23 market share, the Company began a systematic shift away from its traditional
24 mortgage business to a more risky business model.  In the years prior to the Relevant
25 Period, Countrywide's business focused primarily upon originating traditional, 30-
26 year fixed rate conforming loans that were properly underwritten to assure the
27 borrower could repay the lender.  Beginning in 2003, Countrywide substantially
28 increased its origination of higher margin – but far riskier and relatively novel loan

products – such as pay-option adjustable-rate mortgages ("Pay Option ARMs") and home equity lines of credit ("HELOCs") – while at the same time Countrywide continually loosened and ignored its underwriting guidelines so the Company could capture more of this seemingly lucrative business.

6.   While investors knew Countrywide was originating more Pay Option ARMs and HELOCs, among other exotic loans, Defendants concealed and misrepresented the fact that the Company was continually loosening its underwriting guidelines and abandoning sound underwriting practices, and had ceded its underwriting guidelines to the most aggressive lenders in the country.

7.   As 2004 began, Defendants continued to assert that the Company would not sacrifice quality for quantity as Countrywide pushed for more market share. Mozilo stated: "Going for 30% mortgage share is totally unrelated to quality of loans we go after. . . .  There will be no compromise by this company in the overall quality of the product line. . . ."

8.   By the beginning of the Relevant Period, Defendants knew Countrywide could ***not*** increase its market share by originating exotic loan products while at the same time maintaining high credit quality and appropriate underwriting standards. Nonetheless, during the Relevant Period and despite repeated warnings to the contrary, Defendants repeatedly reassured investors that Countrywide was not sacrificing loan quality to drive loan volume.  For example, on March 15, 2005, Mozilo stated "that under no circumstances, will Countrywide ever sacrifice sound lending and margins for the sake of getting to that 30% market share."

9.   Similarly, Defendants repeatedly reassured investors Countrywide had not materially changed the risk profile of the Company.  For example, on September 13, 2005, Mozilo reassured investors Countrywide "start[s] with responsible lending practices" and its "loan underwriting guidelines are conservative" such that the "credit quality of [Countrywide's loan] portfolio remains outstanding."

10.     Concerning the credit quality of Countrywide's loan portfolio, Defendants stated in the Company's SEC filings: "We manage mortgage credit risk principally by . . . only retaining high credit quality mortgages in our loan portfolio."

11.     Defendants went so far as to state the Company's underwriting policies had not been loosened in any way that might impact loan quality.  On July 26, 2005, Mozilo stated: "I'm not aware of any loosening of underwriting standards that creates a less of a quality of loan that we did in the past."

12.     Defendants' repeated statements about the high credit quality of Countrywide's loans, and the Company's commitment to sound underwriting practices, were manifestly untrue.  Many of the Company's former employees have come forth to describe a corporate culture that actively cast sound underwriting practices aside in the quest to originate more loan volume.  Indeed, Ambac Assurance Corporation, which insured Countrywide loans, found Countrywide loans displayed "remarkably poor loan performance" and an astronomically high 97% of Countrywide's loans insured by Ambac contained evidence of one or, in most cases, more than one material defects.

13.     Defendants also repeatedly represented that Countrywide had robust internal controls to monitor the Company's compliance with its own underwriting guidelines.  For example, the Company lauded in its public filings with the SEC, its "proprietary underwriting systems . . . to prevent fraud" and its Quality Control Department's "comprehensive loan audits" that gave Countrywide the ability to "evaluate and measure adherence to prescribed underwriting guidelines."  Defendants repeated these statements throughout the Relevant Period despite knowing that Countrywide's loan portfolio was rife with fraud and that an overwhelming number of the Company's loans were originated pursuant to material, unjustified exceptions to the Company's underwriting guidelines.  Exceptions to Countrywide's already loose underwriting guidelines were more the rule, than the exception.  For instance, in June 2006, Countrywide originated: (i) 33.3% of its Pay Option ARMs pursuant to

---

exceptions to its underwriting policies; (ii) 37.3% of its subprime first lien loans pursuant to exceptions to its underwriting policies; (iii) 25.3% of its subprime second liens pursuant to exceptions to its underwriting policies; and (iv) 55.3% of its standalone home equity loans pursuant to exceptions to its underwriting policies. Countrywide never disclosed its high rates of exceptions but misled investors by claiming to adhere to its strict underwriting guidelines.

14.     Pay Option ARMs were a very significant loan product for Countrywide representing tens of billions of dollars of exposure.  Defendants repeatedly stated that Countrywide's Pay Option ARMs were a high credit quality loan, that was well-understood and not a significant credit risk to the Company.  For instance, on May 31, 2006, Mozilo stated:

> [T]he amount of pay option loans in the bank's portfolio now stands at [$]31 billion, up 19% from [$]26 billion in the last quarter. Despite recent scrutiny to pay option loans, and there's been plenty, ***Countrywide views the product as a sound investment for our bank*** and a sound financial management tool for consumers. . . . ***The performance profile of this product is well understood*** because of its 20-year history, which includes stress tests in very difficult environments.  Moreover, Countrywide actively manages credit risk through ***prudent program guidelines*** including negative amortization limits and ***sound underwriting***.[1]

15.     Defendants knew Countrywide's Pay Option ARMs were not well understood or stress tested in difficult environments.  Indeed, Mozilo recognized in an internal e-mail:

---

[1] All emphasis is added and internal citations omitted unless otherwise noted.

We have ***no way, with any reasonable certainty, to assess the real risk of holding these loans*** on our balance sheet.  The only history we can look to is that of World Savings however ***their portfolio was fundamentally different than ours*** in that their focus was equity and our focus is fico.  In my judgement [sic], as a long time lender, I would always trade off fico for equity.  ***The bottom line is that we are flying blind on how these loans will perform in a stressed environment*** of higher unemployment, reduced values and slowing home sales.

16.    Countrywide's Pay Option ARMs were a tremendous credit risk to the Company as Countrywide had secretly abandoned its underwriting obligations.  Indeed, ***by no later than May 2006 Countrywide internally recognized that one-third (33%) of the reduced documentation loan products held for investment by Countrywide Bank had income overstated by fifty percent (50%) or more, including Countrywide Bank's portfolio of Pay Option ARMs***.  Defendants never disclosed this material information to investors.

17.    Contrary to his public statements lauding the creditworthiness of the Pay Option ARM portfolio, Mozilo privately recognized two critical problems with Countrywide's Pay Option ARM loans: (i) Pay Option ARMs like the ones Countrywide originated were inherently flawed loan products unlike Pay Option ARMs originated historically; and (ii) Countrywide had not properly underwritten its Pay Option ARM loans.   Indeed, Mozilo frankly noted in an internal e-mail Countrywide's "***inability to properly underwrite*** these [Pay Option ARMs] combined with the fact that these loans are ***inherently unsound*** unless they are full doc, no more than 75% LTV and no piggys."

18.    Moreover, given the negative amortization associated with the Pay Option ARM loans, Defendants knew the losses incurred as a result of default would be more substantial than Countrywide's other loan products.  Countrywide's Pay

---

1  Option ARM portfolio was rife with fraud and high credit exposure, but Defendants
2  lauded the loans as high credit quality.

3        19.    Defendants' false statements had their desired effect; the market and
4  Plaintiffs were misled as to the truth behind Countrywide's apparent success and
5  Countrywide's stock was artificially inflated throughout the Relevant Period.

6        20.    Defendants engaged in a complex series of misrepresentations and
7  omissions over a long period of time that falsely portrayed the most important aspects
8  of Countrywide's business operations.  Countrywide's business model, like that of any
9  mortgage lender, depended upon the Company originating loans in which a high
10  percentage of borrowers repay their loans.  Secretly abandoning sound underwriting
11  practices to drive up loan volume posed an undisclosed threat to the Company's entire
12  business model, as it jeopardized Countrywide's creditworthiness and access to
13  liquidity.  Defendants' false statements concealed the true likelihood and extent of the
14  risks associated with Countrywide's new business model – which included, among
15  other things, massive delinquencies and defaults, reduced earnings, and an inability to
16  access liquidity and the secondary loan market – which materialized over time and
17  caused Countrywide's stock price to drastically drop beginning no later than July 16,
18  2007.

19        21.    On July 16, 2007, Countrywide revealed to the market that
20  "delinquencies and defaults continue to rise."  Foreclosures had more than doubled
21  from June 2006, causing the credit rating agency Standard & Poor's to comment: "It's
22  definitely a worrying trend."

23        22.    On July 24, 2007, Countrywide revealed, among other things, an
24  alarming growth in delinquencies and defaults, which were the foreseeable result of
25  Countrywide abandoning sound underwriting practices.  Investors were shocked, and
26  the stock lost over 10% of its value over the course of the day.

27        23.    Despite being unable to conceal the Company's growing delinquencies
28  and defaults, Defendants continued to conceal much of the truth from investors and

---

COMPLAINT                              7

1    falsely reassure investors concerning the Company's financial condition.   For
2    instance, on July 24, 2007, Mozilo falsely reassured investors that Countrywide had
3    witnessed only a "*de mimimis*" amount of fraudulent loans.  In truth, as Defendants
4    had already known for a year, Countrywide's low documentation loans were rife with
5    fraud.   Countrywide's exposure to fraudulent loans wasn't *de minimis*; it was
6    cataclysmic.

7         24.    Defendants continued to maintain artificial inflation in Countrywide's
8    stock price after the July 24, 2007 disclosure by continuing to conceal, among other
9    things, (i) the large percentage of loans originated by Countrywide pursuant to
10   exceptions to Countrywide's already loose underwriting standards; (ii) the large
11   percentage of Pay Option ARMs on Countrywide's balance sheet originated pursuant
12   to a fraudulent overstatement of the applicant's income; (iii) the risks posed by the
13   Company's exposure to exotic loans had been heightened by Countrywide's
14   systematic disregard for sound underwriting practices; (iv) that for years Countrywide
15   employed a "matching strategy" by which Countrywide ceded its own underwriting
16   standards to the most aggressive lenders in the business; and, (v) Countrywide's
17   financial statements did not accurately account for the Company's poor loan quality.

18        25.    In August through November 2007, as the market continued to learn
19   more about Countrywide's lending practices and its delinquencies and defaults
20   continued to rise, the Company was plagued by concerns it would be cut off from
21   much needed financing.  The private markets were hostile to providing more money to
22   Countrywide, because the Company had given so much money to persons who could
23   not repay their loans.  The concealed risks associated with Countrywide abandoning
24   sound underwriting practices were materializing.

25        26.    Defendants repeatedly assured investors that Countrywide had ample
26   access to financing to fund its ongoing operations.  For instance, on August 23, 2007,
27   Mozilo blasted a Merrill Lynch analyst who cautioned investors that Countrywide
28   could fall into bankruptcy.   Mozilo called the report "totally irresponsible and

COMPLAINT                                8

baseless" with "no basis whatsoever" and reiterated that "there is no more chance for bankruptcy today for Countrywide than it was six months ago, [or] two years ago, when the stock was $45 a share. [We] are a very solid company."

27.    In truth, Countrywide was not a solid Company and the bankruptcy rumors were well-founded. Though it would not be publicly disclosed until *The Wall Street Journal* ran an expose on November 26, 2007, by August 2007 Countrywide had become dependent upon quasi-governmental aid to stay afloat, borrowing $51.1 billion from the Federal Home Loan Bank in Atlanta between mid-August 2007 and September 30, 2007. According to *The Wall Street Journal*, Countrywide had been unable to raise private financing due to "investors' fears over default risk."

28.    Countrywide's mountain of bad loans, originated pursuant to Defendants' undisclosed abandonment of sound underwriting practices, proved to be Countrywide's undoing. From July 16, 2007 (when Standard & Poor's labeled Countrywide's growing delinquencies and defaults "definitely a worrying trend") through November 26, 2007 (when *The Wall Street Journal* revealed Countrywide was so desperate it needed quasi-governmental aid), Countrywide stock declined by $27.60 from $36.26 to $8.64.

29.    Ultimately, on January 11, 2008, Countrywide was forced to sell itself to Bank of America for $7.16 per share – which was a small fraction of Countrywide's reported book value of $22 per share. To this day, Countrywide's lending practices continue to plague Bank of America, causing two economics professors to recently write Countrywide's "exceptionally large rates of horrible loans, defaulting so quickly after origination, are a powerful indicator that Countrywide was engaged in accounting control fraud."

30.    Plaintiffs bring this action to recover investment losses caused by Defendants' fraudulent conduct. Defendants' false and misleading statements artificially inflated the price of Countrywide stock. Upon disclosure of the truth

concerning Defendants' statements, Plaintiffs were injured when Countrywide's stock price declined precipitously.

## II.      JURISDICTION AND VENUE

31.     This Court has jurisdiction over the subject matter of this action pursuant to §27 of the Exchange Act, 15 U.S.C. §78aa and 28 U.S.C. §§1331, 1337, and 1367.

32.     Venue is proper in this District pursuant to §27 of the Securities Exchange Act, 15 U.S.C. §78aa, and 28 U.S.C. §§1391 (b) and (c).  Substantial acts in furtherance of the wrongs alleged and/or their effects have occurred within this District.

33.     In connection with the acts and omissions alleged herein, all of the Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

## III.     THE PARTIES

**Plaintiffs**

34.     Non-party Wallace R. Weitz & Company is a registered investment adviser managing investment funds for the Weitz Funds, individuals, corporations, pension plans, foundations, and endowments.  The firm was founded in 1983 and maintains its headquarters in Omaha, Nebraska.  Wallace R. Weitz & Company is the investment adviser on behalf of Plaintiffs Children's Hospital & Medical Center Foundation of Omaha, Hastings College Foundation, Peter Kiewit Foundation, Weitz Value Fund, Weitz Partners Value Fund, Weitz Hickory Fund, Weitz Balanced Fund, Research Fund, Partners III Opportunity Fund, and Heider Weitz Partnership.

35.     Wallace R. Weitz & Company, as the investment adviser for Plaintiffs, read and relied upon certain of Defendants' false and misleading statements alleged herein, as detailed *infra*.  In reliance on Defendants' material misrepresentations and omissions, as described below, Plaintiffs purchased millions of Countrywide common shares during the Relevant Period.  Plaintiffs' purchases and sales of Countrywide

---

COMPLAINT                                    10

1  stock are set forth in Plaintiffs' trade data provided to Defendants by letter dated

2  September 30, 2010, and incorporated by reference herein, and which Plaintiffs are

3  willing to submit to the Court under seal.   Plaintiffs' purchases during the Relevant

4  Period were at artificially inflated prices caused by Defendants' false statements.  As a

5  result of Plaintiffs' purchases of Countrywide common shares during the Relevant

6  Period, and Defendants' wrongful conduct, Plaintiffs suffered substantial losses in an

7  amount to be determined by Plaintiffs' testifying damages expert.

8  **Defendant Countrywide**

9       36.    Defendant Countrywide Financial Corporation is a corporation organized

10 and existing under the laws of the State of Delaware.  Prior to being acquired by Bank

11 of America Corporation on July 1, 2008, Countrywide was the nation's largest home

12 loan mortgage originator.   In 2009, as part of a re-branding effort, Countrywide

13 changed its name to Bank of America Home Loans.   Countrywide, now doing

14 business as Bank of America Home Loans, maintains its headquarters in Calabasas,

15 California.

16 **The Officer Defendants**

17      37.    Defendant Angelo R. Mozilo ("Mozilo") is a co-founder of Countrywide

18 and was the Chairman of the Board of Directors since March 1999 and CEO between

19 February 1998 and July 2008.  Mozilo was also President of the Company from

20 March 2000 through December 2003 and has served in other executive capacities

21 since the Company's formation in 1969.  Mozilo signed the Company's materially

22 false and misleading Form 10-K Annual Reports for 2003 through 2006 filed with the

23 SEC, and accompanying certifications made pursuant to the Sarbanes-Oxley Act of

24 2002 ("SOX"), as well as SOX Certifications accompanying the Company's Form 10-

25 Q Quarterly Reports filed with the SEC between the first quarter of 2004 and the third

26 quarter of 2007.  Between 2004 and 2007, Mozilo sold over 12 million shares of

27 Countrywide common stock for proceeds of $474,491,038.25.

28

COMPLAINT                                11

38.    Defendant David Sambol ("Sambol") joined Countrywide in 1985 and became the Company's President and Chief Operating Officer ("COO") in September 2006.   Sambol served from 2004 to 2006 as Executive Managing Director for Business Segment Operations, heading all revenue-generating operations of the Company, as well as the corporate operational and support units comprised of Administration, Marketing and Corporate Communications, and Enterprise Operations and Technology.   Sambol served as Chairman and CEO of the Company's principal operating subsidiary, Countrywide Home Loans, Inc. ("CHL") beginning in 2007, and from 2004 through 2006 Sambol was President and COO of CHL.   Sambol was also part of the Credit Committee, composed of the Chief Risk Officer and other senior executives, which reviewed and monitored credit risk and the actual and projected credit losses for all of the Company's portfolios, and also evaluated loan loss reserves and the methodology for calculating them.   Sambol signed the Company's materially false and misleading Form 10-Q Quarterly Reports filed with the SEC on November 7, 2006, May 9, 2007, August 9, 2007, and November 9, 2007.   Between 2004 and 2007, Sambol sold over 1.6 million shares of Countrywide common stock for proceeds of $68,878,744.13.

39.    Defendant Eric P. Sieracki ("Sieracki") served as Executive Managing Director and Chief Financial Officer ("CFO") of Countrywide starting in 2005. During the Relevant Period, Sieracki was a member of several management committees: the Executive Strategy Committee; the Credit Committee; and the Asset/Liability Committee, of which he was chairman.   Sieracki signed the Company's Form 10-K Annual Reports for 2005 and 2006 filed with the SEC and accompanying SOX certifications; Form 10-Q Quarterly Reports between the first quarter of 2005 and the third quarter of 2007 and accompanying SOX certifications; and Form 10-Q/A Amended Quarterly Reports for the first three quarters of 2004.  In 2004, Sieracki sold over 88,000 shares of Countrywide common stock for proceeds of $7,496,562.15.

40.    Mozilo, Sambol, and Sieracki are collectively referred to as the Individual Defendants or Officer Defendants.

**Defendant KPMG**

41.    Defendant KPMG LLP ("KPMG") served as Countrywide's outside auditor beginning January 5, 2004.  KPMG provided audit, audit-related, tax and other services to Countrywide during the Relevant Period, which included the issuance of unqualified opinions on the Company's financial statements for the years ended December 31, 2004, 2005 and 2006, and management's assessments of internal controls for the years ended December 31, 2005 and 2006.  KPMG maintains its national headquarters in New York.

## IV.    BACKGROUND AND OVERVIEW OF DEFENDANTS' WRONGFUL CONDUCT

### A.    Countrywide's Business Model and Growth Initiative

42.    Countrywide originated, sold, and serviced both prime and subprime mortgage loans until its acquisition by Bank of America in July 2008.  By 2005, Countrywide was the largest mortgage lender in the United States, originating over $490 billion in mortgage loans in 2005, over $450 billion in 2006, and over $408 billion in 2007.  Countrywide recognized pre-tax earnings of $2.4 billion and $2 billion in its loan production divisions in 2005 and 2006, respectively, and a pre-tax loss of $1.5 billion in its loan production division in 2007.

43.    Countrywide pooled most of the loans it originated and sold them in secondary mortgage market transactions.  Countrywide sold the pooled loans either through whole loan sales or securitizations.  Historically, Countrywide's primary business had been originating prime conforming loans that were saleable to the Government Sponsored Entities ("GSEs") Federal National Mortgage Association ("Fannie Mae") and Federal Home Loan Mortgage Company ("Freddie Mac").  In the fiscal years 2001, 2002, and 2003, Countrywide's prime conforming originations were 50%, 59.6%, and 54.2% of its total loan originations, respectively.  In 2003, United

States residential mortgage production reached a record level of $3.8 trillion. Countrywide experienced record earnings in that year, with net earnings of $2.4 billion, an increase of $1.5 billion, or 182%, over 2002.

44.     Beginning in 2003, Countrywide, at the direction of the Individual Defendants, publicly announced that the Company intended to reduce its dependence upon the home mortgage refinance market and substantially grow the Company's overall market share in the residential home mortgage purchase market to 30% in five years or less.  In 2003, at the time of Defendants' bold proclamation, Countrywide's market share of the purchase market was only about 13%.

45.     Countrywide and the Individual Defendants not only predicted that they could deliver on their 30% market-share goal, but they promised that under no circumstances would Countrywide sacrifice credit quality and sound underwriting practices to achieve this 30% target.

46.     In truth, Defendants did sacrifice credit quality in an attempt to gain market share and artificially inflate Countrywide's stock price.  From mid-2003 onward, Countrywide continually loosened and/or ignored its underwriting guideline, and abandoned sound underwriting practices to drive loan volume.

47.     In 2004, in a market where originations were declining overall, Countrywide maintained net earnings of $2.1 billion, and increased its overall market share.  Countrywide achieved this result in large part by moving away from its historical core business of prime mortgage underwriting to aggressively matching loan programs being offered by other lenders, even monoline subprime lenders.

48.     During the Relevant Period, Countrywide greatly expanded its production of nonconforming, subprime, and home equity loans, and greatly reduced its origination of prime conforming loans (as set forth in the table below):

|  | 2001 | 2002 | 2003 | 2004 | 2005 | 2006 |
|---|---|---|---|---|---|---|
| **Prime Conforming** | 50.0% | 59.6% | 54.2% | 38.2% | 32.0% | 31.9% |
| **Prime Non-Conforming** | 16.5% | 24.5% | 31.4% | 38.7% | 47.2% | 45.2% |
| **Home Equity** | 6.8% | 4.6% | 4.2% | 8.5% | 9.0% | 10.2% |
| **Nonprime (Subprime)** | 7.8% | 3.7% | 4.6% | 11.0% | 8.9% | 8.7% |
| **FHA/VA** | 18.9% | 7.6% | 5.6% | 3.6% | 2.1% | 2.8% |
| **Commercial** | 0.0% | 0.0% | 0.0% | 0.0% | 0.8% | 1.2% |

49.     Countrywide's increased origination of "exotic" loans was no secret to investors.  The market understood these loans might carry some increased credit risk.  Defendants concealed the extent of the increased credit risk.  Defendants concealed from and misrepresented to investors, among other things, that (i) rather than utilizing prudent underwriting to originate these more risky loans, as was publicly stated, Countrywide abandoned sound underwriting practices to increase loan volume; (ii) many of the borrowers of Countrywide's exotic loans did not understand the terms of the loans; (iii) many of the borrowers of Countrywide's exotic loans (particularly Pay Option ARMs) could not afford to repay the loans; (iv) many of the borrowers of Countrywide's exotic loans had fraudulently overstated their income in order to qualify for the loan; (v) many of Countrywide's loans were approved pursuant to exceptions to Countrywide's already loosened underwriting standards; (vi) Defendants had no basis to model the delinquency and/or default rates for the Company's new exotic loans; and (vii) in violation of Generally Accepted Accounting Principles ("GAAP"), Defendants purposefully caused Countrywide to not set aside sufficient reserves for the massive loan losses that would inevitably occur once the housing

1  market cooled and the Company's risky loans stopped performing, and similarly over-

2  estimated the values of loan-related assets on its balance sheet (*i.e.*, mortgage

3  servicing rights ("MSRs") and retained interest ("RIs")).

4        **B.**      **Countrywide Misrepresented the Risks Associated with the Company's New Business Model by Misleadingly**

5              **Describing the Credit Quality of Its Loans, Dedication to Sound Underwriting Practices, and Internal Controls**

6

7       50.    As set forth in §V.B-C, Countrywide and the Individual Defendants

8  repeatedly reassured the market that Countrywide was a conservatively run mortgage

9  lender that prudently underwrote loans to ensure the long-term viability of the

10  Company, and that management would not trade (nor had it traded) the risk of bad-

11  credit quality loans in return for the possibility of making a fast buck while the

12  housing market was doing well.  As Defendants repeatedly represented to investors,

13  they managed Countrywide to perform well across housing cycles.

14       51.    Defendants repeatedly represented that Countrywide was primarily a

15  prime loan originator and not like companies in the subprime space.  In truth,

16  Countrywide's lending practices and its loans were much more like those of subprime

17  lenders than like Countrywide's former prime loan origination business.

18       52.    For example, Countrywide's Form 10-Ks deceptively described the types

19  of loans upon which the Company's business depended.  While Countrywide provided

20  statistics about its originations, which reported the percentage of loans in various

21  categories, the information was misleading because its descriptions of "prime non-

22  conforming" and "nonprime" loans in its periodic filings were insufficient to inform

23  investors what types of loans were included in those categories.  "Prime" loans were

24  described in Countrywide's 2005, 2006, and 2007 Forms 10-K as follows:

25            Prime Mortgage Loans include conventional mortgage loans, loans

26            insured by the Federal Housing Administration ("FHA") and loans

27            guaranteed by the Veterans Administration ("VA").  A significant

28            portion of the conventional loans we produce qualify for inclusion in

guaranteed mortgage securities backed by Fannie Mae or Freddie Mac ("conforming loans"). Some of the conventional loans we produce either have an original loan amount in excess of the Fannie Mae and Freddie Mac loan limit for single-family loans ($417,000 for 2006) or otherwise do not meet Fannie Mae or Freddie Mac guidelines. Loans that do not meet Fannie Mae or Freddie Mac guidelines are referred to as "nonconforming loans."

53.    Nothing in that description informed Countrywide's investors that its "prime non-conforming" category included loans to borrowers with FICO scores below 660. Indeed, Countrywide did not consider any FICO score to be too low to have the loan qualify as "prime." Further, the prime conforming category included so-called "Alt-A" loan products with increasing amounts of credit risk, such as (1) reduced or no documentation loans; (2) stated income loans; and (3) loans with loan to value or combined loan to value ratios of 95% and higher. Finally, Countrywide did not disclose that Pay Option ARM loans, including reduced documentation Pay Option ARM loans, were included in the category of prime loans. Moreover, to the extent these extremely risky loans were below the loan limits established by the GSE entities that purchased these loans, they would have been reported by Countrywide as prime conforming loans. In 2005 and 2006, Countrywide's Pay Option ARMs ranged between 17% and 21% of its total loan originations. It maintained the majority of these loans in the held for investment portfolio at Countrywide Bank.

54.    Significantly, the Countrywide periodic filings do not define "nonprime" in any way, and Countrywide's periodic filings failed to disclose that loans in the category of subprime were not merely issued to borrowers with blemished credit, but that this category included loans with significant additional layered risk factors, such as (1) subprime piggyback seconds, also known as 80/20 loans; (2) reduced or no documentation loans; (3) stated income loans; (4) loans with loan to value or

1    combined loan to value ratios of 95% and higher; and (5) loans made to borrowers

2    with recent bankruptcies and late mortgage payments.

3        55.    As set forth in more detail herein, Countrywide not only misleadingly

4    labeled many high-risk loans as "prime" loans, Defendants repeatedly referred to the

5    loans it originated and retained as "high credit quality" that were significantly

6    different than the quality of loans originated by subprime lenders.   In truth,

7    Countrywide had abandoned sound underwriting practices and its loan portfolios were

8    not "high credit quality."   Indeed, Countrywide's purportedly "high credit quality"

9    "prime" Pay Option ARM and HELOC loan portfolios performed far worse than

10   traditional prime loans.

11       56.    Countrywide publicly stated it maintained internal controls to assess the

12   Company's compliance with its own underwriting policies and to ensure the Company

13   did not incur the risk of improperly underwritten loans to borrowers that were unlikely

14   to be able to repay.   Defendants purposefully ignored, hamstrung and overrode

15   Countrywide's internal controls, which got in the way of Defendants' efforts to

16   increase loan volume.   Indeed, as set forth herein, Mozilo himself repeatedly

17   originated loans that did not conform to the Company's underwriting guidelines and

18   Defendants Sambol and Sieracki rejected attempts by the Company's Chief Risk

19   Officer to enhance the quality of the Company's disclosures as was required by the

20   federal securities laws.

21       57.    By increasing its origination of non-conforming and subprime loans

22   between 2003 and 2006, Countrywide was able to originate many more loans in those

23   years and increase its market share, even as the residential real estate market declined

24   in the United States.   While Countrywide boasted to investors that its market share

25   was increasing, company executives did not disclose that its market share increase

26   came at the expense of prudent underwriting guidelines.   As a result, Countrywide's

27   share price rose from $25.28 on December 31, 2003 to $42.45 on December 29, 2006,

28   the last trading day of that year.

COMPLAINT                              18

**C.   Countrywide Recklessly Increased Its Credit Risk**

      **1.   Countrywide Generally Abandoned Sound Underwriting Practices**

58.   To achieve the Company's stated goal growing market share to 30% of all mortgage loan originations, Countrywide systematically abandoned sound underwriting practices in 2003 and continued to originate a high percentage of the Company's loans with little regard for the borrower's true ability to repay until mid-2007.

59.   Countrywide repeatedly asserted it originated loans pursuant to strict underwriting guidelines and only allowed "exceptions" if compensating factors were present.

60.   Countrywide repeatedly asserted it underwrote loans to ensure that borrowers could afford to repay the loans, as is the most basic purpose of underwriting.

61.   Countrywide failed to disclose, and expressly misrepresented, that its business model was premised upon the origination of loans to borrowers who did not have the ability to make the required payments, had lied on their applications, and/or otherwise did not meet the already aggressive underwriting guidelines for the loan product.

62.   One means by which Countrywide repeatedly approved borrowers it knew would have difficulty repaying the loan amount included the common practice of approving borrowers for reduced-documentation loans after Countrywide determined that the borrower could not qualify for the loan based on the borrower's income as reflected in a W-2 federal tax form or tax return.

63.   Countrywide's abandonment of sound underwriting practices and affirmative steps to make loans to persons who Countrywide knew could not afford them, were documented in a July 1, 2008 article by MSNBC News, titled "Countrywide Whistleblower Reports 'Liar Loans.'"

COMPLAINT                              19

Mark Zachary, who'd been in the mortgage business for 12 years when he took a job at Countrywide in August 2006 as a regional vice president in Houston, says he found a corporate culture of shady, possibly illegal practices.

"You see some of the things that were going on and you just know that it's not right," he said in an exclusive interview with NBC News. "It was, what do we do to get one more deal done. It doesn't matter how you get there, just how do you get one more deal done."

In a series of internal documents over the next nine months, Zachary says he repeatedly warned superiors about questionable practices:

- Inflating home appraisals – so buyers could borrow enough to cover closing costs . . . but end up owing more than the house was worth.

- Flipping loans – moving an unqualified buyer from a conventional loan to one that doesn't require documentation, knowing they couldn't afford it.

- Coaching borrowers – to overstate, even double, their income to qualify.

In fact, Zachary says certain loans were known as "liar loans." Why?

"Because the income stated on those loans generally is not a true representation of what that person normally makes," he said.

In February 2007, after six months on the job, Zachary warned superiors about the potential effects of bad lending practices, writing:

"In a market where there are more foreclosures and defaults than we care to talk about, I think part of that is because some builders and

1    lenders are setting people up for further failure in life by putting them in
2    loans and houses they do not belong in."

3         Were these practices the work of a couple of bad apples?

4         "No, not at all," says Zachary.  "It comes down, I think from the
5    very top that you get a loan done at any cost."

6         Zachary said these practices ultimately misled investors – about
7    the safety and value of these loans, and hurt borrowers – who were put in
8    loans they couldn't afford to repay.

9         Countrywide denies Zachary's allegations, saying it "investigated
10   each of his claims and found no merit to his accusations."

11        However, NBC News spoke to six other former Countrywide
12   employees in different parts of the country who described the same
13   culture and many of the same practices.  Some even said that W-2's and
14   other documents – including paystubs, lease agreements, and letters of
15   verification – were falsified to clear loans.

16        A former loan officer – who runs a website criticizing
17   Countrywide – said the more loans they made, the more they were paid .
18   . . which created a culture of anything goes.

19        "I've seen supervisors stand over employees' shoulders and watch
20   them, you know, change incomes and things like that to make the loan
21   work," he said.

22        Customers say they saw it too.  Lisa Blue says her countrywide
23   loan officer told her to claim she made more than twice her actual
24   income.

25        "I said I highly doubt an accounting manager makes a hundred
26   thousand dollars anywhere," Blue said.  "She was telling me to state stuff
27   that was totally lies."

28

1          Zachary says after he took his concerns to senior management, and

2          refused to approve unqualified borrowers to make his numbers, he was

3          fired after 10 months on the job.

4                              * * *

5          [Internal Countrywide] documents show Zachary began raising

6          questions to Countrywide superiors about specific lending practices as

7          early as September 2006, soon after joining the company.

8          64.    Similarly, on November 13, 2008, *BusinessWeek* ran a story reporting

9  that, according to a former Countrywide wholesaler John Sipes ("Sipes"),

10  "underwriters at the Santa Monica (Calif.) and Beverly Hills branches of Countrywide

11  often shredded tax documents they received from borrowers to destroy proof of the

12  borrowers' incomes and extend bigger loans than they could afford."  According to

13  Sipes, the practice was "rampant" at these Countrywide offices and known to

14  Countrywide's corporate offices.

15          65.    Defendants, who knew the Company had abandoned sound underwriting

16  practices, but failed to disclose the truth to investors, also knew Countrywide hadn't

17  taken appropriate measures to ensure loans were made to persons who could repay.

18  Indeed, Countrywide actively encouraged its employees to market subprime loans to

19  borrowers with limited income histories and little to no down payment requirements in

20  order to increase loan volume.  According to Brian Koss, who spent four years as a

21  senior regional vice president at Countrywide where he ran 54 branches in New

22  England and upstate New York, Countrywide "approached making loans like making

23  widgets, focusing on cost to produce and not risk or compliance.  Programs like 'Fast

24  and Easy' where the income and assets were stated, not verified, were open to abuse

25  and misuse.  The fiduciary responsibility of making sure whether the loan should truly

26  be done was not as important as getting the deal done.  As long as people had jobs and

27  values were on the rise, life was good."

28

66.     Similarly, the Company encouraged production without regard for quality by rewarding employees with lavish vacations without properly weighing whether the loans they originated performed.  According to Cynthia Lau ("Lau"), a Countrywide loan officer for seven years between 2000 and August 2007, the Company offered incentives for the employee who sold the most loans, including trips to Hawaii and Palm Springs.  According to Lau, "It was the Wild, Wild West.  You've got people who were able to get homes without any money down, without having to prove their income, as long as you had good credit and as long as the market, you know, substantiated [it] at that time."

67.     Liar loans and the failure to properly underwrite loan applications was rampant throughout Countrywide and the Company systematically abandoned appropriate underwriting practices.

68.     Countrywide masked its practices while residential real estate prices were rising because borrowers were able to sell their homes for a gain or refinance troubled loans.  When the housing market cooled, however, the truth of Countrywide's underwriting was revealed in the form of rampant delinquencies and defaults.  These delinquencies and defaults resulted in numerous investigations, including an analysis of Countrywide's underwriting practices by insurers of Countrywide's loans – including one by Ambac Assurance Corporation ("Ambac").  According to Ambac, the Countrywide loans it insured displayed "remarkably poor loan performance." After the Relevant Period, Ambac obtained and reviewed the loan files for 6,533 defaulted loans originated by Countrywide and insured by Ambac.  According to Ambac's re-underwriting of the loans, a remarkable 97% contained evidence of one or, in most cases, more than one material defects.  According to Ambac's re-underwriting of Countrywide's loans, based on Countrywide's own loan files, "Countrywide's loans did not bear the represented attributes or conform to Countrywide's own underwriting guidelines, and in many cases were made to borrowers with little or no ability to repay their loans."

## 2. Countrywide Loosened Its Underwriting Guidelines and Introduced a "Matching Strategy"

69.   As determined by the SEC, by the end of 2006, Countrywide's underwriting guidelines were looser and more aggressive than they had ever been. The Company's aggressive guideline expansion was deliberate, and began in 2003. Indeed, from January 2003 until well into 2006, Countrywide's credit risk management department ("Risk Management") spent approximately 90% of its time processing requests for expansions of Countrywide's underwriting guidelines.

70.   Countrywide's "matching strategy," also known as the "supermarket strategy," was a key driver of the Company's aggressive expansion of underwriting guidelines.   The strategy committed the Company to offering any product and/or underwriting guideline available from at least one "competitor," which included subprime lenders.   Thus, if Countrywide did not offer a product offered by a competitor, Countrywide's production division invoked the matching strategy to add the product to Countrywide's menu.

71.   For example, if Countrywide's minimum FICO score for a product was 600, but a competitor's minimum score was 560, the production division invoked the matching strategy to reduce the minimum required FICO score at Countrywide to 560.

72.   Thus, Countrywide's underwriting standards were *at least* as aggressive as the most aggressive lenders in the country.   However, as John McMurray ("McMurray"), Countrywide's Chief Risk Officer, repeatedly warned Defendants, Countrywide implemented its matching strategy without also requiring the credit risk mitigants that were being used by Countrywide's competitors.   In effect, as Countrywide's credit risk officer McMurray wrote Sambol on June 24, 2005, "***our match end up being more aggressive tha[n] the guideline we were originally trying to match***."   Countrywide embraced – and won – the race to the bottom in credit quality and underwriting standards to increase loan volume.

73.     The impact of the matching strategy was intensified by Countrywide's "no-brokering" policy, which precluded Countrywide's loan officers from referring loan applicants to other brokers and/or institutions. Prior to its implementation, loan officers could engage in a practice known as "brokering," in which the loan officer would refer those borrowers deemed too risky for Countrywide to another lender, which in turn paid a commission to the Countrywide loan officer. The no brokering policy increased the incentives for Countrywide's retail sales force to be aggressive in finding ways for Countrywide to underwrite a loan, regardless of whether the loan satisfied the underwriting guidelines Countrywide repeatedly trumpeted to investors.

74.     Mozilo, Sambol, and Sieracki knew that the Company was taking on increased risk of defaults and delinquencies as a result of its widened underwriting guidelines and matching strategy. Nonetheless, Defendants repeatedly concealed the unprecedented expansion of underwriting guidelines and the attendant increased credit risk by making false and misleading statements to the market concerning the credit quality of the Company's loans and Countrywide's dedication to prudent underwriting and internal controls.

### 3.     Countrywide Approved Non-Qualifying Loans Through an Exceptions Process

75.     Though Countrywide proclaimed in its Forms 10-Ks that it managed credit risk through its loan underwriting, the Company's increasingly wide underwriting guidelines and exceptions process materially increased Countrywide's credit risk during that time. Countrywide used an automated underwriting system known as "CLUES" to actually underwrite loans. The CLUES system applied the principles and variables set forth in the Countrywide underwriting manuals and its loan program guide. CLUES applied a device known as the "underwriting scorecard," which assessed borrower credit quality by analyzing several variables, such as FICO scores, loan to value ratios, documentation type (*e.g.*, full, reduced, stated) and debt-

to-income ratios. These variables were weighted differently within the scorecard, depending upon their perceived strength in predicting credit performance.

76.     In underwriting a loan, Countrywide loan officers entered an applicant's information into CLUES, which would: (1) approve the loan; (2) approve the loan with caveats; or (3) "refer" the loan to a loan officer for further consideration and/or manual underwriting.  The CLUES program typically did not "reject" a loan if a requirement of Countrywide's guidelines had not been met or if CLUES calculated that the loan presented an excessive layering of risk.  Instead, CLUES "referred" the loan, indicating that the loan application would have to be reviewed manually prior to approval.  In these circumstances, to proceed with the loan, the loan officer would request an "exception" from the guidelines from more senior underwriters at Countrywide's structured lending desk ("SLD").

77.     Countrywide's level of exceptions was higher than that of other mortgage lenders.  The elevated number of exceptions resulted largely from Countrywide's use of exceptions as part of its matching strategy to introduce new guidelines and product changes.

78.     Exceptions to Countrywide's already loose underwriting guidelines were more the rule, than the exception.  For instance, in June 2006, Countrywide originated: (i) 33.3% of its Pay Option ARMs pursuant to exceptions to its underwriting policies; (ii) 37.3% of its subprime first lien loans pursuant to exceptions to its underwriting policies; (iii) 25.3% of its subprime second liens pursuant to exceptions to its underwriting policies; and (iv) 55.3% of its standalone home equity loans pursuant to exceptions to its underwriting policies.  These levels of exceptions were commonplace at Countrywide.

79.     Defendants were aware of the rampant exceptions to Countrywide's underwriting policies.  Countrywide produced a monthly report titled the "Credit Risk Leadership Reporting Package" which measured various metrics of Countrywide's loan originations, among them the number of loans originated pursuant to exceptions

to Countrywide's underwriting policies.  These reports were provided to numerous executives with Countrywide, including Sambol.

80.    The actual underwriting of exceptions was also severely compromised. According to Countrywide's official underwriting guidelines, exceptions were only proper where "compensating factors" were identified which offset the risks caused by the loan being outside of guidelines.  In practice, however, Countrywide used as "compensating factors" variables such as FICO and loan to value, which had already been assessed by CLUES in issuing a "refer" finding.

81.    Mozilo was personally involved in extending loans pursuant to unjustified exceptions to Countrywide's underwriting guidelines.  For example, as part of a "V.I.P." lending program at Countrywide aptly named "Friends of Angelo," influential lawmakers and politicians received favorable mortgage financing on terms other than those available to ordinary borrowers and outside the normal underwriting process.  In June 2008, *Conde Nast Portfolio* reported that Senate Banking Committee Chairman Christopher Dodd, Senate Budget Committee Chairman Kent Conrad, Fannie Mae former CEO Jim Johnson, former Secretary of Housing and Urban Development Alphonso Jackson, former Secretary of Health and Human Services Donna Shalala, and former U.N. ambassador and assistant Secretary of State Richard Holbrooke all benefitted from the "Friends of Angelo" program.  According to *Portfolio*, "For V.I.P.s, Countrywide often waived at least half a point and eliminated fees amounting to hundreds of dollars for underwriting, processing and document preparation.  If interest rates fell while a V.I.P. loan was pending, Countrywide provided a free 'float-down' to the lower rate, eschewing its usual charge of half a point.  Some V.I.P.s who bought or refinanced investment properties were often given the lower interest rate associated with primary residences."

82.    Unsurprisingly, Countrywide's exception loans were ultimately a problem for the Company as they performed poorly and exhibited increased delinquency rates.  For instance, an internal June 2007 presentation made to several

Managing Directors at Countrywide summarized the delinquency rates of Countrywide's exceptions loans and indicated that loans originated in 2006 pursuant to exceptions had exhibited "astoundingly poor performance for purportedly prime credit loans."

83.     Defendants never disclosed Countrywide's exceptions rates to investors, though it was obvious that investors, including Plaintiffs, and analysts would find this information material.  Nor did Countrywide ever reveal to investors that the Company knew its origination of loans pursuant to exceptions to Countrywide's underwriting policies had created a huge number of loans that were, and would increasingly be, problem loans for the Company.

### 4.  Countrywide Originated and Held Pay Option ARMs, Which Defendants Knew to Be Extremely Risky Loan Products Improperly Underwritten

84.     Countrywide began originating Pay Option ARM loans in 2004; by the second quarter of 2005 21% of Countrywide's loan production was Pay Option ARMs.  Pay Option ARMs allowed borrowers to choose between four payment options: (l) a minimum payment which was insufficient to cover accruing interest; (2) an interest-only payment; (3) a fully amortizing payment with a 30 year pay-off; and (4) a fully amortizing payment with a 20 year pay-off.  If the minimum payment was selected, then the accruing interest would be added to the loan's principal balance, a phenomenon known as negative amortization.  Countrywide's Pay Option ARM loans typically allowed for negative amortization until the principal balance reached 115% of the original loan balance, at which time the payment would reset to the amount necessary to repay principal and interest in the term remaining on the loan.  This resulted in a much higher monthly payment and "payment shock" to many borrowers.

85.     Even if the borrower never reached the 115% threshold, the loan would typically reset after five years to a fully amortizing payment.  Because Countrywide began to offer Pay Option ARMs in 2004, Countrywide's first wave of automatic

1  resets was scheduled to occur in 2009.  Unlike many other loans that Countrywide

2  originated, Countrywide Bank held most of the Pay Option ARMs for investment.

3      86.    Countrywide publicly heralded Pay Option ARMs as a safe product

4  offering, and told investors it was a high credit quality asset to hold on its balance

5  sheet.  For instance, in its 2006 Form 10-K, Countrywide proclaimed that it had

6  "prudently underwritten" its Pay Option ARMs.  On May 31, 2006, Mozilo gave a

7  speech in which he stated, "Pay-Option loans represent the best whole loan type

8  available for portfolio investment from an overall risk and return perspective," that,

9  "[t]he performance profile of this product is well understood because of its twenty

10  year history, which includes stress tests in difficult environments[,]" and that

11  Countrywide "actively manages credit risk through prudent program guidelines . . .

12  and sound underwriting."

13      87.    Countrywide also repeatedly stated Countrywide's Pay Option ARMs

14  portfolio had "very high initial loan quality," and that Countrywide "only originate[d]

15  pay-option loans to borrowers who can qualify at the loan's fully-indexed interest

16  rates."

17      88.    Contrary to their public statements extolling the credit quality of the

18  Pay-Option ARMs originated by Countrywide, Defendants knew these loans were

19  extremely risky, but failed to disclose the material facts known to them.  As set forth

20  in more detail at §IV.D.6, *infra*, Defendants received numerous warnings that the

21  Company's Pay Option ARMs were not high credit quality and posed a substantial

22  credit risk to Countrywide.

23      89.    Defendants knew Countrywide had billions of dollars of Pay Option

24  ARMs that were originated pursuant to materially fraudulent loan applications.

25  Indeed, by no later than May 2006, Countrywide internally recognized that 33% of its

26  reduced documentation loan products, including the Pay Option ARMs held by

27  Countrywide Bank – which had ballooned to $26.1 billion by the end of 2005 and was

28  $32.7 billion at the end of 2006 – were originated pursuant to income numbers that

had been overstated by the borrower by at least 50%. According to Countrywide Bank's Credit Risk Officer, the vast majority of these overstatements were due to fraud. These undisclosed findings, among others, directly contradicted Defendants' statements that the Pay Option ARMs were a high quality asset for Countrywide to retain on its balance sheet.

90. Similarly, a June 2006 focus group study conducted by Countrywide, revealed to Defendants that many Pay Option ARM borrowers did not know how they were going to pay the loans back once they reset, and there was evidence brokers were coaching applicants to lie on the loans. Indeed, in a follow-up study of 1,800 Pay Option ARM borrowers, 25% could not afford the fully amortized amount and 25% were not sure if they could make the fully amortized amount. These undisclosed findings, among others, directly contradicted Defendants' representations that Countrywide qualified Pay Option ARM borrowers at the fully amortized amount of the loan.

**D.   Countrywide and the Individual Defendants Were Aware of Increased Credit Risk from Imprudent Lending and Abandoning Sound Underwriting**

**1.   The Late 2003 Meeting**

91. By the end of 2003, Defendants knew that Countrywide was engaging in rampant imprudent lending. The Company was making far too high a percentage of its loans to persons that were not likely to be able to repay the loan amount in the event of a downturn in the housing market, and Defendants internally debated whether to continue this risky practice.

92. According to an article in *The Wall Street Journal*, published on February 23, 2008, in a heated debate in late 2003 Countrywide's risk managers warned Defendant Sambol that the Company was incurring too much risk by making imprudent loans. During the meeting, according to *The Wall Street Journal*, tensions between Sambol and the Company's risk managers "boiled over." Nick Krsnich, who was Countrywide's Chief Investment Officer and was responsible for pricing loans

and managing risks, protested Countrywide's "imprudent lending." According to the article, citing several sources, Sambol repeatedly brushed aside warnings that underwriting standards were too lax and that following risk management's advice would render the Company would turn Countrywide into a "nice, little boutique."

### 2. The September 2004 Warnings

93. On September 1, 2004, in an e-mail to Stan Kurland ("Kurland") and Keith McLaughlin ("McLaughlin"), Mozilo recognized that Countrywide had in fact sacrificed credit quality to increase loan origination quantity. Mozilo admitted: "As I look at production trends, not only at Countrywide, but also with other lenders, *there is a clear deterioration in the credit quality of loans being originated over the past several years*. In addition, from my point of view, *the trend is getting worse* as the competition for sub-prime, Alt-A and nonconforming in general continues to accelerate."

94. Similarly, in a September 9, 2004 memorandum, McMurray warned Countrywide's senior officers that several aggressive features of Countrywide's guidelines (*e.g.*, high loan to value programs, ARM loans, interest only loans, reduced documentation loans, and loans with layered risk factors) significantly increased Countrywide's credit risk. Additionally, McMurray noted that the economic environment for credit risks was deteriorating as house price appreciation was unlikely to continue and the market's compensation (*i.e.*, credit spreads) for credit risks had declined. Furthermore, McMurray noted that Countrywide was doing more executions where it retained credit risk, such as HELOC and subprime production. McMurray's September 9, 2004 memorandum was widely shared within the Company.

95. In a September 9, 2004 e-mail accompanying his memorandum, McMurray wrote "[l]oan quality is a significant credit risk factor" and noted Countrywide's "move to more aggressive underwriting guidelines have increased risk."

---

96.    The credit risk described in September 2004 worsened from September 2004 to August 2007.   Risk Management continuously had discussions with Countrywide's loan production division, which reported to Sambol, about the credit concerns identified in the September 2004 warning.   Nevertheless, Countrywide continued to expand its underwriting guidelines, and to liberally make exceptions to those guidelines, through at least the end of 2006.  These facts were never disclosed to investors.

### 3.    Warnings Regarding the Matching Strategy

97.    Defendants knew Countrywide's underwriting guidelines were among the most aggressive in the country as the Company sought to match the loan products of the most aggressive lenders in the country.  McMurray repeatedly provided explicit and ominous warnings about Countrywide's matching strategy.

98.    According to sworn testimony in the SEC action against the Individual Defendants, McMurray and others in Countrywide's Credit Risk Management frequently warned Sambol about Countrywide's matching strategy.

99.    In a June 25, 2005 email to Sambol concerning guideline expansion and the Company's growing credit risks, McMurray addressed the matching strategy and explained that "'because the matching process includes comparisons to a variety of lenders, our [guidelines] will be a composite of the outer boundaries across multiple lenders[,]" and that because comparisons are only made to competitor guidelines where they are more aggressive and not used where they are less aggressive, Countrywide's "composite guides [sic] are likely among the most aggressive in the industry."

100.    On November 2, 2006, McMurray sent an email to Countrywide's Chief Investment Officer ("CIO"), which the CIO forwarded to Sambol, stating that the matching strategy had caused Countrywide to cede its underwriting standards to the aggressive lenders in the market.  In the email, McMurray asked: "Do we want to

1   effectively cede our policy and is this approach 'saleable' from a risk perspective to

2   those constituents who may worry about our risk profile?"

3       101.   In a November 16, 2006 email to Sambol, McMurray complained about

4   guidelines and products being introduced in contravention of credit policy.  As an

5   example, McMurray cited the fact that the loan production divisions were offering

6   Extreme Alt-A loans, even though that program had not been officially approved in

7   the guideline review process.

8       102.   The proposed guidelines would have permitted 100% financing, layered

9   with additional credit risk factors such as stated income, lower than average FICO

10  scores, or non-owner occupied investment properties.

11      103.   In a February 11, 2007 email to Sambol, McMurray noted that the

12  production divisions continued to advocate for, and operated pursuant to, an approach

13  based upon the matching strategy alone, and repeated his concern that the strategy

14  would cause Countrywide's guidelines to be a composite of the riskiest underwriting

15  guidelines used by Countrywide's competitors.  Additionally, McMurray warned that,

16  "I doubt this approach would play well with regulators, investors, rating agencies etc.

17  To some, this approach might seem like we've simply ceded our risk standards and

18  balance sheet to whoever has the most liberal guidelines."

19      104.   Contrary to Defendants' public statements that Countrywide utilized

20  prudent underwriting and refused to sacrifice loan quality to compete for loan

21  quantity, Countrywide's matching strategy ensured its underwriting was both

22  aggressive and imprudent.

23          **4.      HELOCs and Warnings Regarding 100% Financing**

24      105.   HELOCs were second mortgage loans secured only by the difference

25  between the value of the home and the amount due on a first mortgage.  HELOCs sat

26  in the "first loss" position, meaning that if there is a default and foreclosure, the

27  HELOC lender receives proceeds from the sale of the underlying property only after

28  the first lien holder is paid in full.  As noted by *The Wall Street Journal* in December

---

COMPLAINT                        33

2007, HELOCs are "high-risk" loans that are "potentially worthless in a default because the first-lien holder gets first dibs on the home." Thus, even a relatively modest decline in home prices can have a devastating effect on the collateral securing HELOCs, resulting in the entire amount of the HELOC becoming unsecured.

106. Defendants knew that if home prices declined, the value of the collateral purportedly supporting the Company's HELOCs would disappear before the first-lien holder's collateral – leaving Countrywide with nothing to support its loans. The risk of issuing HELOCs was even greater when the first mortgage loan was granted with 100% financing. In such situations, even if there was no decline in real estate values, there was still no collateral backing the HELOC. The entire collateral, *i.e.*, the mortgaged property, was tied up for the benefit of the first lien holder. Because Countrywide's position in HELOCs was subservient to the first lien holder, Countrywide management knew that in selling these loans it was required to focus carefully on the creditworthiness of the borrower and have in place enhanced and careful underwriting policies to ensure that only the most creditworthy were offered this loan product.

107. "100% financing" refers to loans borrowers could obtain without making a down payment, *i.e.*, loans equal to the full purchase price of the home. "80/20 Programs" were also no-money-down loans and a type of 100% financing that enabled the borrower to avoid purchasing expensive private mortgage insurance (which was usually required when the loan was for more than 80% of the home price). The home buyer took out two loans, one for 80% of the purchase price, and a second, "piggyback" loan for the remaining 20% of the purchase price

108. The seriousness of Risk Management's warnings on guideline expansion and the consequences of Countrywide's failure to heed such warnings are vividly demonstrated by the Company's experience with "80/20" subprime loans. An 80/20 subprime loan is a loan where a borrower with a subprime FICO score simultaneously takes out two loans to purchase a home: a first lien loan (typically 80% of the

1  purchase price), and a second lien loan (typically 20% of the purchase price).  As a
2  result of having 100% financed the purchase, the borrower has no initial equity in the
3  home.  Pursuant to Risk Management's "Policy on High Risk Products," subprime
4  80/20 loans could not be originated via the exceptions process, and could only be
5  originated if Countrywide could totally extinguish the credit risks (*e.g.*, residual
6  interests or corporate guarantees) resulting from such loans.  But the production
7  divisions ignored the policy.

8      109.  Ultimately, Countrywide's HELOCs would perform horribly.
9  Unbeknownst to investors, among other things, over 70% of Countrywide's HELOCs
10  were done on a reduced documentation basis, a large percentage were given to
11  subprime borrowers with FICO scores of less than 660, and a large percentage of the
12  purportedly prime HELOCs had a high collateral to loan value.  Indeed, in the first
13  two quarters of 2007, 23% of Countrywide's HELOCs had a collateral to loan value
14  of 100% or more (*i.e.*, they were greater than 100% financing).

15      110.  Mozilo knew of the risks Countrywide incurred by originating subprime
16  80/20 loans and repeatedly questioned the wisdom of continuing to offer the product.
17  Mozilo became concerned about the loans in the first quarter of 2006, when HSBC, a
18  purchaser of Countrywide's 80/20 loans, began to contractually force Countrywide to
19  buy back certain of these loans that HSBC contended were defective.  On March 28,
20  2006, Mozilo sent an e-mail to Sambol and others, directing them to implement a
21  series of corrective measures to "avoid the errors of both judgment and protocol that
22  have led to the issues that we face today caused by the buybacks mandated by HSBC."
23  Mozilo further stated that the 100% loan-to-value (also known as 80/20) subprime
24  product is "the most dangerous product in existence and there can be nothing more
25  toxic and therefore requires that no deviation from guidelines be permitted
26  irrespective of the circumstances."

27      111.  Then, in an April 13, 2006 email, Mozilo informed Sambol, Sieracki, and
28  others that there were numerous issues that they must address relating to the 100%

---

COMPLAINT                                35

1   subprime second business in light of the losses associated with the HSBC buyback.
2   One issue in particular that Mozilo identified was the fact that the loans had been
3   originated "through our channels with disregard for process [and] compliance with
4   guidelines." Mozilo went on to write that he had "personally observed a serious lack
5   of compliance within our origination system as it relates to documentation and
6   generally a deterioration in the quality of loans originated versus the pricing of those
7   loan [sic]." Mozilo noted that, "[i]n my conversations with Sambol he calls the 100%
8   sub prime seconds as the 'milk' of the business. Frankly, I consider that product line
9   to be the poison of ours."

10      112.   Furthermore, in an April 7, 2006 email to Sambol concerning
11   Countrywide's subprime 80/20 loans, Mozilo stated that, "In all my years in the
12   business I have never seen a more toxic prduct [sic]. It's not only subordinated to the
13   first, but the first is subprime. In addition, the FICOs are below 600, below 500 and
14   some below 400[.] With real estate values coming down . . . the product will become
15   increasingly worse. There has [sic] to be major changes in this program, including
16   substantial increases in the minimum FICO. . . . Whether you consider the business
17   milk or not, I am prepared to go without milk irrespective of the consequences to our
18   production."

19      113.   Echoing Mozilo's criticisms of the 80/20 product, in April 2006 Risk
20   Management recommended increasing the minimum FICO score on the product by 20
21   points.   Sambol, then still the head of the production divisions, opposed this
22   recommendation, and noted that such an increase would make Countrywide
23   uncompetitive with subprime lenders such as New Century, Option One, and Argent.

24      114.   On December 7, 2006, Mozilo circulated a memorandum drafted for him
25   by McMurray to the Board of Directors and all Countrywide managing directors,
26   including Sambol and Sieracki. In the memorandum, Mozilo made the following
27   observations, among others:

28

- Countrywide had expanded its subprime underwriting guidelines in every conceivable area, lowering minimum FICOs, raising maximum loan size and LTV, and making interest only, stated income, and piggyback second loans available to subprime borrowers;

- Countrywide expected that subprime loans originated in 2006 (the "2006 Vintage") would be the worst performing on record, driven by wider guidelines and the worsening economic environment, which included rising interest rates and declining home values;

- the percentage of 60- and 90-day delinquencies in the 2006 Vintage (at 8.11% and 4.03% respectively), exceeded the percentages from each of the previous six years, and the Company expected these percentages to rise; and

- 62% of Countrywide's subprime originations in the second quarter of 2006 had a loan to value ratio of 100%.

115. In April 2006, Mozilo wrote that no premium, no matter how high, could justify underwriting a loan for a borrower whose FICO score was below 600. Yet Countrywide failed to disclose to investors the serious deficiencies in its underwriting of these "toxic" loans, and repeatedly misrepresented its prudent underwriting and refusal to make imprudent loans.

### 5.    Warnings Regarding Loan Exceptions

116. Mozilo, Sambol, and Sieracki were aware of significant lapses in Countrywide's underwriting processes and the resulting risk to Countrywide.

117. Countrywide produced a monthly report titled the "Credit Risk Leadership Reporting Package" which measured various metrics of Countrywide's loan originations, among them the number of loans originated pursuant to exceptions to Countrywide's underwriting policies. These reports were provided to numerous executives with Countrywide, including Sambol, on a regular basis.

118.   Similarly, Defendants received numerous specific warnings.  On May 22, 2005, McMurray warned Sambol of the likelihood of significantly higher default rates in loans made on an exception basis: "[t]he main issue is to make sure everyone's aware that we will see higher default rates."  McMurray explained that "exceptions are generally done at terms more aggressive than our guidelines," and continued that "[g]iven the expansion in guidelines and the growing likelihood that the real estate market will cool, this seems like an appropriate juncture to revisit our approach to exceptions."  McMurray also warned that increased defaults would cause repurchase and indemnification requests to rise and the performance of Countrywide-issued mortgage-backed securities ("MBS") to deteriorate.

119.   On June 28, 2005, the Corporate Credit Risk Committee, of which Sieracki was a member, received a presentation detailing, among other things, that in June 2005 exception loans greater than $650,000 were performing 2.8 times worse than similar loans underwritten within guidelines.

120.   The poor quality of the loans originated through the exception process became even more obvious in the first quarter of 2007.  In fact, in materials distributed at a March 12, 2007 meeting of the credit risk committee attended by Sambol and Sieracki, Risk Management reported that nearly 12% of the loans reviewed by Countrywide in an internal quality control process were rated "severely unsatisfactory" or "high risk."  The causes for such a rating included findings that such loans had debt-to-income, loan to value, or FICO scores outside of Countrywide's already wide underwriting guidelines.  By the second quarter of 2007, Risk Management began to report a serious deterioration in the performance of exception loans.

121.   These material deficiencies in Countrywide's underwriting were never disclosed to investors.  To the contrary, Defendants repeatedly misrepresented the Company's commitment to prudent underwriting and its strict enforcement of underwriting guidelines to produce quality loans.

1

### 6.    Warnings Regarding Pay Option ARMs

2        122.    Information regarding Countrywide's Pay Option ARMs was important

3    to Defendants and investors as Countrywide retained significant amounts of exposure

4    to these loans – over $33 billion of these loans were on Countrywide Bank's balance

5    sheet by the end of 2006.  Defendants repeatedly told investors these were high credit

6    quality assets, but Defendants knew throughout the Relevant Period that the vast

7    majority of these loans were "stated income" at high risk for fraud, and that a large

8    percentage of borrowers had chosen the Pay Option ARM not because of its flexibility

9    in repayment, but because the borrower could not afford the home purchase with any

10    other loan type.  Defendants received many warnings concerning the risks posed by

11    Pay Option ARMs, which warnings were directly contrary to Defendants' public

12    statements, but Defendants failed to disclose the true risks and warnings to investors.

13        123.    No later than February 2004, McMurray was warning Countrywide that

14    Pay Option ARM borrowers would suffer "payment shock" particularly in an

15    environment of rising interest rates and where home price appreciation was slowing.

16        124.    In June 2005, Risk Management warned senior executives, including

17    Sieracki, that action was needed to address the increasing pace of negative

18    amortization and the potential for payment shock associated with Pay Option ARMs.

19        125.    During the June 28, 2005 meeting of Countrywide's Corporate Credit

20    Risk Committee, attended by Sieracki, Countrywide's senior management discussed

21    the fact that borrowers were likely to see payment shock, with increases of payments

22    between 65-108% and that 60-70% of borrowers were paying only the minimum

23    payment on their Pay Option ARMs.  The amount of payment shock and the number

24    of borrowers only making the minimum payments increased in 2006.  Indeed,

25    according to a memorandum for the June 22, 2006 meeting of Countrywide's

26    Corporate Credit Risk Committee, borrowers would likely see payment shock of

27    113% to 157%.

28

COMPLAINT                            39

126.   No later than July 26, 2005, as expressed in an email to Sambol, Mozilo was concerned about the rate of negative amortization in the Pay Option ARM portfolio.   As Mozilo knew, high rates of negative amortization suggested the borrowers could not afford the full payments on the loan.  On April 4, 2006, Mozilo received an e-mail regarding Pay Option ARMs which informed him that "72% of [Pay Option ARMs] customers chose Minimum Payment selection in February 06, up from 60% in August 05."  In response to this information Mozilo sent an email to Sambol that reflected how well he understood the negative ramifications of the information for Countrywide, telling Sambol "***this is important data that could portend serious problems with this product.***"  Mozilo continued that "since over 70% have opted to make the lower payment it appears that is just a matter of time that we will be faced with much higher resets and therefore much higher delinquencies."

127.   By no later than May 2006, ***the bank internally recognized that 33% of the reduced documentation loan products, including Pay Option ARMs, held by Countrywide Bank – constituting tens of billions of dollars of exposure – were originated pursuant to income numbers that had been overstated by the borrower by at least 50%***.   These findings were summarized in a June 2, 2006 email sent to Sambol, which also attached a complete audit report.

128.   On May 18, 2006, Mozilo sent another email to Sambol and Sieracki again sounding the alarm about the Pay Option ARMs portfolio.  Stating that "the Bank faces potential unexpected losses because higher [interest] rates will cause the loans to reset much earlier than anticipated and as a result causing mortgagors to default due to the substantial increase in their payments," Mozilo directed the management team to reduce "balance sheet risk" by refinancing Pay Option ARMs into interest-only loans and improving consumer education about the consequences of resets.  Mozilo concluded his e-mail by stating that "there is much more that we can do to manage risk more carefully during this period of uncertainty both as to the rate environment and untested behavior of payoptions."  The next day, On May 19, 2006,

Mozilo sent another e-mail to Sambol and Sieracki, noting that Pay Option ARMs presented a long term problem "unless [interest] rates are reduced dramatically from this level and there are no indications, absent another terrorist attack, that this will happen."

129.   On June 1, 2006, one day after he gave a speech publicly praising Pay Option ARMs, Mozilo sent an e-mail to Sambol and other executives in which he expressed concern that the majority of the Pay Option ARMs were originated based upon stated income, and that there was evidence of borrowers misrepresenting their income.  Mozilo viewed stated income as a factor that increased credit risk and the risk of default.  In his e-mail, Mozilo reiterated his concern that in an environment of rising interest rates, resets were going to occur much sooner than scheduled, and because at least 20% of the Pay Option ARM borrowers had FICO scores less than 700, borrowers "are going to experience a payment shock which is going to be difficult if not impossible for them to manage."  Mozilo concluded that the Company needed to act quickly to address these issues because "[w]e know or can reliably predict what's going to happen in the next couple of years."   Mozilo directed Countrywide Bank to (1) stop accumulating loans with FICO scores below 680 unless the loan-to-value ratio was 75% or lower; (2) assess the risks that the Bank faced on loans with FICO scores below 700 and determine if they could be sold out of the Bank and replaced with higher quality loans; and (3) take a careful look at the reserves and "begin to assume the worst."

130.   Despite his concerns about the Pay Option ARMs on Countrywide's balance sheet, Mozilo and Countrywide continued to misrepresent to the market, among other things, that Countrywide's Pay Option ARMs were high credit quality products prudently underwritten to ensure performance by the borrowers.

131.   On July 10, 2006, Mozilo received an internal monthly report, called a "flash report," that tracked the delinquencies in the Pay Option ARM portfolio, as well as the percentage of borrowers electing to make the minimum payment and the

amount of accumulated negative amortization on each loan.  Mozilo learned that from September 2005 through June 2006, the percentage of Pay Option ARM borrowers choosing to make the minimum payment had nearly doubled, from 37% to 71%. Mozilo believed that these statistics were significant enough that he requested that the Company include a letter in bold type with every new Pay Option ARM loan to inform borrowers of the dangers of negative amortization and to encourage full payment.

132.   Indeed, on July 10, 2006, Mozilo wrote in an email "it appears to me that the loans (payoptions) with neg[ative] am[ortization] have a higher delinquency than our standard book of business.  If that is the case, ***this is quite alarming*** because of the very low payment requirements of a neg am loan."

133.   About a month later, on August 16, 2006, Mozilo received an e-mail from a fellow member of Countrywide's Board of Directors, asking whether the Company anticipated any significant problems with the Pay Option ARM portfolio. Mozilo responded by reiterating the ongoing concerns he had shared with senior management earlier in 2006.  By this point in time, over 75% of the Pay Option ARM borrowers were opting for the minimum payment, which, along with rising interest rates, continued to accelerate negative amortization.  Mozilo explained that, as a result, the loans would reset much faster than the borrowers expected with accompanying payment shock.  The only solution, Mozilo wrote, was to refinance the loans before reset, but this would be difficult in light of decreasing home values and rising interest rates.  Mozilo wrote that only "unlikely" events, such as a dramatic rise in home values or a dramatic drop in interest rates, would alleviate future payment shock.

134.   Mozilo met with Sambol the morning of September 25, 2006, to discuss the Pay Option ARM loan portfolio.  The next day Mozilo sent an e-mail to Sambol and Sieracki expressing even greater concern about the portfolio.  In that e-mail, Mozilo stated, "We have no way, with any reasonable certainty, to assess the real risk

of holding these loans on our balance sheet.  The only history we can look to is that of World Savings however their portfolio was fundamentally different than ours in that their focus was equity and our focus is fico.  In my judgement [sic], as a long time lender, I would always trade off fico for equity.  The bottom line is that we are flying blind on how these loans will perform in a stressed environment of higher unemployment, reduced values and slowing home sales."

135.   In his September 26, 2006 email Mozilo further stated that "pay options are currently mispriced in the secondary market, and that spread could disappear quickly if there is an foreseen [sic] headline event such as another lender getting into deep trouble with this product or because of negative investor occurance [sic]."  He urged that the "timing [wa]s right" to sell Countrywide Bank's portfolio of loans.  To mitigate these anticipated losses, Mozilo proposed that the Bank "sell all newly originated pay options and begin rolling off the bank balance sheet, in an orderly manner, pay options currently in their port[folio]."

136.   McMurray responded to Mozilo's September 26, 2006 email, agreeing that Countrywide "should be shedding rather than adding Pay Option risk to the portfolio."  In the fall of 2006, Countrywide's CIO went further, and recommended to Mozilo, Sambol, Sieracki, and others that all Pay Option ARMs be sold from Countrywide Bank because Countrywide was not receiving sufficient compensation on these loans to offset the risk of retaining them on its balance sheet.

137.   Mozilo remained uncomfortable with the risk presented by the Pay Option ARM.  Indeed, on January 29, 2007, Mozilo wrote an e-mail in which he instructed the president of Countrywide Bank to "to explore with KPMG the potential of selling out (one time transaction because of the tarred reputation of pay options) the bulk to the pay options on the Bank's balance sheet and replace them with HELOCS."  Then, on November 3, 2007, Mozilo instructed the president of the Bank and Sambol that he did not "want any more Pay Options originated for the Bank.  I also question whether we should touch this product going forward because of ***our inability to***

1  *properly underwrite these combined with the fact that these loans are inherently*
2  *unsound unless they are full doc, no more than 75% LTV and no piggys*."

3        138.   Ultimately, Countrywide's Pay Option ARMs were a substantial factor in
4  the Company's collapse because Countrywide had recklessly underwritten the loans
5  and made rampant imprudent lending decisions.  As Mozilo frankly admitted in an
6  email to Sambol on November 4, 2007, "Pay options have hurt the company and the
7  Bank badly. . . .  World Savings culture permits them to make these loans in a sound
8  manner and *our culture does not* . . . fico scores are no indication of how these loans
9  will perform."

10        139.   Despite repeated warnings that Countrywide's Pay Option ARMs had not
11  been properly underwritten and posed a tremendous risk to the Company as a result,
12  Defendants never disclosed the true risks associated with the Pay Option ARMs and
13  repeatedly misrepresented to investors the loans were high credit quality.

14        **7.    The Individual Defendants' Knowledge of and Failure
     to Disclose Increased Credit Risk**
15

16        140.   Both Sambol and Sieracki were members of the Countrywide Credit Risk
17  Committee.  The committee had quarterly meetings.  At these meetings, the members
18  were provided with detailed presentations highlighting Countrywide's increased credit
19  risk.  For example, at an April 6, 2005 meeting of the Credit Risk Committee attended
20  by Sambol, McMurray reported that (1) Countrywide non-conforming loans
21  originated in May 2002 were twice as likely to default as loans originated in January
22  2000; (2) the risk of home equity lines of credit defaulting had doubled over the past
23  year, mainly due to the prevalence of reduced documentation in those loans; and (3)
24  Countrywide was now a leader in the subprime market in four of six categories,
25  whereas in December 2004 Countrywide had only been a leader in two of six
26  categories.

27        141.   Similarly, Sieracki attended a June 28, 2005 meeting at which the COO
28  noted that Countrywide was taking on "too much" balance sheet risk in HELOCs and

subprime loans, and had taken on "unacceptable risk" from non-owner occupied loans made at 95% combined loan to value ratios, which were an exception to Countrywide's then-existing underwriting guidelines.  Risk Management also reported at that meeting that non-conforming loan programs accounted for 40% of Countrywide's loan originations and that subprime production had tripled, rising from 4% to 14% of total production.  Finally, at that same meeting, Risk Management reported to the committee on evidence of borrowers misrepresenting their income and occupation on reduced documentation loan applications, and the increasing credit risks associated with Pay Option ARM loans, for example, negative amortization, payment shock, and the necessity of raising the initial interest rate to reduce the speed of negative amortization on the loans.

142.   Sambol and Sieracki also learned of the risks associated with the Company's aggressive guideline expansion in meetings of other company committees. For example, Sieracki was a member of the Asset and Liability Committee, and Sambol attended certain of its meetings.  If a proposed guideline expansion had a modeled expected default rate in excess of 8%, the proposal had to be submitted to this committee for approval. All proposed expansions to Countrywide's subprime menu from late 2005 through 2006 presented an expected default rate in excess of 8% and required approval of that committee.  In June 2005, Sambol and McMurray engaged in a lengthy email exchange regarding the impact of Countrywide's underwriting guideline expansion related to requests for subprime product expansions that had been taken up by the asset and liability committee in the first and second quarters of 2005.  In that exchange, McMurray warned Sambol that "as a consequence of [Countrywide's] strategy to have the widest product line in the industry, we are clearly out on the 'frontier' in many areas." McMurray went on to note that the frontier had "high expected default rates and losses."

143.   Additionally, proposals with high expected defaults or that were otherwise controversial were referred to the Countrywide Responsible Conduct

Committee for approval.  Sambol was a member of this committee, which had repeatedly approved guideline expansions.  For instance, in late 2006 Countrywide's production divisions proposed expanding Countrywide's guidelines to match certain guidelines offered by Bear Stearns and Lehman Brothers, programs that were known within Countrywide as "Extreme Alt-A."  Risk Management was concerned about the risks associated with these guidelines, and referred the request to the responsible conduct committee.  Sambol, in his capacity as a member of that committee, approved the expansion.

144.   Both Mozilo and Sambol knew that a significant percentage of borrowers who were taking out stated income loans were engaged in mortgage fraud as a result of the findings presented at the April 24, 2006 meeting of the Credit Risk Management Committee of Countrywide Bank, the findings of which report was provided to Mozilo and Sambol.

145.   On June 1, 2006, Mozilo advised Sambol in an e-mail that he had become aware that the pay option ARM portfolio was largely underwritten on a reduced documentation basis and that there was evidence that borrowers were lying about their income in the application process.  On June 2, 2006, Sambol received an email reporting on the results of a quality control audit at Countrywide Bank that showed that 50% of the stated income loans audited by the Bank showed a variance in income from the borrowers' IRS filings of greater than 10%.  Of those, 69% had an income variance of greater than 50%.  These material facts were never disclosed to investors.

146.   Sambol and Sieracki also actively participated in decisions to exclude disclosures regarding Countrywide's widened underwriting guidelines in the periodic filings.  Throughout 2006, McMurray unsuccessfully lobbied to the financial reporting department that Countrywide disclose more information about its increasing credit risk, but these disclosures were not made.

147.   In January 2007, McMurray sent an email to Sieracki, which he subsequently incorporated by reference in his Management Discussion & Analysis

questionnaire, explaining that Countrywide's delinquencies would increase in the future due to a weakening real estate market and what McMurray characterized as credit guidelines that were "wider than they have ever been." On January 29, 2007 McMurray provided Sambol and others with an outline of where credit items impacted Countrywide's balance sheet. McMurray then forwarded the email to the financial reporting staff, and specifically requested that a version of the outline be included in the 2006 Form 10-K. The information was not included in the 2006 Form 10-K.

148.   In August 2007, McMurray exchanged a series of emails with the managing director of financial reporting suggesting revisions to the Form 10-Q for the second quarter of 2007. McMurray again specifically asked financial reporting to include information regarding widened underwriting guidelines in the prospective trends section of the Form 10-Q for the second quarter of 2007. In response, the managing director of financial reporting wrote back to McMurray, stating that he did not make McMurray's changes because he "expect[ed] those changes to be trumped by certain reviewers." One of those reviewers was Sambol.

149.   When McMurray's request that Countrywide disclose its widened underwriting guidelines was not included in the draft filing, he sent a "qualified" certification to the Company's Sarbanes-Oxley officer, along with an email articulating his concerns. That email was forwarded to the deputy CFO, who then spoke with McMurray about his concerns. She took his suggestions to Sieracki and Sambol, who directed her not to include them in the Form 10-Q.

150.   Despite McMurray's repeated requests, Countrywide never made any disclosures in its Forms 10-Q or 10-K for 2005, 2006, or 2007 about the unprecedented loosening of its underwriting guidelines or adequately disclosed the Company's increased exposure to credit risk resulting from its imprudent lending.

**E.   Countrywide Materially Misstated Its Financial Results**

151.   GAAP are the standards and conventions recognized and utilized by the accounting profession in preparing financial statements. The Financial Accounting

Standards Board ("FASB") is the designated organization for establishing standards of financial accounting governing the preparation of financial reports by nongovernmental entities. FASB standards are officially recognized as authoritative by the SEC and the American Institute of Certified Public Accountants ("AICPA").

152. Financial statements filed with the SEC that are not presented in conformity with GAAP are presumed to be misleading pursuant to SEC Regulation S-X, 17 C.F.R. §210.4-01(a)(1).

153. Throughout the Relevant Period, Countrywide issued materially false and misleading financial results. Countrywide violated GAAP by misrepresenting its allowances for loan losses ("ALL") on loans held for investment ("LHI"), valuation of RIs, valuation of MSRs, and accruals for breaches of representations and warranties ("R&Ws") in connection with loan securitizations. Defendants overstated Countrywide's earnings and the value of the assets on its balance sheet throughout the Relevant Period, misrepresented the Company's creditworthiness, and falsely misled investors as to the overall financial condition of the Company and its business operations.

154. Statement of Financial Accounting Standards No. 5, Accounting for Contingencies ("SFAS 5"), sets forth the standards of financial accounting and reporting for loss contingencies. SFAS 5 sets forth the standards Countrywide was required to adhere to in order to properly account for reserves for ALL and breaches in R&Ws.

155. Statement of Financial Accounting Standards No. 140, Accounting for Transfers and Servicing of Financial Assets and Extinguishment of Liabilities, ("SFAS 140") was issued in September 2000 by the FASB, and later amended by Statement of Financial Accounting Standards No. 156, Accounting for Servicing of Financial Assets ("SFAS 156"). The principles described in SFAS 140 set forth "the standards for accounting for securitizations and other transfers of financial assets and collateral." SFAS 140 sets forth the standards to properly assess the fair value for RIs

and MSRs.  Both RIs and MSRs are components of the revenue line item gain-on-sale.  SFAS 140, ¶11.4.

156.   The AICPA issues industry-specific Audit & Accounting Guides ("AAG"), including guides for Depository and Lending Institutions, that provide guidance in the preparation of financial statements in accordance with GAAP.  The AAG for Depository and Lending Institutions interpreted GAAP pronouncements on the proper methods to assess fair value for RIs and MSRs and accrue liabilities for ALL and R&Ws.

157.   The AICPA also issues Audit Risk Alerts ("ARAs") based, in part, on industry participation and feedback.  The ARAs address areas of concern and identify the significant business risks that may result in the material misstatement of financial statements.   According to the 2007 ARA, Lawrence R. Gee, Countrywide's "Technical Accountant" since 2006, made "essential contributions" to the development of the ARA for lending institutions, which are included in the AICPA's annual Audit and Accounting Manual ("AAM").

158.   According to the 2004 ARA, financial institutions emphasized subprime lending was beginning to show credit quality weakness.  AAM 8050.07. The ARA also stated that "[h]ome equity lending has tapered off and delinquencies are increasing.  The federal banking agencies noted that possibly half of U.S. family mortgages may be subprime, and delinquencies on subprime loans continue to rise."  AAM 8050.33.

159.   The 2005 ARA also emphasized significant risks confronting lending institutions, including the valuation of MSRs and RIs derived from ARMs.  The 2005 ARA noted that such assets were impaired given the combination of continued interest rate increases and a flooded MBSs market.  AAM 8050.10.

160.   According to the 2005 ARA, when the valuation of MBSs or MSRs represents a material component of an entity's financial statements, a robust

1   methodology must be in place to evaluate all of the critical variables in the pricing
2   model.  AAM 25 8050.11.

3       161.   The 2005 ARA also noted the findings of the Office of the Comptroller
4   of the Currency ("OCC"), which stated that financial institutions with significant
5   holdings of financial instruments such as MBSs "need to focus on the economic value
6   of their equity."  AAM 8050.14.

7       162.   The 2005 ARA further noted that "it is possible that financial institutions
8   may have extended credit to customers based upon inflated collateral values, perhaps
9   subjecting themselves to additional credit risk."  AAM 16 8050.22.

10      163.   According to SEC Staff Accounting Bulletin No. 102, Selected Loan
11  Loss Allowance Methodology and Documentation Issues ("SAB 102"), "[i]t is critical
12  that loan loss allowance methodologies incorporate management's current judgments
13  about the credit quality of the loan portfolio through a disciplined and consistently
14  applied process. . . .  A registrant's loan loss allowance methodology generally should
15  . . . [c]onsider the particular risks inherent in different kinds of lending . . . [and]
16  [c]onsider current collateral values."

17      164.   According to the 2006 ARA, many of the same significant risks faced by
18  mortgage lenders in 2005 remained.

19      165.   In 2007, the AAG provided fraud risk factors applicable to mortgage
20  lenders, including:

21          (a)   Significant volatility in financial markets where the institution is
22  exposed to loss of revenue,

23          (b)   Deteriorating economic conditions (for example, real estate prices)
24  within industries or geographic regions in which the institution has significant credit
25  concentrations, and

26          (c)   Decline in asset quality due to borrowers affected by recessionary
27  declines.

28      AAG Ch. 5, Ex. 5-1.

## 1. Inadequate Allowances for Loan Losses

166. Countrywide's ALL represented the reasonably likely loss on loans held for investment. In order for Countrywide to increase ALL, it would have needed to take additional provisions for anticipated loan losses.

167. GAAP requires that provisions for loan losses reduce pre-tax earnings on a dollar-for-dollar basis.

168. With respect to the GAAP requirements, SFAS 5 (¶8) states:

An estimated loss from a loss contingency . . . shall be accrued by a charge to income if *both* of the following conditions are met:

a. Information available prior to issuance of the financial statements indicates that it is probable that an asset had been impaired or a liability had been incurred at the date of the financial statements. It is implicit in this condition that it must be probable that one or more future events will occur confirming the fact of the loss.

b. The amount of loss can be reasonably estimated.

169. Additionally, the SEC provided guidance on accounting for loan losses that Countrywide should have followed, but did not. For instance, SAB 102 states: "It is critical that loan loss allowance methodologies incorporate management's current judgments about the credit quality of the loan portfolio through a disciplined and consistently applied process. . . . A registrant's loan loss allowance methodology generally should . . . [c]onsider all known relevant internal and external factors that may affect loan collectibility . . . [and] [b]e based on current and reliable data[.]"

170. SAB 102 also states: "Factors that should be considered in developing loss measurements include . . . [l]evels of and trends in delinquencies and impaired loans . . . [and] [e]ffects of any changes in risk selection and underwriting standards, and other changes in lending policies, procedures, and practices." The SEC further stated in SAB 102 that "[f]or many entities engaged in lending activities, the allowance and provision for loan losses are significant elements of the financial

statements.  Therefore, the staff believes it is appropriate for an entity's management to review, on a periodic basis, its methodology for determining its allowance for loan losses."

171.   The AAG also provided guidance on ALL, noting that "[c]hanges in facts, circumstances or institution's procedures may cause factors different from those considered in the past to become significant to the estimate of the allowance at the balance sheet date."  AAG Ch. 9.

172.   The AAG specifically stated that according to SFAS 5 "a loan would be impaired at origination . . . if a faulty credit granting decision has been made or loan credit review procedures are inadequate or overly aggressive, in which case, the loss should be recognized at the date of the loan origination."

173.   During the Relevant Period, Countrywide's ALL did not increase in appropriate relation to the amounts of credit risk the Company assumed.   As Countrywide was unable to securitize many of its high-risk loans, and continued to hold them in its portfolio, the Company failed to appropriately account for the new level of risk by increasing its ALL and adjusting its historical rate of default to include the Company's increased risk.

174.   On July 24, 2007, Countrywide reported an increase in loan loss provisions of $293 million for the second quarter of 2007.  On October 27, 2007, Countrywide announced a further provision for loan losses of $934 million for the third quarter 2007.  Nearly 24% of the Company's subprime loans were delinquent, up from 20.15% in the second quarter of 2007 and 16.93% in the third quarter of 2006.  As stated in the Company's press release, the increase in loan loss provisions was "primarily relate[d] to additional reserves provided for the Company's junior lien home equity [HELOCs] and pay option loans in the Banking Operations HFI [held for investment] portfolio."

**2.    Overvalued Retained Interests from Securitizations**

175.   As a result of the Company's increased credit risk and failure to adhere to its own underwriting guidelines, Countrywide overstated the fair value of its RIs from securitizations. As a result, Countrywide also falsely and materially inflated its assets, stockholders' equity, gain-on-sale, revenues and net income.

176.   SFAS 140, ¶59 states: "If the retained interests are subordinated to more senior interests held by others, that subordination may concentrate into the retained interests most of the risks inherent in the transferred assets and shall be taken into consideration in estimating the fair value of the retained interests."

177.   As alleged, given that a substantial portion of the underlying loans in the securitizations were not originated in accordance with the Company's underwriting standards, there was an increased risk that these loans would become delinquent and default.  The Company failed to appropriately include in its assumptions for both weighted average life and net credit losses on RIs the increased likelihood that these loans would become delinquent and default.

178.   The impact of Countrywide's improper accounting was evidenced by Countrywide's recorded writedowns to RI of $2.4 billion during 2007.

**3.    Overvalued Mortgage Servicing Rights**

179.   Throughout the Relevant Period, Countrywide overstated the fair value of its MSRs as a result of its lax underwriting standards.   As a result, Defendants falsely and materially inflated Countrywide's assets, gain-on-sale and reported net income.

180.   Countrywide failed to properly assign an appropriate fair value when it initially recorded MSRs, and it did not do so when it subsequently valued MSRs in accordance with SFAS 140 and SFAS 156.  This practice was in violation of GAAP and also caused Countrywide to improperly inflate its reported gain-on-sale and net income.

181.   GAAP mandate that MSRs be continually evaluated to determine whether their valuation should change, including whether or not costs expected to be

incurred cause MSRs to become a servicing liability rather than an asset.  SFAS 140, ¶62.  If the costs of servicing poor quality loans increase to a high enough level, they will offset the expected income to be derived from those MSRs.

182.  As loans fell into delinquency, Countrywide should have anticipated those incrementally higher costs and factored them into the valuation of MSRs. Instead, Countrywide inappropriately maintained its historical approach to establishing the value of these assets while making riskier loans upon which it retained MSRs.

183.  The reported gross balance of MSRs rose from $9.8 billion as of December 31, 2004 to $13.0 billion as of December 31, 2005.  Despite the continued significant increase in credit risk assumed by Countrywide during that year, the valuation allowance for impairment of MSRs actually decreased from $1.1 billion to only $0.4 billion.

184.  Likewise, in 2006, Countrywide adopted SFAS 156 and was dependent upon the fair value assumptions employed by management.  During 2006, despite the significant increase in the level of credit risk that by then had been accumulated by Countrywide, the Company's reported balance of MSRs reflected a $432 million increase in fair value solely derived from modified assumptions applied in its pricing model relating to SFAS 156.   However, 2002 to 2006, Countrywide did not significantly modify the fair value assumptions used in its model.  The Company thus failed to incorporate the increased credit risk of its lending strategies implemented in 2003, and the steady loosening of underwriting standards and due diligence practices thereafter, or failed to do so appropriately. Countrywide should have decreased the weighted average life of its MSRs in order to address the rising risk of default.

185.  Countrywide first wrote down the fair value of its MSRs in its third quarter 2007 Form 10-Q.  In that quarter, Countrywide recorded a reduction of $1.1 billion in the fair value of the MSRs due solely to a change in model assumptions. Nevertheless, there does not appear to have been any meaningful change to the key

fair value assumptions in the model disclosed by Countrywide to explain this change, strongly indicating an understanding that its model was inadequate, but a refusal to acknowledge its prior improper valuations.

**4.    Failure to Properly Reserve for Representations and Warranties**

186.   Countrywide did not properly accrue liabilities for breaches of representations and warranties throughout the Relevant Period.   As a result, Countrywide materially understated its liabilities and overstated its gain-on-sale revenues, and net income.

187.   Countrywide made R&Ws in connection with the sale of its mortgage loans to the secondary market through securitizations.   The accrual of loss contingencies for R&Ws is based upon the rate of expected future claims from investors resulting from breaches of the Company's corporate guarantees and mortgage loan R&Ws.   Countrywide's R&Ws with respect to the mortgage loans it sold included guarantees concerning the loans compliance with applicable loan criteria, such as loan to value ratio limits, level of origination documentation required, credit scores, debt to income ratios, delinquency rates, the Company's written underwriting policies, and compliance with applicable laws.

188.   Countrywide understated its loss accrual for R&Ws because it ignored the high risk and poor quality of its underlying loans and its deteriorated underwriting practices.   As a result, the Company and Officer Defendants violated GAAP. Specifically, SFAS No. 5, Accounting for Contingencies, required that Countrywide record a reserve for a future loss associated with a breach of its representations and warranties that was probable and estimable.

189.   In the context of lending, SFAS No. 5 requires consideration of underwriting, and provides that a loan may even be impaired at origination "if a faulty credit granting decision has been made or loan credit review procedures are

1  inadequate or overly aggressive, in which case, the loss should be recognized at the
2  date of loan origination." *See* AAG 9.36.

3      190.    Further, SFAS 140 and Emerging Issues Task Force No. 92-2, Measuring
4  Loss Accruals by Transferors for Transfers of Receivables with Recourse ("EITF 92-
5  2"), states that the reserve should be estimated based upon certain factors, including
6  the Company's historical repurchase experience, industry repurchase experience,
7  expected future volume of repurchases, and expected value of underlying collateral.

8      191.    Utilizing proper risk assumptions, Countrywide's lax underwriting
9  standards and the resulting increased delinquencies would have resulted in
10  proportionally increased reserves for breaches of R&Ws throughout the Relevant
11  Period.  However, not until the third quarter of 2007 was Countrywide forced to admit
12  that the amount of its reserves for R&W had been wrong.  At that time, the Company
13  increased its allowance for R&Ws by $291.5 million, from the $41.0 million reported
14  12 months earlier.  The Company reported that $177.3 million of this increased
15  allowance related to prime loans and $67.1 million related to the nonprime loans,
16  demonstrating the true extent of the Company's exposure to losses in its purported
17  prime loan portfolio as a result its improper practices.  As a result, the Officer
18  Defendants caused Countrywide to violate GAAP by, among other things,
19  understating its liabilities and overstating its reported net income and the value of the
20  assets.

21      **F.    KPMG Failed to Properly Audit Countrywide**

22      192.    Countrywide's audited financial statements for 2004, 2005, and 2006,
23  violated GAAP because they misrepresented and failed to disclose that the Company
24  improperly assessed fair value for its RI and MSRs, improperly accrued from its
25  breaches in R&W, and had materially understated its ALL.  By conducting audits of
26  Countrywide's financial statements and issuing unqualified audit opinions, KPMG
27  violated Generally Accepted Auditing Standards ("GAAS") and acted with deliberate
28  recklessness, or, in the alternative, with negligence.  KPMG had no reasonable basis

1    to issue its audit opinions with respect to Countrywide's internal financial controls.

2    Through its audits, KPMG readily should have uncovered evidence of the Company's

3    failures to comply with GAAP.  KPMG's failure to do so constituted an extreme

4    departure from accepted and binding standards of care as defined by GAAS, or, in the

5    alternative, negligence.  Absent deliberate recklessness or, alternatively, negligence,

6    KPMG could not have issued Countrywide's clean audit opinions.

7        193.  "Red flags" are fraud risk factors that indicate a high risk of material

8    misstatement.  Red flags come to the attention of the auditor through its testing

9    required under GAAS, and place a reasonable auditor on notice that the audited

10    company could potentially be engaged in wrongdoing.  The $570.3 million increase in

11    negative amortization between fiscal year 2005 and fiscal year 2006 is a significant

12    red flag.  So are the increased delinquencies on HELOCs and Pay-Option ARMs in

13    fiscal year 2006.  KPMG either failed to properly inquire further into such red flags or

14    ignored them outright.

15        194.  KPMG, in particular, was required to be familiar with the many risk

16    factors Countrywide faced in the proper presentation of its financial statements.  Risk

17    factors identify areas of an audit that have an increased level of risk, and may present

18    areas of the audit that require additional testing.  The auditor should especially be

19    attuned to these areas of increased risk when performing its duties in accordance to

20    GAAS.  During the Relevant Period, KPMG failed to appropriately consider or simply

21    ignored relevant risk factors, including those related to deficiencies in the Company's

22    internal controls, in auditing Countrywide's financial statements.

23            **1.    The 2004 Audit**

24        195.  During its audit of Countrywide in 2004, had KPMG in fact complied

25    with GAAS, KPMG would have uncovered various red flags that should have

26    prompted the auditors to either test further or require management to adjust the

27    Company's financial statements so they would be presented free of material

28    misstatements.

196.   In 2004, compliance with AU 311 would have led KPMG to learn that Countrywide had publicly announced and implemented a very aggressive firm-wide goal of capturing 30% residential mortgage market share by 2008.   This stated objective not only increased the degree of credit risk that Countrywide was likely to assume as a whole, but it also increased the risk that Countrywide would compromise its lending standards in the face of increased competition to reach this position.  AAM 8050.12.

197.   In accordance with AU 319, KPMG's testing of Countrywide's internal controls should have included a review of Countrywide's underwriting guidelines, such as those set forth in its underwriting matrices, and the trending of underwriting practices as shown in those matrices.  KPMG should have also tested the operating effectiveness of internal controls over financial information, including whether management was approving and granting loans in accordance with its written underwriting standards.  These routine tests would have enabled KPMG to understand the procedures by which transaction were processed, if the transactions were being processed in accordance with the Company's policies, and if there were any change from the prior year.  The analysis would have alerted KPMG to another red flag, that Countrywide was systematically loosening its underwriting practices, beginning at the end of 2003 and continuing throughout 2004, and that the Company was granting loans to borrowers who did not qualify even under the Company's loosened underwriting standards.  Specifically, AAG Ch. 5 observes that "[e]xcessive extension of credit standards" is a fraud risk factor.

198.   Testing of Countrywide's internal controls, in accordance with AU 319 and AU 316, also required a detailed testing of the Company's loan files.   For example, KPMG should have tested whether Countrywide's loans were being approved in accordance with the Company's written lending policies, whether credit investigations were being performed, whether credit limits were adhered to, whether Countrywide's procedure for capturing all required loan documentation was

1   functioning, and whether the information recorded in Countrywide's data processing
2   system and used for management reporting was being tested by personnel independent
3   of the preparer and was accurate.

4       199.   As part of KPMG's review of Countrywide's loan files and internal
5   controls, KPMG should have reviewed Countrywide's internal reports generated by
6   Countrywide's Quality Control Department.  As Countrywide stated in its Form 10-K
7   filings, the Company employed an "extensive post funding quality control process"
8   and the Quality Control Department was "responsible for completing comprehensive
9   loan audits that consist of a re-verification of loan documentation, an in depth
10   underwriting and appraisal review, and if necessary, a fraud investigation" so the
11   Company could "evaluate and measure adherence to prescribed underwriting
12   guidelines and compliance to laws and regulations to ensure that current loan
13   production represents acceptable credit risk."   Countrywide's Quality Control
14   Department documented rampant deviations from Countrywide's underwriting
15   guidelines and the existence of extensive fraud within the Company's loans, and/or
16   the Quality Control failed to establish proper procedures for testing and reporting the
17   Company's compliance with underwriting guidelines as it was required to do.

18       200.   Had KPMG properly reviewed Countrywide's loan files, KPMG would
19   have discovered that Countrywide routinely originated high-risk loans to borrowers
20   with the weakest credit.   Additionally, KPMG would have discovered that
21   Countrywide was not performing appropriate levels of due diligence on such loans.
22   Through its testing of Countrywide's loan files, KPMG would have learned that
23   Countrywide classified loans that were subprime loans as "prime" loans.  KPMG also
24   would have seen that loans were being granted without verification of borrower
25   income, employment, or net worth, and that loans were being granted with appraisals
26   and other important documents missing from the loan files. These facts should have
27   raised a red flag for KPMG in conjunction with the ARA  given that they revealed a
28   pattern of the management's override of its own internal controls, which, as noted

above, was a pervasive fraud risk.  AU 316.08; AU 319.22.  Moreover, the failure to appropriately document these loans should have raised serious concerns about whether borrowers could re-pay their loans and whether the value of the underlying collateral was sufficient.  AU 328; AAG Ch. 9.

201.   KPMG should have tested management's key assumptions for calculating ALL.  Had KPMG performed such a test, KPMG would have determined that Countrywide was using an unreliable model for calculating ALL based upon historical results, one that failed to account for the changes Countrywide had implemented as to its lending practices.

202.   Had KPMG properly assessed the red flags above KPMG would have determined that Countrywide was in fact originating loans based on faulty credit granting decisions and that the Company's lack of loan credit review procedures were widespread.  Therefore, many of its loans should have been considered impaired at origination pursuant to AAG Ch. 9 and, as a result, ALL was materially understated.

203.   KPMG showed a similar failure to exercise professional skepticism related to Countrywide's reported valuation of MSR and RI.  The historical rate of default was a key assumption Countrywide used to calculate MSR and RI.  Had KPMG properly assessed Countrywide's accounting estimates, it would have made a determination that management did not adjust the historical rate to factor in the increased risk that the Company was assuming through its aggressive production of nonconforming loans, loosening underwriting practices, and increased credit risk.

### 2.   The 2005 Audit

204.   In 2005, KPMG would have seen the same red flags that were apparent in 2004, and would have been required, in the face of those red flags, to perform the same procedures it was required to perform in 2004.

205.   As in 2004, KPMG's review of Countrywide's underwriting matrices pursuant to AU 319 would have alerted KPMG to another red flag, that loosening of

underwriting guidelines continued in 2005, so that even less creditworthy borrowers were obtaining loans.

206.   In 2005, KPMG's detailed testing of the Company's loan files would have provided evidence similar to the evidence that would have been found in 2004. In addition, such testing would have provided evidence that Countrywide was issuing increasing numbers of Pay Option ARMs to less creditworthy borrowers, without proper documentation of income or assets or adequate appraisals.

207.   Through its detailed loan testing in accordance with AU 319, KPMG also should have determined whether appraisals were included in Countrywide's files and were supportive of a reasonable collateral value. This analysis should have been conducted on an ongoing basis.  AU 328.  Specifically, "an inspection of loan documentation should include tests of the adequacy of both the current value of collateral in relation to the outstanding loan balance and, if needed, insurance coverage on the loan collateral."  AAG Ch. 8.  This red flag should have alerted KPMG that Countrywide might be exposed to increased credit risk and as a result, the financial statements were at a high risk of material misstatement.

208.   As a result of the red flags listed above, KPMG was required to perform additional testing of its loans to determine if delinquencies were rising in high risk loans. AU 316, 326, 329; AAG Chs. 5 and 9.

209.   As in 2004, the risk factors highlighted above, in conjunction with the red flags that should have become apparent, required KPMG to approach its audit of Countrywide with increased skepticism.  Accordingly, KPMG should have performed tests similar to those it should have performed in 2004.

210.   By the end of 2005, the prime rate of interest increased to 7.15% from 5.15% at the end of 2004.  This external economic factor posed a risk that KPMG should have considered as to the difficulty that borrowers would face in refinancing their ARM loans, which would raise the potential for increasing the rate of default,

1    thus affecting the accounting estimates necessarily underlying Countrywide's ALL

2    and R&W and its valuation of MSRs and RI.

3        211.   Despite the significant increase in credit risk assumed by Countrywide,

4    the valuation allowance for impairment of Countrywide's MSR dropped from 11% to

5    only 3% of gross MSR. KPMG should have determined that the valuation allowance

6    was inadequate in light of the rising credit risk and that the Officer Defendants failed

7    to incorporate expected increasing operating costs to service these loans.  AU 230,

8    316, 328, and 342; and AAG Chs. 9 and 10.

9        212.   With respect to the valuation of RIs, by performing tests such as it had

10   been required to perform in 2004, KPMG would have learned that the net lifetime

11   credit losses rate dropped 15%, from 2.0% in 2004 to 1.7% in 2005.  Once again, this

12   was a red flag to KPMG that management's assumptions were incorrect because as

13   delinquencies and credit risk increased, net credit losses should have also increased

14   accordingly.

15       213.  If, in 2005, KPMG had properly performed the procedures set forth

16   above, KPMG would have determined that a "clean opinion" on Countrywide's

17   financial statements would have been false and misleading.  Thus, KPMG acted with

18   deliberate recklessness, or, in the alternative, with negligence, in conducting its 2005

19   audit of Countrywide's financial statements and failed to conduct its audit in

20   accordance with GAAS.

21                    **3.    The 2006 Audit**

22       214.   In 2006, all of the risk factors that were present in 2004 and 2005 were

23   equally relevant.  In 2006, the risk of the "housing bubble effects" was noted in AAM

24   8050.37.

25       215.   In 2006, KPMG should have been aware of the same fraud risk factors

26   and risks of material misstatements that were relevant in 2004 and 2005, as set forth

27   above.

28

216.   In 2006, KPMG should have seen the same red flags as were present in 2005, and would have been required, in the face of those red flags, to perform the same procedures it was required to perform in 2005.

217.   As in 2004 and 2005, KPMG's review of Countrywide's underwriting matrices pursuant to AU 319 would have alerted KPMG to another red flag, that Countrywide's loosening of underwriting guidelines continued in 2006 so that even less creditworthy borrowers were obtaining loans.

218.   In accordance with AU 319 and AU 316, KPMG should have tested the Company's loan files.  This testing would have revealed, among many other facts, that Countrywide was continuing to issue Pay Option ARMs and other higher risk loan products to less creditworthy borrowers without proper documentation of income or assets, as negative amortization amounts were growing.  In accordance with AAG Ch. 9 and AAM 8050.17, and after reviewing Countrywide's loan files, KPMG should have found that Countrywide's loans were once again not being approved in accordance with its underwriting practices and that evidence supporting collateral such as appraisals was inadequate, as illustrated above.

219.   In performing its 2006 analytical review procedures, KPMG again should have examined the volume of loans produced by type as a percentage of all loans produced to measure the composition of the loan portfolio relative to the lending strategy.  AAG Ch. 5.  In doing so, KPMG would have learned that approximately 54% of loans originated by Countrywide in 2006 were nonconforming loans.  This was a continued red flag to KPMG that Countrywide was aggressively originating high-risk loans.  AU 328 and 342; AAG Chs. 9 and 10.

220.   The risk factors described above in conjunction with the red flags required KPMG to approach its 2006 audit of Countrywide with increased skepticism.  KPMG would then have learned that Countrywide's ALL as a percentage of loans held for investment stayed essentially flat as compared to 2005.  This static reserve rate was one of a multitude of fraud risks exhibited by Countrywide throughout the

years 2004, 2005 and 2006. AAG Ch. 5, Ex. 5-1 ("Rapid growth or unusual profitability, especially compared to that of other peer financial institutions; for example unusually large growth in the loan portfolio without a commensurate increase in the size of the [ALL].")

221. KPMG also failed to exercise professional skepticism in evaluating management's assumptions for purposes of its fair value measurements related to RI. Countrywide's increase of its expectation of net lifetime credit loss from 1.7% to 2.6% in 2006 did not reasonably capture total credit-related losses expected as of that time due to the continuing increase in riskier loans and given that this rate continued to be based upon the historical performance of Countrywide's loans. KPMG should have been aware that management was using an incorrect assumption to calculate its RI, because the historical performance of Countrywide's loans was not a reliable indicator of future performance. As alleged, KPMG knew that in 2006 many relevant delinquency trends indicated that credit risk was increasing and Countrywide was unlikely to be able to avoid significant credit losses, particularly on the most subordinated of equity interests in its securitizations.

222. KPMG acted with deliberate recklessness, or, in the alternative, with negligence, in conducting its 2006 audit of Countrywide's financial statements and failed to conduct its audit in accordance with GAAS. In 2006, if KPMG had properly performed the procedures set forth above, it would have determined that a "clean opinion" on Countrywide's financial statements would have been false and misleading.

### G.   The Individual Defendants' Massive Insider Sales

223. Between 2004 and the end of 2007, the Individual Defendants sold over $550 million of their stock holdings. The chart below summarizes the sale of significant amounts of Countrywide common stock by the Individual Defendants:

| Defendant | Date of Sales | Shares Sold | Proceeds |
|-----------|---------------|-------------|----------|
| Mozilo | 5/5/04 – 10/12/07 | 12,874,835 | $474,491,038.25 |
| Sambol | 1/2/04 – 7/19/07 | 1,617,400 | $69,878,744.13 |
| Sieracki | 2/2/04 | 88,143 | $7,496,562.15 |
| **TOTALS** | | **14,580,378** | **$551,866,344.53** |

**H.    Countrywide's Collapse: Countrywide's Undisclosed Risky Lending Practices Cause the Company to Suffer a Liquidity Crisis and Its Stock to Collapse**

224.   Defendants knew that Countrywide's business model, like that of any mortgage lender, depended upon the Company originating loans in which a high percentage of borrowers repaid their loans.

225.   Countrywide's high-risk lending posed a profound, undisclosed threat to the Company's sources of funding.  Countrywide's high-risk loans threatened to destroy Countrywide's creditworthiness, and thus its ability to obtain the liquidity it needed, whether by selling debt instruments, selling mortgages that it originated, borrowing, or otherwise.

226.   Countrywide was dependent upon external financing sources, including being able to sell its loans to the secondary mortgage market, in order to finance the Company's loan originations.  Defendants knew that if Countrywide originated low-credit quality loans that did not perform, there was a high likelihood Countrywide would be shut out of the secondary mortgage market.  Without access to external financing, such as the secondary mortgage market, Defendants knew Countrywide would likely be unable to fund its business operations and would suffer a liquidity crisis.  Indeed, Countrywide repeatedly stated in its Form 10-Ks filed with the SEC:

> We rely substantially on the secondary mortgage market as a source of long-term capital to support our mortgage banking operations. Nearly all mortgage loans that we produce are sold in the secondary

1    mortgage market, primarily in the form of Mortgage-Backed Securities
2    ("MBS") and asset-backed securities.

3         We ensure our ongoing access to the secondary mortgage market
4    by consistently producing quality mortgages and servicing those
5    mortgages at levels that meet or exceed secondary mortgage market
6    standards.  As described elsewhere in this document, we have a major
7    focus on ensuring the quality of our mortgage loan production and we
8    make significant investments in personnel and technology in this regard.

9    227.   Beginning no later than July 16, 2007, investors and the public generally
10 began to learn (and further scrutinize) the true quality of Countrywide's loans.  On
11 July 16, 2007, Countrywide issued a press release and filed a Form 8-K with the SEC
12 revealing to the market that "delinquencies and defaults continue to rise."
13 Foreclosures had more than doubled from June 2006, causing the credit rating agency
14 Standard & Poor's to comment: "It's definitely a worrying trend."

15    228.   On July 24, 2007, Countrywide again disclosed "delinquencies and
16 defaults continued to rise across all mortgage product categories" and, as a result, "the
17 Company increased credit-related costs in the quarter, primarily related to its
18 investments in prime home equity loans."  Further, Defendants partially revealed that
19 Countrywide had substantially loosened its underwriting guidelines.

20    229.   As more news about Countrywide's true loan quality reached investors,
21 and the Company's true lending practices were partially revealed, Countrywide's
22 funding sources became increasingly concerned about the quality of the Company's
23 loans and whether the Company would be swamped under a tidal wave of bad debt.
24 Investors also became increasingly concerned that the Company's poor-credit quality
25 loans would cause the Company to be shut out of the financing markets.  Defendants,
26 however, repeatedly but falsely assured investors the Company had adequate liquidity
27 and downplayed the risks of bankruptcy – and failed to disclose the Company had in
28 fact suffered an inability to raise financing through its usual sources.

COMPLAINT               66

230. From August 1, 2007, through August 3, 2007, investors became increasingly concerned about Countrywide's liquidity in light of Countrywide's growing defaults and delinquencies. Indeed, on August 1, 2007, the annual cost of protecting $10 million of Countrywide bonds against possible default for five years was $172,000, but increased to $213,000 on August 2, 2007, and $328,000 on August 3, 2007. The concealed risks associated with Countrywide abandoning sound underwriting practices were materializing in the form of a heightened likelihood of being shut out of financing from the secondary market and not having access to capital – and ultimately bankruptcy.

231. After the stock market closed on August 9, 2007, Countrywide filed with the SEC the Company's Form 10-Q noting the Company was concerned about its ability to access credit to finance its operations.

232. On the heels of the August 9, 2007 Form 10-Q, on August 13, 2007 and August 15, 2007, Merrill Lynch issued an analyst report indicating that Countrywide, because of its liquidity problems, could go bankrupt.

233. Then, on August 16, 2007, Countrywide announced that it drew its entire $11.5 billion credit facility to "supplement" its cash position and all three major credit rating agencies issued downgrades with regard to Countrywide securities.

234. Throughout August 2007, and afterwards, Defendants repeatedly assured investors that Countrywide had ample access to financing to fund its ongoing operations. In truth, but which would not be disclosed until November 26, 2007, beginning in August 2007 Countrywide was increasingly unable to raise financing in the private market (on terms that would support its business model) because of the Company's growing delinquency and default rates. As *The Wall Street Journal* reported on November 26, 2007, Countrywide had become dependent upon quasi-governmental aid to stay afloat and had borrowed $51.1 billion from Federal Home Loan Bank in Atlanta from mid-August 2007 through September 30, 2007. According

to *The Wall Street Journal*, Countrywide had been unable to raise private financing due to "investors' fears over default risk."

235.  On September 11, 2007, media reports revealed "Countrywide is in desperate need of cash right now to continue funding mortgages and the credit markets are still largely closed to them."

236.  On October 26, 2007, Countrywide reported a quarterly loss of $1.2 billion, or $2.85 per share.  The Company reported a $1 billion write-down of its loans and MBSs and an increase in loan loss provisions to $934 million.

237.  During the period from November 15, 2007 through November 21, 2007, speculation that Countrywide would have to file for bankruptcy substantially increased.

238.  Investor concerns about Countrywide's liquidity and potential for filing for bankruptcy grew so significant that Countrywide stock dropped to $8.21 (a decline of 20%) in intra-day trading on November 20, 2007.  Countrywide issued a false and misleading statement denying it was facing bankruptcy, which propped up the stock and Countrywide shares rebounded to only decline by 2.7%, closing at $10.28.

239.  Despite Countrywide's reassurances, Countrywide shares continued to drop on November 21, 2007, as investors weighed the likelihood of whether Countrywide would file for bankruptcy.

240.  Countrywide's mountain of bad loans, originated pursuant to Defendants' undisclosed abandonment of sound underwriting practices, proved to be Countrywide's undoing.  The Company's bad loans caused Countrywide to be shut out of the private financing market.  Further, Countrywide was being forced to make increasingly large provisions for credit losses and write-downs of its assets. Ostensibly, Countrywide could be sold for, at least, its book value.  But Countrywide had falsified its reported book value.  Ultimately, on January 11, 2008, Countrywide was forced to sell itself to Bank of America for $7.16 per share – which was a small

fraction of Countrywide's book value of $22 per share (based on the Company's publicly reported financial statements).

241.   Countrywide's lending practices continue to plague Bank of America, which acquired the Company and its problems.  The number of delinquencies and defaults keeps growing, providing further evidence that Defendants abandoned sound underwriting practices and employed accounting fraud.  For example, as William K. Black and L. Randall Wray  (both professor of economics at the University of Missouri, Kansas City) wrote for the *Huffington Post* on November 4, 2010:

> [The] data suggest that the delinquency/foreclosure rate for Countrywide-originated mortgages must have been well over 20 percent – over ten times the normal delinquency rate and four times the traditional rule of thumb for fatal losses.  These exceptionally large rates of horrible loans, defaulting so quickly after origination, are a powerful indicator that Countrywide was engaged in accounting control fraud.

## V.   DEFENDANTS' FALSE AND MISLEADING STATEMENTS

### A.   Plaintiffs' Reliance Upon Defendants' Statements

242.   The false and misleading statements set forth herein were widely disseminated to the securities markets, investment analysts, and to the investing public.  Those statements caused and maintained the artificial inflation of the price of Countrywide common stock, which consequently traded at prices in excess of its true value.

243.   Plaintiffs are entitled to the presumption of reliance established by the fraud-on-the-market doctrine.  At all times relevant to this Complaint, the market for Countrywide common stock was an efficient market.  Countrywide common stock was actively traded on a highly efficient and automated market.  Countrywide filed periodic public reports with the SEC and was followed by numerous securities analysts employed by leading brokerage firms and investment banks who wrote reports about the Company.  Countrywide regularly issued press releases, which were

carried by national and international news wires, and which were publicly available and entered into the public marketplace. As a result, and which is empirically evident, the market for Countrywide equity securities promptly digested current information regarding Countrywide from all publicly-available sources and reflected such information in the Countrywide common stock price.

244. Plaintiffs are also entitled to the presumption of reliance established by the *Affiliated Ute* doctrine as Defendants failed to disclose material known facts to the market concerning Defendants' mortgage underwriting practices, credit risk, and other fraudulent accounting and GAAP violations.

245. Plaintiffs, through their investment adviser Wallace R. Weitz & Company, also read, or listened to, and relied on certain of Defendants' materially false and misleading statements prior to purchasing Countrywide common stock at artificially inflated prices. Plaintiffs specifically read and relied upon Defendants' false and misleading statements pertaining to, among other things, the Company's mortgage underwriting practices, credit risk, and compliance with GAAP.

246. Plaintiffs, through their investment adviser Wallace R. Weitz & Company, specifically read (and/or listened to) and relied upon the false and misleading statements alleged herein at §V.B-C, which include the false and misleading statements contained in (i) Countrywide's public press releases alleged herein that were published during the Relevant Period; (ii) Countrywide's SEC filings on Forms 10-Q and 10-K filed with the SEC during the Relevant Period; (iii) Countrywide's analyst conference calls concerning quarterly financial results during the Relevant Period; and (vi) various direct communications between Defendants and Plaintiffs.

**B.    Defendants' False and Misleading Statements**

247. Prior to the beginning of the Relevant Period on March 12, 2004, Defendants informed the market that Countrywide intended to grow its business to 30% market share. Defendants repeatedly reassured the market Countrywide would

1  not sacrifice loan quality for quantity. For instance, on January 27, 2004, Mozilo
2  stated:

3          Going for 30% mortgage share is totally unrelated to quality of
4          loans we go after.  We originate all types of loans today, from sub-prime,
5          you know, all the way up to prime prime and jumbos and super jumbos,
6          so we cover the entire marketplace today.  There will be no compromise
7          by this company in the overall quality of the product line, you know,
8          which manifests itself in your delinquencies and foreclosures, but we
9          don't compromise on that as we grow market share, nor is there a
10         necessity to do that.

11  **March 12, 2004 Form 10-K**

12         248.   The Relevant Period begins on March 12, 2004.  That day, Countrywide
13  filed its Annual Report for 2003 with the SEC on Form 10-K (the "2003 Form 10-K").
14  Mozilo signed the report.

15         249.   The 2003 Form 10-K falsely reported the Company's loan production by
16  category of loan.  According to the 2003 Form 10-K, subprime mortgages were equal
17  to 4.6% of total loan production by dollar amount.  And, the Company reported that
18  prime and prime home equity loans held for investment equaled $22.0 billion at year
19  end.

20         250.   The 2003 Form 10-K falsely emphasized the Company's commitment to
21  originating quality loans as a means of protecting the Company's access to the
22  secondary mortgage market, which was admittedly important to the Company:

23          We rely substantially on the secondary mortgage market. . . .  We
24          ensure our ongoing access to the secondary mortgage market by
25          ***consistently producing quality mortgages*** and servicing those mortgages
26          at levels that meet or exceed secondary mortgage market standards.  As
27          described elsewhere in this document, we have a major focus on

28

---

COMPLAINT                                71

1  ***ensuring the quality of our mortgage loan production*** and we make

2  significant investments in personnel and technology in this regard.

3  251.   In a section of the 2003 Form 10-K titled "Mortgage Credit Risk,"

4  Defendants falsely described Countrywide as committed to managing credit risk by

5  employing rigorous underwriting practices to ensure the Company only originated

6  quality loans to individuals with a demonstrated capacity to repay the borrowed

7  amount:

8  **Mortgage Credit Risk**

9       Overview

10      In our mortgage lending activities, ***we manage our credit risk by***

11  ***producing high quality loans*** . . . .

12                  *      *      *

13      Loan Quality

14      Our Credit Policy establishes standards for the determination of

15  acceptable credit risks.   Those standards encompass borrower and

16  collateral quality, underwriting guidelines, and loan origination standards

17  and procedures.

18      Borrower quality includes consideration of the borrower's credit

19  and ***capacity to pay***.  We assess credit and capacity to pay through the

20  use of credit scores, application of a mortgage scorecard, and manual or

21  automated underwriting of additional credit characteristics.

22                  *      *      *

23      Our loan origination standards and procedures ***are designed to***

24  ***produce high quality loans***.  These standards and procedures encompass

25  underwriter qualifications and authority levels, appraisal review

26  requirements, fraud prevention, funds disbursement controls, training of

27  our employees and on-going review of their work.  We help ***to ensure***

28  ***that our origination standards are met*** by employing accomplished and

seasoned management, underwriters, and processors and through the extensive use of technology.  We also have a comprehensive training program for the continuing development of both our existing staff and new hires.  In addition, we employ proprietary underwriting systems in our loan origination process that improve the consistency of underwriting standards, assess collateral adequacy, and help to prevent fraud, while at the same time increasing productivity.

In addition to our pre-funding controls and procedures, we employ an extensive post funding quality control process.  Our quality control department, under the direction of the Chief Credit Officer, is responsible for completing comprehensive loan audits that consist of a re-verification of loan documentation, an in depth underwriting and appraisal review, and if necessary, a fraud investigation.  We also employ a post-funding proprietary loan performance evaluation system.  This system identifies fraud and poor performance of individuals and business entities associated with the origination of our loans.  *The combination of this system and our audit results allows us to evaluate and measure adherence to prescribed underwriting guidelines and compliance to laws and regulations to ensure that current loan production represents acceptable credit risk*, as defined by the Board of Directors.

252. Mozilo and McLaughlin signed the 2003 Form 10-K and SOX Certifications, falsely certifying that:

1.     I have reviewed this annual report on Form 10-K of Countrywide Financial Corporation;

2.     Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances

under which such statements were made, not misleading with respect to the period covered by this report;

3.   Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4.   The registrant's other certifying officers and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) for the registrant and have:

(a)   Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

(b)   Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

(c)   Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5.     The registrant's other certifying officers and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of registrant's board of directors (or persons performing the equivalent functions):

(a)     All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

(b)     Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Under §906 of SOX, Mozilo and McLaughlin attested as follows:

In connection with the Annual Report on Form 10-K of Countrywide Financial Corporation (the "Company") for the period ended December 31, 2003 as filed with the Securities and Exchange Commission on the date hereof (the "Report"), I, Angelo R. Mozilo, Chief Executive Officer of the Company, certify, pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002, that:

1.     The Report fully complies with the requirements of section 13(a) or 15(d) of the Securities Exchange Act of 1934; and

2.     The information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company.

253.   Defendants' statements in the 2003 Form 10-K were materially false and misleading when made.  As set forth in greater detail in §IV.B-E, Defendants' statements concerning the types of loans produced and the value of prime loans held

for investment were false and misleading because Countrywide misclassified subprime loans as prime loans. Defendants' statements that Countrywide was committed to producing high quality loans through a rigorous underwriting process in which the Company carefully evaluated the borrower's ability to repay, were false and misleading. As the Defendants knew, Countrywide's stated efforts to substantially increase market share could only be achieved by loosening the Company's underwriting guidelines, and even disregarding its own guidelines, to increase loan volume without regard to loan quality and/or the borrower's ability to repay the loan. Further, the SOX Certifications signed by Mozilo and McLaughlin were false and misleading because the Company did not maintain adequate disclosure controls and internal controls to report material risks taken by the Company in its lending practices and detect, prevent and/or report fraud.

**April 21, 2004 Earnings Release**

254.   On April 21, 2004, Countrywide issued a press release that announced the Company's financial results for the first quarter of 2004 (subsequently filed with the SEC on April 21, 2004). The Company falsely reported net earnings of $691 million and earnings per share ("EPS") of $2.22, and falsely reported the value of the Company's assets (including MSR and LHI). The press release misleadingly stated: "Purchase fundings for the quarter grew to $32 billion, up 32 percent from the first quarter of 2003, reflecting the Company's strategic focus on increasing purchase market share" – but failed to disclose the Company's purposeful disregard for its underwriting standards. Mozilo stated: "Outstanding operational and financial results characterized the first quarter of 2004. . . .  This performance, in light of rapidly shifting environmental conditions, illustrates the ***strength and flexibility of our business model and risk management strategies***, as the Company delivered impressive results."

255.   On the Company's conference call with analysts to elaborate on the press release, Mozilo falsely stressed Countrywide's "careful" approach to underwriting and

originating subprime lenders – which falsely purported to differentiate Countrywide from others in the marketplace:

> We have successfully managed this product for years.  So I think using what our competitors do as a barometer will put you down the wrong path.  ***We are a very different***, focused company that understands this [subprime] product very well, hot to originate it, how to manage it, how to underwrite, how to service it.  And so we look at – the short answer to your question is – we look at this sub-prime business as a – ***one that has to be carefully managed*** but one that has a tremendous opportunity for us, long into the future, certainly through the balance of this decade and beyond.

256.    Mozilo also responded to an analyst's question regarding the potential risks from originating non-traditional, riskier loans, such as subprime loans.  Mozilo falsely stated that Countrywide had taken a more disciplined approach than its competitors, it was not involved in the "frothy business" that others engaged in, and Countrywide was properly monitoring subprime risks:

> Subprime cannot be looked at generically.  There's very good solid subprime business and there's this frothy business that you relate to. . . .  ***I think it's very important that you understand the disciplines that the company has, that Countrywide has which is a very strong discipline in the origination of subprime loans and maintaining that discipline is critically important to us***.  When you look at subprime you have to look at it in various tranches and we're at the high end of that tranche.

257.    The statements made by Defendants on April 21, 2004 were materially false and misleading when made for the reasons set forth in §IV.B-E.  Specifically, Countrywide's financial statements did not comply with GAAP, and Countrywide had not taken a "careful" approach to the sub-prime market but rather had abandoned

sound underwriting practices in an effort to drive up loan volume at the expense of loan quality.  In this important regard, Countrywide was similar to other lenders in the subprime space and it was misleading for Defendants to assert otherwise.  Mozilo's statements "that the company had … very strong disciplines in the origination of sub-prime loans"; "we are a very different company that understands this [subprime] product"; and Countrywide's subprime originations were "at the high end" of the subprime tranche; were false and misleading because Countrywide loosened and abandoned sound underwriting practices to increase loan volume without regard to loan quality.

**The May 7, 2004 Form 10-Q**

258.   On May 7, 2004, Countrywide filed its Form 10-Q with the SEC.  In the Form 10-Q, signed by Kurland and McLaughlin, Countrywide again reported its false and misleading financial results for the first quarter of 2004.  The Form 10-Q falsely reported the Company's earnings, ALL, valuations of RIs (including impairment), valuations of MSRs, and falsely described its exposure related to R&Ws made in connection with off-balance sheet loan securitizations.

259.   The Form 10-Q falsely described the Company's loan production by type, and falsely described the management of credit risk in the following terms: "We manage mortgage credit risk principally by . . . ***only retaining high credit quality mortgages in our loan portfolio***."

260.   Further, the Form 10-Q included SOX Certifications signed by Mozilo and McLaughlin that were substantially identical to those set forth in ¶252.

261.   Defendants' statements in the May 7, 2004 Form 10-Q were materially false and misleading when made.  As set forth in greater detail in §IV.B-E, Defendants' statements concerning the types of loans produced and the value of prime loans held for investment were false and misleading because Countrywide misclassified subprime loans as prime loans.  Defendants' statements that Countrywide managed credit risk by only retaining "high credit quality loans" were

false and misleading.  As the Defendants knew, Countrywide's stated efforts to substantially increase market share could only be achieved by loosening the Company's underwriting guidelines, and abandoning sound underwriting practices, to increase loan volume without regard to loan quality and/or the borrower's ability to repay the loan.  Further, the SOX Certifications signed by Mozilo and McLaughlin were false and misleading because Countrywide's financial statements did not comply with GAAP and the Company did not maintain adequate disclosure controls and internal controls to report material risks taken by the Company in its lending practices and detect, prevent and/or report fraud.

**July 22, 2004 Earnings Release**

262.   On July 22, 2004, Countrywide issued a press release that announced the Company's financial results for the second quarter of 2004 (subsequently filed with the SEC on July 26, 2004).  The Company falsely reported net earnings of $700 million and EPS of $2.24, and falsely reported the value of the Company's assets (including MSR and LHI).  The press release misleadingly stated "purchase fundings rose 40 percent from the second quarter of 2003 to a record $46 billion, a reflection of the Company's strategic focus on increasing purchase market share" – but failed to disclose the Company's purposeful disregard for its underwriting standards.  Mozilo stated:  "Countrywide delivered solid results . . . .  This demonstrates Countrywide's ability to execute its strategic plan, prudently manage risk, and right size its operational infrastructure in the midst of a volatile interest rate environment."

263.   On a conference call later that same day on July 22, 2004, addressing a specific question concerning Countrywide's provision for loan loss reserves, Mozilo falsely stated that the Company's loan loss reserves were adequate because the Company originated and retained high credit quality loans.  Moreover, Mozilo falsely assured investors that the Company expected its loans to continue to perform well into the future – despite his knowledge that Countrywide altered its lending practices and

1  that the Company's new loans would not perform well if housing prices stopped

2  appreciating:

3    And I would expect that – because of the **quality of that portfolio**

4    and the type of loans that are in there, which are mortgage loans, **assets**

5    **that we understand very well** and know how to service, that **we can**

6    **expect the performance that we're seeing today to continue at a very**

7    **high level**.

8    264.   The statements made by Defendants on July 22, 2004 were materially

9  false and misleading when made for the reasons set forth in §IV.B-E.  Specifically,

10  Countrywide's financial statements did not comply with GAAP.  While Countrywide

11  was "increasing purchase market share," the Company failed to disclose it had done so

12  by abandoning prudent underwriting practices in an effort to drive up loan volume at

13  the expense of loan quality.   Mozilo's statements that Countrywide "prudently

14  managed risk" and had "execute[d] on its strategic plan" were false and misleading for

15  the same reasons.   Similarly, the Company's loan loss reserves were not adequate

16  because the Company could not reasonably, in light of the true quality of its loan

17  portfolio, expect its loans to continue to perform well once home prices stopped

18  appreciating.

19  **The August 6, 2004 Form 10-Q**

20    265.   On August 6, 2004, Countrywide filed its Form 10-Q with the SEC.  In

21  the Form 10-Q, signed by Kurland and McLaughlin, Countrywide again reported its

22  false and misleading financial results for the second quarter of 2004.  The Form 10-Q

23  falsely reported the Company's earnings, ALL, valuations of RIs (including

24  impairment), valuations of MSRs, and falsely described its exposure related to R&Ws

25  made in connection with off-balance sheet loan securitizations.

26    266.   The Form 10-Q falsely described the Company's loan production by

27  type, and falsely described the management of credit risk in the following terms: "We

28

manage mortgage credit risk principally by . . . ***only retaining high credit quality mortgages in our loan portfolio***."

267.   Further, the Form 10-Q included SOX Certifications signed by Mozilo and McLaughlin that were substantially identical to those set forth in ¶252.

268.   Defendants' statements in the August 6, 2004 Form 10-Q were materially false and misleading when made.   As set forth in greater detail in §IV.B-E, Defendants' statements concerning the types of loans produced and the value of prime loans held for investment were false and misleading because Countrywide misclassified subprime loans as prime loans.   Defendants' statements that Countrywide managed credit risk by only retaining "high credit quality loans" were false and misleading.   As the Defendants knew, Countrywide's stated efforts to substantially increase market share could only be achieved by loosening the Company's underwriting guidelines, and abandoning sound underwriting practices, to increase loan volume without regard to loan quality and/or the borrower's ability to repay the loan.   Further, the SOX Certifications signed by Mozilo and McLaughlin were false and misleading because Countrywide's financial statements did not comply with GAAP and the Company did not maintain adequate disclosure controls and internal controls to report material risks taken by the Company in its lending practices and detect, prevent and/or report fraud.

**September 14, 2004 Lehman Brothers**
**2004 Financial Services Conference**

269.   On September 14, 2004, Mozilo spoke at the Lehman Brothers 2004 Financial Services Conference where he misleadingly told investors: "Credit quality of the loan portfolio remains stellar."

**October 20, 2004 Earnings Release**

270.   On October 20, 2004, Countrywide issued a press release that announced the Company's financial results for the third quarter of 2004 (subsequently filed with the SEC on October 20, 2004).   The Company falsely reported net earnings of $582

million and EPS of $0.94, and falsely reported the value of the Company's assets (including MSR and LHI).  The press release misleadingly stated "purchase fundings rose 35 percent from the third quarter of 2003 to $52 billion, a reflection of the Company's strategic focus on increasing purchase market share" – but failed to disclose the Company's purposeful disregard for its underwriting standards.  Mozilo stated:  "Countrywide delivered one of its best quarters ever . . . .  Countrywide's financial results for the quarter – highlighted by diluted earnings per share of $0.94 – once again demonstrate the strength and resilience of our business model."

271.   On a conference call held later that same day to discuss the third quarter financial results Mozilo and Kurland both commented that interest only loans, particularly those in Alt-A, were high quality loans.  Mozilo stated "to me it's a quality loan" and Kurland added "as Angelo indicated, they're very high quality loans" because, as Kurland stated, Countrywide only made these loans to "the very high end of the credit spectrum."

272.   During the call, Mozilo also deflected concerns about his insider selling by stating his sales were purely a reflection of his age and not his knowledge the stock was inflated:

> My decision has been that since I'm 65 years old to exercise and sell, and it's done on a schedule, on a 10(b)5-1 irrespective of what the markets are.  Stock up, stock down, it's sold.  And I would attach no meaning to it whatsoever because those who have in the past attached meaning to it have been a big loser.  So the sale . . . is one of a personal nature and has nothing to do with the company.

273.   The statements made by Defendants on September 14 and October 20, 2004 were materially false and misleading when made for the reasons set forth in §IV.B-E.  Specifically, Countrywide's financial statements did not comply with GAAP.  While Countrywide's "purchase fundings rose 35 percent," Defendants failed to disclose Countrywide had done so by abandoning prudent underwriting practices in

1  an effort to drive up loan volume at the expense of loan quality. Mozilo's statements

2  that his stock sales were driven by his age, and therefore not by any untoward purpose

3  to avoid an inevitable crash in the Company's stock price, were false and misleading

4  as Mozilo knew the Company's lending practices were unsustainable and highly risky.

5  **November 8, 2004 Form 10-Q**

6  274.   On November 8, 2004, Countrywide filed its Form 10-Q with the SEC.

7  In the Form 10-Q, signed by Kurland and McLaughlin, Countrywide again reported its

8  false and misleading financial results for the third quarter of 2004.  The Form 10-Q

9  falsely reported the Company's earnings, ALL, valuations of RIs (including

10  impairment), valuations of MSRs, and falsely described its exposure related to R&Ws

11  made in connection with off-balance sheet loan securitizations.

12  275.   The Form 10-Q falsely described the Company's loan production by

13  type, and falsely described the management of credit risk in the following terms: "We

14  manage mortgage credit risk principally by . . . *only retaining high credit quality*

15  *mortgages in our loan portfolio*."

16  276.   Further, the Form 10-Q included SOX Certifications signed by Mozilo

17  and McLaughlin that were substantially identical to those set forth in ¶252.

18  277.   Defendants' statements in the November 8, 2004 Form 10-Q were

19  materially false and misleading when made.  As set forth in greater detail in §IV.B-E,

20  Defendants' statements concerning the types of loans produced and the value of prime

21  loans held for investment were false and misleading because Countrywide

22  misclassified subprime loans as prime loans.   Defendants' statements that

23  Countrywide managed credit risk by only retaining "high credit quality loans" were

24  false and misleading.  As the Defendants knew, Countrywide's stated efforts to

25  substantially increase market share could only be achieved by loosening the

26  Company's underwriting guidelines, and abandoning sound underwriting practices, to

27  increase loan volume without regard to loan quality and/or the borrower's ability to

28  repay the loan.  Further, the SOX Certifications signed by Mozilo and McLaughlin

COMPLAINT                    83

1   were false and misleading because Countrywide's financial statements did not comply

2   with GAAP and the Company did not maintain adequate disclosure controls and

3   internal controls to report material risks taken by the Company in its lending practices

4   and detect, prevent and/or report fraud.

5   **February 2, 2005 Earnings Release**

6       278.   On February 2, 2005, Countrywide issued a press release that announced

7   the Company's financial results for the fourth quarter of 2004 and fully year 2005

8   (subsequently filed with the SEC on February 2, 2005).   The Company falsely

9   reported net earnings of $343 million and EPS of $0.56 for the quarter, and falsely

10  reported the value of the Company's assets (including MSR and LHI).   The press

11  release misleadingly stated: "Purchase fundings were $47 billion for the quarter,

12  advancing 36 percent over the year-ago period and demonstrating the success of the

13  Company's strategic initiative to increase volume in the less interest-rate sensitive

14  purchase market" – but failed to disclose the Company's purposeful disregard for its

15  underwriting standards.   Mozilo also misleadingly reassured investors the Company

16  was prudently protecting shareholder's long-term interests:   "Countrywide not only

17  delivered the second-best financial results in our 35-year history, ***but also made***

18  ***substantial investments in the Company's future growth, diversification and***

19  ***stability***. . . .   As always, the people of Countrywide have worked diligently ***to build***

20  ***lasting value*** for our shareholders."   In truth, the Company was recklessly originating

21  risky loans that put the Company's future at stake in order to make a fast buck –

22  Countrywide was not emphasizing stability and lasting value.

23      279.   On a conference call held later that same day to discuss the fourth quarter

24  financial results, in which Mozilo, Kurland and McLaughlin participated, Mozilo

25  reassured investors that Countrywide wasn't changing its business model and

26  increasing risk to grow market share.   Mozilo stated:   "Our strategies relative to our

27  core business of Mortgage Banking remain consistent in terms of how we approach

28  the business, how we are continuing picking up market share."

COMPLAINT                                    84

280.   The statements made by Defendants on February 2, 2005 were materially false and misleading when made for the reasons set forth in §IV.B-E.  Specifically, Countrywide's financial statements did not comply with GAAP.   While Countrywide's purchase fundings rose 36%, Defendants failed to disclose Countrywide had done so by abandoning prudent underwriting practices in an effort to drive up loan volume at the expense of loan quality.  Mozilo's statements that the Company was making "substantial investments" in the Company's "stability" and working "diligently to build lasting value for our shareholders" were false and misleading because the Company was really making risky loans that jeopardized the Company's stability and long-term value.  Kurland's contention the Company had not increased the amount of risk it undertook in its effort to grow market share was not true.   And, McLaughlin's recitation of loan numbers was false as the Company improperly classified non-prime loans as prime.

**March 15, 2005 Form 10-K**

281.   On March 15, 2005, Countrywide filed its Annual Report for 2004 with the SEC on Form 10-K (the "2004 Form 10-K).  Mozilo signed the 2004 Form 10-K.

282.   In the 2004 Form 10-K, Countrywide again reported its false and misleading financial results for the fourth quarter and full year of 2004.  The Form 10-K falsely reported the Company's earnings, ALL, valuations of RIs (including impairment), valuations of MSRs, and falsely described its exposure related to R&Ws made in connection with off-balance sheet loan securitizations.  The 2004 Form 10-K falsely described the Company's loan production by type, falsely characterizing non-prime loans as prime.

283.   In the 2004 Form 10-K, Defendants emphatically reassured investors Countrywide was dedicated to originating "quality mortgages":

> We rely substantially on the secondary mortgage market as a
> source of long-term capital to support our mortgage banking operations.
> Nearly all mortgage loans that we produce are sold in the secondary

mortgage market, primarily in the form of Mortgage-Backed Securities ("MBS") and asset-backed securities.

We ensure our ongoing access to the secondary mortgage market *by consistently producing quality mortgages* and servicing those mortgages at levels that meet or exceed secondary mortgage market standards. As described elsewhere in this document, we have *a major focus on ensuring the quality of our mortgage loan production* and we make significant investments in personnel and technology in this regard.

284. In a section of the 2004 Form 10-K titled "Mortgage Credit Risk," the Company described its Credit Policy, portraying it as a tightly controlled and supervised process "designed to produce high quality loans" through a rigorous pre-loan screening procedure and post-loan auditing and appraisal and underwriting reviews:

Loan Quality

Our Credit Policy establishes standards for the determination of acceptable credit risks. Those standards encompass borrower and collateral quality, underwriting guidelines and loan origination standards and procedures.

Borrower quality includes consideration of the borrower's credit and capacity to pay. We assess credit and capacity to pay through the use of credit scores, application of a mortgage scorecard, and manual or automated underwriting of additional credit characteristics.

Collateral quality includes consideration of property value, condition and marketability and is determined through physical inspections and the use of manual and automated valuation models.

Underwriting guidelines facilitate the uniform application of underwriting standards to all borrowers regardless of race, religion or

ethnic background.  Uniformity in underwriting also provides a means for measuring and managing credit risk. . . .

*Our loan origination standards and procedures are designed to produce high quality loans*. These standards and procedures encompass underwriter qualifications and authority levels, appraisal review requirements, fraud prevention, funds disbursement controls, training of our employees and ongoing review of their work.  We help to ensure that our origination standards are met by employing accomplished and seasoned management, underwriters and processors and through the extensive use of technology.  We also have a comprehensive training program for the continuing development of both our existing staff and new hires.  In addition, *we employ proprietary underwriting systems in our loan origination process that improve the consistency of underwriting standards, assess collateral adequacy and help to prevent fraud*, while at the same time increasing productivity.

In addition to our pre-funding controls and procedures, we employ an extensive post-funding quality control process.  Our Quality Control Department, under the direction of the Chief Credit Officer, is responsible for completing comprehensive loan audits that consist of a re-verification of loan documentation, an in-depth underwriting and appraisal review, and if necessary, a fraud investigation.  We also employ a pre- and post-funding proprietary loan performance evaluation system.  This system identifies fraud and poor performance of individuals and business entities associated with the origination of our loans.  *The combination of this system and our audit results allows us to evaluate and measure adherence to prescribed underwriting guidelines* and compliance with laws and regulations.

285.   Defendants falsely assured investors the Company continually evaluated the credit quality of its loan portfolio and set adequate loan loss reserves based on historic loan performance – but Defendants failed to disclose the Company did not have historic data sufficient to assess the likely performance of its exotic loan portfolios (such as Pay Option ARMs and HELOCs) and that the allowance did not properly consider that Countrywide had abandoned sound underwriting practices. Defendants falsely stated:  "The allowance for loan losses is evaluated on a periodic basis by management and is determined by applying expected loss factors to outstanding loans, based on historical default rates and loss percentages for similar loans originated by the Company, estimates of collateral value for individually evaluated loans, and judgmental components such as economic considerations."

286.   KPMG issued an audit report on management's assessment of the Company's internal control over financial reporting, in accordance with the standards of the Public Company Accounting Oversight Board.  In a report dated March 11, 2005, KPMG stated:

> We conducted our audit in accordance with the standards of the Public Company Accounting Oversight Board (United States). . . .  In our opinion, the consolidated financial statements referred to above present fairly, in all material respects, the financial position of Countrywide Financial Corporation and subsidiaries as of December 31, 2004, and the results of their operations and their cash flows for the year ended December 31, 2004, in conformity with U.S. generally accepted accounting principles.  Also in our opinion, the related financial statement schedules, when considered in relation to the basic consolidated financial statements taken as a whole, present fairly, in all material respects, the information set forth therein.

287.   Further, the 2004 Form 10-K included SOX Certifications signed by Mozilo and McLaughlin that were substantially identical to those set forth in ¶252.

288.   Defendants' statements in the 2004 Form 10-K were materially false and misleading when made.  As set forth in greater detail in §IV.B-F, Countrywide's financial statements did not comply with GAAP.  Defendants' statements concerning the types of loans produced and the value of prime loans held for investment were false and misleading because Countrywide misclassified subprime loans as prime loans.  Defendants' extensive statements concerning Countrywide's policies and procedures to ensure the origination of high quality loans were false and misleading as the Company had abandoned sound underwriting practices to increase loan origination volume.  Further, the SOX Certifications signed by Mozilo and McLaughlin were false and misleading because Countrywide's financial statements did not comply with GAAP and the Company did not maintain adequate disclosure controls and internal controls to report material risks taken by the Company in its lending practices and detect, prevent and/or report fraud.

**March 15, 2005 Piper Jaffray Conference**

289.   On March 15, 2005, Mozilo spoke at a financial conference sponsored by Piper Jaffray.  Mozilo misleadingly reassured investors that Countrywide – unlike other lenders – had taken a cautious, disciplined approach to subprime lending and knew how to manage the risk of such loans:

> [T]here is an old Yiddish [ph] expression; it says 'when everybody goes to the same side of boat, the boat tends to tip over' and we [see a] lot of people going for the same side of boat.  So we have to remain very disciplined in our subprime efforts, and that's why you don't see massive growth for Countrywide in subprime.  We are trying to stay within a category of subprime that *we know how to manage and manage effectively*.  So I have to separate it; overall industry in trouble, Countrywide are not because *we have remained very disciplined in origination of subprime loans*.

290.   Mozilo also emphatically reassured investors that Countrywide would not – under any circumstances – sacrifice "sound" lending practices to achieve its 30% market goal.

> Your question is 30 percent, is that realistic, the 30 percent goal that we set for ourselves 2008?  It is realistic. . . . It is achievable, absolutely. . . .  ***But I will say this to you that under no circumstances, will Countrywide ever sacrifice sound lending and margins for the sake of getting to that 30% market share***.

291.   Mozilo also assured investors Countrywide was "very careful in [the] underwriting of subprime" and that Countrywide "properly" managed its subprime risk.

292.   Mozilo's statements made at the March 15, 2005 Conference above were materially false and misleading when made for the reasons set forth in §IV.B-E. Among other things, Countrywide had not been "very disciplined" in its origination of subprime loans nor had it managed effectively its exposure to bad subprime loans. Further, Countrywide had in fact sacrificed sound lending practices for the sake of increasing loan volume as Countrywide had abandoned sound underwriting practices.

**April 26, 2005 Earnings Release**

293.   On April 26, 2005, Countrywide issued a press release that announced the Company's financial results for the first quarter of 2005 (subsequently filed with the SEC).  The Company falsely reported net earnings of $689 million and EPS of $1.13 for the quarter, and falsely reported the value of the Company's assets (including MSR and LHI).  The press release misleadingly stated: "Total loan production volume was $92 billion for the quarter, up 21 percent from the comparable quarter last year" – but failed to disclose the Company's purposeful disregard for its underwriting standards.

294.   On a conference call held later that same day to discuss the first quarter financial results, in which Mozilo, Sieracki and McLaughlin participated, Sieracki

1   refuted the proposition that Countrywide may have lowered its underwriting standards
2   to increase loan volume.  Specifically, when asked whether "there had been any
3   changes in the underwriting metrics with the current origination levels or your
4   expected origination during 2005. . .?"  Mozilo replied: "We don't see any change in
5   our protocol relative to the quality of loans that we're originating."

6   295.   On the call, Mozilo reassured investors the Pay Option ARM was a time-
7   tested product that World Savings had originated for years.  However, Mozilo failed
8   to disclose that he personally knew Countrywide's Pay Option ARM portfolio was
9   fundamentally different than that of World Savings, that focusing on FICO with
10  respect to these loans was not the best measure of their risk, that Pay Option ARMs
11  were not "time tested" in the manner Countrywide originated them, and that he
12  personally thought there was no way to know Countrywide's risk associated with
13  owning Pay Option ARMs:

14          On the pay option ARM itself *is a very good product* and it fits the
15          needs of many homebuyers.  And these are again high FICO because of
16          the complexity of that product. . . .  *It's a time-tested product*, by the
17          way.  *World Savings has had that product for years and if you*
18          *originate it properly, it's a very profitable* and good product for both us,
19          the lender and for more the mortgagors. . . .  So it's a very good product
20          and *it's time tested*.

21  296.   The statements made by Defendants on April 26, 2005 were materially
22  false and misleading when made for the reasons set forth in §IV.B-E.  Specifically,
23  Countrywide's financial statements did not comply with GAAP.  Sieracki's statement
24  that the Company did not, and would not, sacrifice underwriting standards to increase
25  origination levels was inaccurate with regard to then past, then-present and future
26  lending practices at the Company.

27  297.   Mozilo's statements concerning Pay Option ARMs were false and
28  misleading, because he failed to disclose his knowledge that the product, as originated

1  by Countrywide, was not time tested and posed a potentially substantial risk to the

2  Company.  Indeed, as Mozilo would later admit:

3  We have no way, with any reasonable certainty, to assess the real risk of

4  holding these loans on our balance sheet.  The only history we can look

5  to is that of World Savings however their portfolio was fundamentally

6  different than ours in that their focus was equity and our focus is fico.  In

7  my judgement, as a long time lender, I would always trade off fico for

8  equity.  The bottom line is that we are flying blind on how these loans

9  will perform in a stressed environment of higher unemployment, reduced

10  values and slowing home sales.

11  298.  Moreover, as detailed *supra*, Countrywide had not properly underwritten

12  its Pay Option ARM loans, and a high percentage of the portfolio had been originated

13  pursuant to applications containing fraudulently inflated income numbers or were

14  otherwise "inherently unsound," as recognized by Defendant Mozilo.

15  **May 9, 2005 Form 10-Q**

16  299.  On May 9, 2005, Countrywide filed its Form 10-Q with the SEC.  In the

17  Form 10-Q, signed by Kurland and Sieracki, Countrywide again reported its false and

18  misleading financial results for the first quarter of 2005.  The Form 10-Q falsely

19  reported the Company's earnings, ALL, valuations of RIs (including impairment),

20  valuations of MSRs, and falsely described its exposure related to R&Ws made in

21  connection with off-balance sheet loan securitizations.

22  300.  The Form 10-Q falsely described the Company's loan production by

23  type, and falsely described the management of credit risk in the following terms: "We

24  manage mortgage credit risk principally by . . ***only retaining high credit quality***

25  ***mortgages in our loan portfolio***."

26  301.  Further, the Form 10-Q included SOX Certifications signed by Mozilo

27  and Sieracki that were substantially identical to those set forth in ¶252.

28

COMPLAINT                                     92

302.   Defendants' statements in the May 9, 2005 Form 10-Q were materially false and misleading when made.   As set forth in greater detail in §IV.B-E, Defendants' statements concerning the types of loans produced and the value of prime loans held for investment were false and misleading because Countrywide misclassified subprime loans as prime loans.   Defendants' statements that Countrywide managed credit risk by only retaining "high credit quality loans" were false and misleading.   As the Defendants knew, Countrywide's stated efforts to substantially increase market share could only be achieved by loosening the Company's underwriting guidelines, and abandoning sound underwriting practices, to increase loan volume without regard to loan quality and/or the borrower's ability to repay the loan.   Further, the SOX Certifications signed by Mozilo and Sieracki were false and misleading because Countrywide's financial statements did not comply with GAAP and the Company did not maintain adequate disclosure controls and internal controls to report material risks taken by the Company in its lending practices and detect, prevent and/or report fraud.

**May 24, 2005 Countrywide Analyst Meeting**

303.   On May 24, 2005, Mozilo, Sambol and Kurland and McMurray, the Company's Chief Credit Officer, participated in the Countrywide Financial Corporation Analyst Meeting.   At the meeting, McMurray stated, without correction or explanation by Mozilo, Sambol or Kurland, that the Company originated loans that met its credit standards: "[q]uality control … is a series of controls that we have post-closing.  So what we are looking for there, is to ensure that the loans that we originate have *both met our credit standards and we[re] underwritten according to those standards*."

304.   During the May 24, 2005 analyst meeting, an unidentified Countrywide representative touted that Countrywide's loans held for investment are "first rate mortgages" and "high quality loans" and, accordingly, the Company's ALL were adequate:

Well, you know, first of all the bank is investing in … *prime mortgages, primarily HELOCs and some first rate mortgages*. … So, not much on the interest rate risk side.  But again, *very high quality loans that have performed historically and we have you know, default models that provide conservative reserves against that book of business*.

305.   Sambol reassured investors that any risks associated with ARMs were mitigated by Countrywide's use of more stringent underwriting criteria: "These risks are mitigated or addressed in part by the different underwriting criteria . . . ."

306.   Defendants' statements at the May 24, 2005 analyst meeting above were materially false and misleading when made for the reasons set forth in §IV.B-E.  Countrywide's quality control measures did not ensure that the Company's loans were underwritten to meet Countrywide's credit standards – as a large percentage of the Company's loans were known to have been originated pursuant to an exception to the Company's underwriting policies and a large percentage of the Company's loans were originated pursuant to fraudulent income representations.  Further, Countrywide's loans held for investment were not "very high quality loans" nor did Countrywide have reasonable historic data on default rates to set conservative reserves.  To the contrary, the loans had not been underwritten properly, and a high percentage of the Company's HELOCs combined risk factors like low FICO, reduced documentation and 100% financing.

**June 2, 2005 Sanford Bernstein Strategic Decisions Conference**

307.   On June 2, 2005, Mozilo and Sambol spoke at the Sanford Bernstein Strategic Decisions Conference.  During the conference, Mozilo misleadingly stated Countrywide's market share growth was the result of numerous factors, but failed to disclose that Countrywide was growing market share by abandoning sound underwriting practices:

COMPLAINT                                    94

1    Slide 13 provides a new review of Countrywide's market share of

2    growth and industry consolidation trends, this is important. Countrywide

3    continues to produce exceptional market share growth, up nearly 2

4    percentage points since first quarter of 2004 to a new high of 14.2% for

5    the first quarter of 2005.  This means that Countrywide funded one out of

6    every 7 loans made in the U.S. in that quarter.   Our market share

7    leadership stands from our focus on mortgage banking, which is unique.

8    Our superior customer service, our wide product menu, our growing

9    sales force.   Our superior technology and our efficiencies is also

10   explained by our success of leveraging our servicing portfolio as a

11   generator recaptured, refinanced and home equity volumes.

12   308.   Mozilo also falsely told investors that Countrywide mitigated the risk

13   associated with Pay Option ARMs and other exotic loan products by carefully

14   underwriting these loans:

15   Certain of the loans being offered today such as interest only

16   products, pay option ARMs, and other short term ARMs have received

17   significant press lately and have been the subject for investor questions.

18   We acknowledge that some of the products offered today carry hard[er]

19   credit risk than traditional GSE 30-year fixed trade loans.  However, ***it is***

20   ***important to note the Countrywide mitigates these risks or addresses***

21   ***them in part by utilizing different underwriting criteria than that is***

22   ***used for traditional fixed rate product such as the requirement for***

23   ***higher credit scores and lower loan to value ratios***.

24   309.   Defendants' statements at the June 2, 2005 conference were false and

25   misleading.  As Defendants knew, Countrywide had not mitigated the risks associated

26   with Pay Option ARMs by employing appropriate underwriting.    Further,

27   Countrywide's market share growth was being powered by loosened (and abandoned)

28

---

COMPLAINT                              95

1  underwriting standards and not by superior service and/or leveraging superior

2  technology and the service portfolio.

3  **July 26, 2005 Earnings Release**

4      310.   On July 26, 2005, Countrywide issued a press release that announced the

5  Company's financial results for the second quarter of 2005 (subsequently filed with

6  the SEC). The Company falsely reported net earnings of $566 million and EPS of

7  $0.92 for the quarter, and falsely reported the value of the Company's assets

8  (including MSR and LHI). The press release misleadingly stated: "Total loan

9  production volume was $121 billion, up 21 percent from the comparable quarter last

10  year" – but failed to disclose the Company's purposeful disregard for its underwriting

11  standards.

12      311.   On a conference call held later that same day to discuss the second

13  quarter financial results, in which Mozilo, Sieracki and Kurland participated, Kurland

14  misleadingly labeled Countrywide's Pay Option ARMs, and other loans with

15  prepayment penalties, as "a very high-quality product." In response to a question

16  from Neil Abromavage about the number of Pay Option ARMs experiencing negative

17  amortization, Kurland falsely stated:

18          I think another important point with our pay option portfolio is

19          that [it] actually enjoys one of the lowest levels of delinquency in our

20          entire portfolio just over 1% delinquency rate. ***And so it is a very high***

21          ***quality product. As I mentioned before, the numbers that we have in***

22          ***terms of loans that are negatively amortizing, it's about at the 20%***

23          ***level***.

24      312.   In truth, Countrywide's Pay Option ARMs were not a "very high quality

25  product." Further, on June 28, 2005, Countrywide's Credit Risk Management

26  recognized that 60% to 70% of Pay Option ARM borrowers were choosing to only

27  make the minimum payment, and thus incurring negative amortization. Further,

28  Defendants knew the 1% delinquency rate was a misleading indicator of the quality of

1  the Pay Option ARMs because delinquencies would increase dramatically as soon as

2  the rates reset when borrowers hit the limit of the allowed negative amortization.

3      313.   Mike Vinciquerra of Raymond James asked about the adequacy of

4  Countrywide's reserves for loans held by the Bank.  Mozilo falsely responded that the

5  reserves were adequate because "these are very high quality loans that were put into

6  the Bank and that was one of the motivating factors in the second quarter because we

7  had a unique opportunity to do that, the volume of our closings were so high of very

8  high quality loans."

9      314.   Mozilo false and misleadingly responded to a question by Ed Groshans

10  concerning whether Countrywide had lowered its underwriting standards.  Mozilo

11  stated:

12          I am not aware of any change of substance in underwriting

13          policies. . . .  I'm not aware of any loosening of underwriting standards

14          that creates a less of a quality of loan that we did in the past.

15                              *       *       *

16          I know I speak from the Company's perspective, we don't view

17          that we [have] taken any steps to reduce the quality [of] our underwriting

18          regimen at all.  As Stan states we are always making certain to the best

19          of our ability that the – at the end of the day that the mortgager has the

20          ability to make the payments and tailoring the loans accordingly.

21      315.   When asked by the Glenview Capital analyst, Barry Cohen, for his

22  opinion of the credit quality of nonprime mortgages, and whether it was stable or

23  worsening, Mozilo stated: "*I think it's stable. . . .  I do participate every day in*

24  *originations myself, and it keeps me apprise of what's happening*.  I think that that

25  situation has stabilized.  *I don't see any deterioration in the quality of those loans*

26  *being originated*."  Sieracki added "I would echo those sentiments. . . .  We operate at

27  the very top end of the nonprime credit spectrum."

28

COMPLAINT                                    97

316.   The statements made by Defendants on July 26, 2005 were materially false and misleading when made for the reasons set forth in §IV.B-E.  Specifically, Countrywide's financial statements did not comply with GAAP.  Countrywide's Pay Option ARMs were not "a very high-quality product," but a ticking time-bomb in which a large proportion of borrowers would not be able to pay their loans once the rates adjusted as they hit the maximum amount of negative amortization allowed. Countrywide had loosened its underwriting standards, and was originating lower quality loans, relative to its historic lending practices.  There was no way that Mozilo could have "participate[d] every day in originations" and been "apprised of what's happening" and believe his statement: "I don't see any deterioration in the quality of those loans being originated."

**August 8, 2005 Form 10-Q**

317.   On August 8, 2005, Countrywide filed its Form 10-Q with the SEC.  In the Form 10-Q, signed by Kurland and Sieracki, Countrywide again reported its false and misleading financial results for the second quarter of 2005.  The Form 10-Q falsely reported the Company's earnings, ALL, valuations of RIs (including impairment), valuations of MSRs, and falsely described its exposure related to R&Ws made in connection with off-balance sheet loan securitizations.

318.   The Form 10-Q falsely described the Company's loan production by type, and falsely described the management of credit risk in the following terms: "We manage mortgage credit risk principally by . . . ***only retaining high credit quality mortgages in our loan portfolio***."

319.   Further, the Form 10-Q included SOX Certifications signed by Mozilo and Sieracki that were substantially identical to those set forth in ¶252.

320.   Defendants' statements in the August 8, 2005 Form 10-Q were materially false and misleading when made.  As set forth in greater detail in §IV.B-E, Defendants' statements concerning the types of loans produced and the value of prime loans held for investment were false and misleading because Countrywide

misclassified subprime loans as prime loans.   Defendants' statements that Countrywide managed credit risk by only retaining "high credit quality loans" were false and misleading.   As the Defendants knew, Countrywide's stated efforts to substantially increase market share could only be achieved by loosening the Company's underwriting guidelines, and abandoning sound underwriting practices, to increase loan volume without regard to loan quality and/or the borrower's ability to repay the loan.  Further, the SOX Certifications signed by Mozilo and Sieracki were false and misleading because Countrywide's financial statements did not comply with GAAP and the Company did not maintain adequate disclosure controls and internal controls to report material risks taken by the Company in its lending practices and detect, prevent and/or report fraud.

**September 13, 2005 Lehman Brothers**
**Financial Services Conference**

321.   Mozilo participated in a conference call with analysts held at Lehman Brothers Financial Services on September 13, 2005.   Mozilo falsely reassured investors that Countrywide was committed to "responsible lending practices" and "sound" underwriting to assure that Countrywide did not engage in unsafe business activities:

> ***We start with responsible lending practices***, certainly, a current topic of the day.  A broad mortgage home product menu provides to write loan, hopefully, for each customer.  ***Loans are underwritten using sound, but flexible guidelines***, as described by the secondary markets in fair lending standards.  ***All business activities are managed with the ongoing safety and soundness Countrywide as a primary concern***.  Focused, managed growth remains our mandate.

322.   In addition, Mozilo falsely stated: "***Conservative underwriting standards*** are evidenced by the quality of the portfolio which I will discuss with you later." When Mozilo did address the portfolio, he falsely described it thusly: "***Credit quality***

---

COMPLAINT                                99

1   *of the portfolio remains outstanding* . . . ."  Furthermore, Mozilo again falsely

2   reassured investors that Countrywide utilized appropriate underwriting:

3            From the risk management perspective **loan underwriting**

4            **guidelines are conservative**, and under constant review.  In addition the

5            bank has made significant advances in automated underwriting

6            technology, which helps **to effectively manage risk** and has active

7            portfolio management surveillance capability on the entire portfolio.

8            Additionally, ongoing market surveillance enables the bank to actively

9            monitor and limit exposure in metropolitan statistical areas with the rapid

10           price appreciation.

11       323.   In conclusion, Mozilo falsely assured investors that Countrywide was

12   growing "prudently" even though he personally knew the Company was recklessly

13   incurring significant undisclosed risks: "Those of you who have followed

14   Countrywide for sometime know that our growth has resulted from expanding our

15   existing expertise while **maintaining the discipline necessary to manage, grow**

16   **prudently**.  This is the Countrywide story."

17       324.   Mozilo's statements on the September 13, 2005 conference call were

18   materially false and misleading when made because Countrywide did not employ

19   "responsible lending practices" or "sound" or "conservative" underwriting, but rather

20   abandoned responsible lending practices.  Countrywide had not been managed for the

21   soundness of the Company, but rather so Defendants could make money in the short

22   term by inflating the Company's stock price by pumping up loan volume at the risk of

23   the Company's well-being over the longer term.  Finally, the Company's credit quality

24   was not "outstanding" and Defendants were not growing the Company "prudently."

25   **October 27, 2005 Earnings Release**

26       325.   On October 27, 2005, Countrywide issued a press release that announced

27   the Company's financial results for the third quarter of 2005 (subsequently filed with

28   the SEC).  The Company falsely reported net earnings of $634 million and EPS of

$1.03 for the quarter, and falsely reported the value of the Company's assets (including MSR and LHI).  The press release misleadingly stated: "Total loan production volume was $147 billion, which increased 60 percent from the comparable quarter last year" – but failed to disclose the Company's purposeful disregard for its underwriting standards.

326.   The press release falsely reassured investors that the Bank was only retaining high-quality loans on its balance sheet, and did not disclose to investors Defendants' knowledge that these loans posed substantial risks to Countrywide: "The Bank continues to leverage its relationship with the Mortgage Banking segment by sourcing high-quality mortgage assets through existing production distribution channels and then funding the loans for either retention in the Bank's investment portfolio or sale into the secondary mortgage market."

327.   The press release falsely summed up the Company's financial condition, stating:  "As we begin the fourth quarter, we are well positioned with a $77 billion mortgage loan pipeline, a $171 billion balance sheet and a high quality credit profile in our loan portfolio."

328.   On a conference call held later that same day, in which Mozilo, Sieracki and Kurland participated, the Company's senior management discussed the third quarter 2005 financial results.  Mozilo discussed the "very high credit quality" of Countrywide's Pay Option ARMs, referring to them as an "excellent asset" when, as he knew, these loans were ticking time-bombs on the Company's balance sheet:

> Pay Option ARMs have recently been portrayed negatively.  But we view this product as enabling us to better serve ***qualified*** customers looking for a more efficient and flexible way to manage their obligations. It is also an ***excellent asset for our portfolio***, given our mortgage loan origination, servicing and ***risk management competencies***.  And the prime quality of our pay option borrowers. . . . Our pay option portfolios

1   have ***very high credit quality***, characterized by high FICO scores, solid

2   loan-to-value ratios, and a low debt-to-income ratios.

3       329.   The statements made by Defendants on October 27, 2005 were materially

4   false and misleading when made for the reasons set forth in §IV.B-E.  Specifically,

5   Countrywide's financial statements did not comply with GAAP.  It was not true that

6   Countrywide had a "high quality credit profile in [its] loan portfolio" at the beginning

7   of the fourth quarter, as the Company was purposefully disregarding its own

8   underwriting procedures to drive up loan volume.  Countrywide's Pay Option ARMs

9   were not "an excellent asset" for Countrywide to retain, and the Pay Option ARM

10  portfolios were not made up of "very high credit quality" loans as these loans were

11  ticking time-bombs in which a large proportion of borrowers would not be able to pay

12  their loans once the rates adjusted.

13  **November 8, 2005 Form 10-Q**

14      330.   On November 8, 2005, Countrywide filed its Form 10-Q with the SEC.

15  In the Form 10-Q, signed by Kurland and Sieracki, Countrywide again reported its

16  false and misleading financial results for the third quarter of 2005.  The Form 10-Q

17  falsely reported the Company's earnings, ALL, valuations of RIs (including

18  impairment), valuations of MSRs, and falsely described its exposure related to R&Ws

19  made in connection with off-balance sheet loan securitizations.  The Form 10-Q also

20  falsely described the Company's loan production by type.

21      331.   In the Form 10-Q, Defendants falsely reassured investors the Company's

22  Pay Option ARMs were high credit quality: "Our pay-option loan portfolio has very

23  high initial loan quality, with original average credit rating (expressed in terms of

24  FICO scores) of 720 and original loan-to-value and combined loan-to-values of 74%

25  and 78%, respectively.  We only originate pay-option loans to borrowers who can

26  qualify at the loan's fully-indexed interest rates."

27      332.   The Company continued to boast: "We manage mortgage credit risk

28  principally by . . . retaining high credit quality mortgages in our loan portfolio."

333.   Further, the Form 10-Q included SOX Certifications signed by Mozilo and Sieracki that were substantially identical to those set forth in ¶252.

334.   Defendants' statements in the November 8, 2005 Form 10-Q were materially false and misleading when made.  As set forth in greater detail in §IV.B-E, Defendants' statements concerning the types of loans produced and the value of prime loans held for investment were false and misleading because Countrywide misclassified subprime loans as prime loans.   Defendants' statements that Countrywide managed credit risk by only retaining "high credit quality loans" were false and misleading.  As the Defendants knew, Countrywide's stated efforts to substantially increase market share could only be achieved by loosening the Company's underwriting guidelines, and abandoning sound underwriting practices, to increase loan volume without regard to loan quality and/or the borrower's ability to repay the loan.  Further, the SOX Certifications signed by Mozilo and Sieracki were false and misleading because Countrywide's financial statements did not comply with GAAP and the Company did not maintain adequate disclosure controls and internal controls to report material risks taken by the Company in its lending practices and detect, prevent and/or report fraud.

**January 31, 2006 Earnings Release**

335.   On January 31, 2006, Countrywide issued a press release that announced the Company's financial results for the fourth quarter and full year of 2005 (subsequently filed with the SEC).  The Company falsely reported net earnings of $639 million and EPS of $1.03 for the quarter, and falsely reported the value of the Company's assets (including MSR and LHI).  The press release misleadingly stated: "Annual mortgage loan production volume reached $491 billion, establishing a new record for the Company as well as the industry.  Countrywide also made significant advances in market share, which grew by more than 25 percent from 2004 to 2005" – but failed to disclose the Company's purposeful disregard for its underwriting standards.

336.   The press release falsely reassured investors that the Bank was only retaining high-quality loans on its balance sheet, and did not disclose to investors Defendants' knowledge that these loans posed substantial risks to Countrywide: "The Bank continues to leverage its relationship with the Mortgage Banking segment by sourcing high-quality mortgage assets through existing production distribution channels and then funding the loans for either retention in the Bank's investment portfolio or sale into the secondary mortgage market."

337.   On a conference call held later that same day, in which Mozilo and Sieracki participated, the Company's senior management discussed the fourth quarter 2005 financial results.  Mozilo made it a point to emphatically, but falsely, emphasize the Company had grown the Pay Option ARM business without sacrificing loan quality:

> The amount of pay option loans in the Bank's portfolio now stands at 26 billion, up from 22 billion last quarter . . . .  ***It's important to note that our loan quality remains extremely high***.

338.   The statements made by Defendants on January 31, 2006 were materially false and misleading when made for the reasons set forth in §IV.B-E.  Specifically, Countrywide's financial statements did not comply with GAAP.  Mozilo's statements on the January 31, 2006 conference call about Pay Option ARMs, and the Company's representation that it had "made significant advances in market share," were misleading when made because Defendants failed to disclose the material fact that Countrywide loosened and abandoned sound underwriting practices to increase the volume of loans originated without regard to quality.

**March 1, 2006 Form 10-K**

339.   On March 1, 2006, Countrywide filed its Annual Report for 2005 with the SEC on Form 10-K (the "2005 Form 10-K).  Mozilo signed the 2005 Form 10-K.

340.   In the 2005 Form 10-K, Countrywide again reported its false and misleading financial results for the fourth quarter and full year of 2005.  The Form 10-

K falsely reported the Company's earnings, ALL, valuations of RIs (including impairment), valuations of MSRs, and falsely described its exposure related to R&Ws made in connection with off-balance sheet loan securitizations. The 2005 Form 10-K falsely described the Company's loan production by type, falsely characterizing non-prime loans as prime.

341. In the 2005 Form 10-K, Defendants emphatically reassured investors Countrywide was dedicated to originating "quality mortgages":

> We rely substantially on the secondary mortgage market as a source of long-term capital to support our mortgage banking operations. Most of the mortgage loans that we produce in our Mortgage Banking Segment are sold in the secondary mortgage market, primarily in the form of MBS and asset-backed securities.
>
> We ensure our ongoing access to the secondary mortgage market by ***consistently producing quality mortgages*** and servicing those mortgages at levels that meet or exceed secondary mortgage market standards. As described elsewhere in this document, ***we make significant investments in personnel and technology to ensure the quality of our mortgage loan production***.

342. In a section of the 2005 Form 10-K titled "Mortgage Credit Risk," the Company described its Credit Policy, portraying it as a tightly controlled and supervised process designed to produce high quality loans through a rigorous pre-loan screening procedure and post-loan auditing and appraisal and underwriting reviews:

> Loan Quality
>
> Our credit policy establishes standards for the determination of acceptable credit risks. Those standards encompass borrower and collateral quality, underwriting guidelines and loan origination standards and procedures.

Borrower quality includes consideration of the borrower's credit and capacity to pay. We assess credit and capacity to pay through the use of credit scores, application of a mortgage scorecard, and manual or automated underwriting.

Collateral quality includes consideration of property value, condition and marketability and is determined through physical inspections and the use of manual and automated valuation models and processes.

Underwriting guidelines facilitate the uniform application of underwriting standards to all borrowers regardless of race, religion or ethnic background. Uniformity in underwriting also provides a means for measuring and managing credit risk. . . .

Our underwriting guidelines for non-conforming mortgage loans, Prime Home Equity Loans, and Nonprime Mortgage Loans have been designed so that these loans are salable in the secondary mortgage market. We developed these guidelines to meet the requirements of private investors, rating agencies and third-party credit enhancement providers.

These standards and procedures encompass underwriter qualifications and authority levels, appraisal review requirements, fraud controls, funds disbursement controls, training of our employees and ongoing review of their work. We help to ensure that our origination standards are met by employing accomplished and seasoned management, underwriters and processors and through the extensive use of technology. We also employ proprietary underwriting systems in our loan origination process that improve the consistency of underwriting standards, assess collateral adequacy and help to prevent fraud, while at the same time increasing productivity.

We supplement our loan origination standards and procedures with a post-funding quality control process.  Our Quality Control Department, under the direction of the Chief Credit Officer, is responsible for completing loan audits that may consist of a re-verification of loan documentation, an underwriting and appraisal review, and if necessary, a fraud investigation.  We also employ a pre- and post-funding proprietary loan performance evaluation system.  This system helps to identify fraud and poor performance of individuals and business entities associated with the origination of our loans.  The combination of this system and our audit results allows us to evaluate and measure adherence to prescribed underwriting guidelines and compliance with laws and regulations.

343.   In the 2005 Form 10-K, Defendants falsely reassured investors that the Company's Pay-Option ARMs were high credit quality:

Our pay-option loan portfolio has a relatively high initial loan quality, with original average FICO scores (a measure of credit rating) of 720 and original loan-to-value and combined loan-to-values of 75% and 78%, respectively.  We only originate pay-option loans to borrowers who can qualify at the loan's fully-indexed interest rates.

344.   In the 2005 Form 10-K, Defendants also reassured investors: "We manage mortgage credit risk principally by selling most of the mortgage loans that we produce and ***by retaining high credit quality mortgages in our loan portfolio***."

345.   Defendants falsely assured investors the Company continually evaluated the credit quality of its loan portfolio and set adequate loan loss reserves based on historic loan performance – but Defendants failed to disclose the Company did not have historic data sufficient to assess the likely performance of its exotic loan portfolios (such as Pay Option ARMs and HELOCs) and that the allowance did not

1  properly consider that Countrywide had abandoned sound underwriting practices.
2  Defendants falsely stated:

3       The Company provides for losses on impaired loans with an
4       allowance for loan losses.  The allowance for loan losses is evaluated on
5       a periodic basis by management and is determined by applying expected
6       loss factors to outstanding loans, based on historical default rates and
7       loss percentages for similar loans originated by the Company and
8       estimates of collateral value for individually evaluated loans.

9  346.  KPMG issued an audit report on management's assessment of the
10 Company's internal control over financial reporting, in accordance with the standards
11 of the Public Company Accounting Oversight Board.  In a report dated February 27,
12 2006, KPMG stated:

13      We conducted our audit in accordance with the standards of the
14      Public Company Accounting Oversight Board (United States).

15                              *     *     *

16      In our opinion, management's assessment that the Company
17      maintained effective internal control over financial reporting as of
18      December 31, 2005, is fairly stated, in all material respects . . . .

19      We also have audited, in accordance with the standards of the
20      Public Company Accounting Oversight Board (United States), the
21      consolidated balance sheets of Countrywide Financial Corporation and
22      subsidiaries as of December 31, 2005 and 2004, and the related
23      consolidated statements of earnings, stockholders' equity and
24      comprehensive income and cash flows for the years then ended, and our
25      report dated February 27, 2006, expressed an unqualified opinion on
26      those consolidated financial statements.

27 347.  Further, the 2005 Form 10-K included SOX Certifications signed by
28 Mozilo and McLaughlin that were substantially identical to those set forth in ¶252.

---

COMPLAINT                                  108

348.   Defendants' statements in the 2005 Form 10-K were materially false and misleading when made.  As set forth in greater detail in §IV.B-F, Countrywide's financial statements did not comply with GAAP.  Defendants' statements concerning the types of loans produced and the value of prime loans held for investment were false and misleading because Countrywide misclassified subprime loans as prime loans.  Defendants' extensive statements concerning Countrywide's policies and procedures to ensure the origination of high quality loans were false and misleading as the Company had abandoned sound underwriting practices to increase loan origination volume.  Further, the SOX Certifications signed by Mozilo and McLaughlin were false and misleading because Countrywide's financial statements did not comply with GAAP and the Company did not maintain adequate disclosure controls and internal controls to report material risks taken by the Company in its lending practices and detect, prevent and/or report fraud.

**March 8, 2006 Raymond James Institutional Investors Conference**

349.   On March 8, 2006, Sieracki spoke at the Raymond James Institutional Investors Conference.  Sieracki falsely stated that Countrywide had grown its market share, not by loosening its underwriting standards, but because it had the most efficient organizational structure to fund loans quickly, which appealed to consumers and brokers.  Sieracki stated:

> [O]rganic growth has empowered production market share growth and frankly all of that market share growth took place not because we were a price leader, frankly it was operational capabilities, in last 4 years, we've had tremendous consumer demand for mortgages and frankly Countrywide was the best that's providing the infrastructure and machinery to fund loan.  It's been difficult especially for third parties like brokers and correspondence to get their loans funded, consumer demand so far outstripped lender supply that it will frankly a freeze of

1    the system and we were just the best at providing the infrastructure to

2    make those loans get funded.

3    350.   Sieracki's statements were false and misleading because Sieracki

4    misleadingly attributed Countrywide's market share growth to Countrywide's better

5    infrastructure without disclosing that Countrywide had increased loan volume by

6    abandoning sound underwriting practices.

7    **March 21, 2006 Piper Jaffray**
**Financial Services Conference**

8

9    351.   On March 21, 2006, Sieracki spoke at the Piper Jaffray Financial

10   Services Conference, at which he falsely described the loan portfolio held by

     Countrywide Bank.  According to Sieracki, Countrywide Bank's loan portfolio was

11   comprised of 40% Pay Option ARMS, 30% hybrids, 20% HELOCs and 10% fixed-

12   rate second mortgages.  According to Sieracki, The portfolio as a whole had an

13   "***extreme[ly] conservative nature.***"  Sieracki summed up the slide, falsely stating:

14   "***Very, very little risk taken in this portfolio***, strictly residential mortgages, no

15   construction loans, no commercial loans, ***nothing exotic, very, very conservative***

16   ***lending strategy***."

17   352.   In truth, Sieracki's statements falsely and misleadingly characterized the

18   portfolio of loans held by Countrywide's banking unit.  The Bank held billions of

19   dollars of risky mortgage loans originated by Countrywide, including Pay Option

20   ARMs and HELOCs, that Defendants knew posed a significant risk to the Bank and

21   were not conservatively underwritten.

22   **March 30, 2006 Countrywide Equity**
**Investors Forum**

23

24   353.   On March 30, 2006, Countrywide hosted a Financial Equity Investors

25   Forum in which Mozilo, Kurland, Sambol, Sieracki, and Carlos Garcia ("Garcia")

26   participated.  Sambol commented on the Company's culture and dedication to proper

27   controls:

28

---

COMPLAINT                                   110

[W]e have an intense and ongoing focus on share growth while at the same time *maintaining a very strong internal control environment and what we believe is the best-of-class governance . . . . [O]ur culture is also characterized by a very high degree of ethics and integrity in everything that we do*.

354. At the March 30, 2006 conference, Garcia noted that Countrywide's reserves for loan losses was more than sufficient because Countrywide fully understood the risk and because the loans that Countrywide originated were very high quality:

Carlos Garcia – Countrywide Financial - EMD and Chief of Banking: [T]he pay options that we're originating are *very high-quality pay options*, both in terms of FICO and LTV, as well as other credit attributes that we look at . . . . Also, our pay option reduction is originated through Countrywide['s] channels and is a *beneficiary of strong underwriting* . . . . So we think we understand the risk very well . . . .

In terms of our reserves and charge-offs, I would have you look at our charge-off experience and relate it to our reserves. Our reserves are around 18 basis points and our charge-off experience is something like in the neighborhood of two to three basis points. And so there's a multiples of the charge-off experience in the reserve, *we have reserved not based on our historical experience*, because we've been growing a new book, so we've looked at all of these different scenarios and *made many conservative assumptions and based our [loan loss] reserves on that*.

355. Mozilo also spoke during the March 30, 2006 conference about his ownership and sales of Countrywide's stock.

But in recent years I've sold no stock and I have no intention of selling any stock.

The only thing I've sold are options that are expiring. And I have a group that you've seen, those of you that follow, have seen me sell a certain amount of shares every week that's under a [10b5-1 plan] *so I have no control over it*. And I think the last exploration is either May or June of this year and I have options in the outer years. *So I've only sold those that I've been compelled to sell because I really believe in this company*, I believe we're just at the threshold of our greatness.

356.   The statements made during the March 30, 2006 conference above were materially false and misleading when made for the reasons set forth in §IV.B-E. Mozilo knew the Company was facing grave risks and was selling shares/options on the basis of this inside, non-public information. Countrywide's loan loss reserves were not adequate as the Company did not have "strong underwriting" and did not understand its Pay Option ARM portfolio, the loan quality was terrible and the loans could not reasonably be expected to perform well. Countrywide had not employed conservative assumptions in setting its reserves, but rather ignored the obvious credit problems in its portfolio.

**April 27, 2006 Earnings Release**

357.   On April 27, 2006, Countrywide issued a press release that announced the Company's financial results for the first quarter of 2006 (subsequently filed with the SEC). The Company falsely reported net earnings of $684 million and EPS of $1.10 for the quarter, and falsely reported the value of the Company's assets (including MSR and LHI). In the press release, Defendants falsely assured the marketplace that "*Countrywide's [financial] results demonstrate the effectiveness of our time-tested business model*, our focus on mortgage lending and the continued diversification of our earnings base." In truth, unbeknownst to investors, Countrywide had so substantially deviated from historic underwriting practices it was misleading to suggest that the Company's business model was "time-tested" as the Company had never before assumed such risk. The press release also misleadingly reported the

1   amount of the Company's loans originated and sold that were prime versus non-prime,

2   without disclosing the Company's definition of prime was far different than industry

3   standards.

4       358.   The press release falsely reassured investors that the Bank was only

5   retaining high-quality loans on its balance sheet, and did not disclose to investors

6   Defendants' knowledge that these loans posed substantial risks to Countrywide: "The

7   Bank continues to leverage its relationship with the Mortgage Banking segment by

8   sourcing high-quality mortgage assets through existing production distribution

9   channels and then funding the loans for either retention in the Bank's investment

10   portfolio or sale into the secondary mortgage market."

11       359.   On a conference call held later that same day, in which Mozilo, Kurland,

12   Garcia and Sieracki participated, the Company's senior management discussed the

13   first quarter 2006 financial results.  Mozilo made it a point to emphatically, but

14   falsely, emphasize the Company had grown the Pay Option ARM business without

15   sacrificing loan quality:  "***It's important to note that our pay option loan quality***

16   ***remains extremely high***."  Mozilo also said with regard to the Pay Option ARMs:

17           We, our origination activities are such that they ***the consumer is***

18           ***underwritten at the fully adjusted rate of the mortgage and is capable***

19           ***of making a higher payment should that be required when they reach***

20           ***the reset period.  Our history and the history of this product is very***

21           ***good*** and  you  have  individuals  who  have  very,  a  little  bit  more

22           sophistication in terms of the election to take this product and have that

23           flexibility and you can see that in the ***very high FICO rates*** that you

24           have in this product versus other ARM products.

25       360.   The statements made by Defendants on April 27, 2006 were materially

26   false and misleading when made for the reasons set forth in §IV.B-E.  Specifically,

27   Countrywide's financial statements did not comply with GAAP. Mozilo's statement

28   on the conference call that the Pay Option ARM loan quality was "extremely high"

was misleading when made because Defendants failed to disclose the material fact that Countrywide loosened and abandoned sound underwriting practices to increase the volume of loans originated without regard to quality.

**May 10, 2006 Form 10-Q**

361.   On May 10, 2006, Countrywide filed its Form 10-Q with the SEC.  In the Form 10-Q, signed by Kurland and Sieracki, Countrywide again reported its false and misleading financial results for the first quarter of 2006.  The Form 10-Q falsely reported the Company's earnings, ALL, valuations of RIs (including impairment), valuations of MSRs, and falsely described its exposure related to R&Ws made in connection with off-balance sheet loan securitizations.  The Form 10-Q also falsely described the Company's loan production by type.

362.   In the Form 10-Q, Defendants falsely reassured investors the Company's Pay-Option ARMs were high credit quality:

> We view these loans as a profitable product that ***does not create disproportionate credit risk***.  Our pay-option loan portfolio has ***very high initial loan quality***, with original average FICO scores (a measure of credit rating) of 721 and original loan-to-value and combined loan-to-values of 75% and 78%, respectively.  We only originate pay-option loans to borrowers who can qualify at the loan's fully indexed interest rates.

363.   The Company continued to boast: "We manage mortgage credit risk principally by . . . retaining high credit quality mortgages in our loan portfolio."

364.   Further, the Form 10-Q included SOX Certifications signed by Mozilo and Sieracki that were substantially identical to those set forth in ¶252.

365.   Defendants' statements in the May 10, 2006 Form 10-Q were materially false and misleading when made.  As set forth in greater detail in §IV.B-E, Defendants' statements concerning the types of loans produced and the value of prime loans held for investment were false and misleading because Countrywide

---

misclassified subprime loans as prime loans. Defendants' statements that Countrywide managed credit risk by only retaining "high credit quality loans" were false and misleading. As the Defendants knew, Countrywide's stated efforts to substantially increase market share could only be achieved by loosening the Company's underwriting guidelines, and abandoning sound underwriting practices, to increase loan volume without regard to loan quality and/or the borrower's ability to repay the loan. Further, the SOX Certifications signed by Mozilo and Sieracki were false and misleading because Countrywide's financial statements did not comply with GAAP and the Company did not maintain adequate disclosure controls and internal controls to report material risks taken by the Company in its lending practices and detect, prevent and/or report fraud.

**May 31, 2006 Sanford C. Bernstein**
**Strategic Decisions Conference**

366. On May 31, 2006, Mozilo spoke at the Sanford C. Bernstein Strategic Decisions Conference. Mozilo falsely reassured investors the Pay Option ARMs were a sound loan product, that they were well understood, and that Countrywide took "prudent program guidelines" and "sound underwriting":

> [T]he amount of pay option loans in the bank's portfolio now stands at 31 billion, up 19% from 26 billion in the last quarter. Despite recent scrutiny to pay option loans, and there's been plenty, Countrywide views the product as ***a sound investment for our bank*** and a sound financial management tool for consumers. . . . The performance profile of this product ***is well understood*** because of its 20-year history, which includes stress tests in very difficult environments. Moreover, ***Countrywide actively manages credit risk through prudent program guidelines including negative amortization limits and sound underwriting***.

367.   Mozilo also downplayed the impacts of any deterioration in housing prices or resetting of the interest payment in the Pay Option ARM (and other ARM) portfolios:

> Yes, the point I failed to cover in that first question, you asked what's the impact of Countrywide if you had deterioration [in home] values.  **_Very little_** because these loans are insured mostly a Fannie, Freddie or private mortgage insurance they have.  You see the bank [has] very substantial equity [to] loan [ ]valuation ratios.  **_So the impact [to] Countrywide through any of these cycles has been de minimis in terms of what happens when values go lower._**
>
> In terms of the second question on the – what happens when these arm loans reset, you have this payment shock that will take place.  It is hard to tell except again, a look at history, I have been through area of 18% mortgage rates and on variable loans and 25% prime rates.  You didn't see an extraordinary amount of foreclosures.  I think the highest foreclosure rate I think I have ever seen is about 2%. . . . [M]ortgagors individually or collectively are pretty smart people.  They can refinance these loans; most of these loans don't have a prepayment penalty.  They can refinance out to another on type loan payoff if the loan is creating a problem for them.  **_There is a variety of things that mortgagors can do to weave their way through a payment increase situation so they are not paralyzed by payment shock_**.

368.   Mozilo's statements concerning Pay Option ARMs were false and misleading for the reasons set forth in §IV.B-E.  The Pay Option ARM was not a time-tested product.  Indeed, as Sambol told Garcia on May 25, 2006 (only days before Mozilo spoke) "historical payoption performance trends can help disclose problems but are not sufficient/capable of providing comfort."  Further, Mozilo knew the Pay Option ARMs as underwritten by Countrywide were not well understood and

1    Countrywide was "flying blind" as to its exposure to these loans.  Moreover, Pay

2    Option ARMs were not a sound investment as Countrywide knew that fully one third

3    of the Company's enormous Pay Option ARMs portfolio had been originated pursuant

4    to the fraudulent overstatement of the applicants' income by over 50%.  The Company

5    had not managed its credit risk prudently or utilized "sound" underwriting.  Finally,

6    Mozilo was privately worried about the Pay Option ARM portfolio, negative

7    amortization, payment shock and the borrowers' ability to repay these loans and knew

8    that a decline in home prices would have a substantial – not a *de minimis* – impact on

9    Countrywide.

10   **July 25, 2006 Earnings Release**

11       369.   On July 25, 2006, Countrywide issued a press release that announced the

12   Company's financial results for the second quarter of 2006 (subsequently filed with

13   the SEC).  The Company falsely reported net earnings of $722 million and EPS of

14   $1.15 for the quarter, and falsely reported the value of the Company's assets

15   (including MSR and LHI).  In the press release, Defendants falsely assured the

16   marketplace that the Company's "growth initiatives . . . help position the Company as

17   a strong performer over the long term in a wide range of interest rate environments" –

18   despite Defendants' knowledge that a significant increase in interest rates posed an

19   alarming, likely fatal, threat to Countrywide as it would result in the Company's risky

20   and poor-quality loans to default at record rates.

21       370.   On a conference call held later that same day, in which Mozilo, Kurland,

22   Garcia and Sieracki participated, the Company's senior management discussed the

23   second quarter 2006 financial results.  Mozilo made it a point to emphatically, but

24   falsely, emphasize the Company "screened very carefully" the appraisers it used.

25       371.   The statements made by Defendants on July 25, 2006 were materially

26   false and misleading when made for the reasons set forth in §IV.B-E.  Specifically,

27   Countrywide's financial statements did not comply with GAAP.  Defendants failed to

28   disclose the material fact that Countrywide loosened and abandoned sound

1   underwriting practices to increase the volume of loans originated without regard to

2   quality.  As a result, Defendants' representation that the Company was positioned to

3   perform well in "a wide range of interest rate environments" was not at all true,

4   because, as Defendants knew, the Company's loan portfolio (and loans

5   sold/securitized to others) would suffer dramatic increases in delinquencies and

6   defaults if rates increased.  Finally, Countrywide did not carefully screen its

7   appraisers, but rather utilized appraisers that would rubber stamp loans so the

8   Company could inflate loan origination volume.

9   **August 7, 2006 Form 10-Q**

10       372.   On August 7, 2006, Countrywide filed its Form 10-Q with the SEC.  In

11   the Form 10-Q, signed by Kurland and Sieracki, Countrywide again reported its false

12   and misleading financial results for the second quarter of 2006.  The Form 10-Q

13   falsely reported the Company's earnings, ALL, valuations of RIs (including

14   impairment), valuations of MSRs, and falsely described its exposure related to R&Ws

15   made in connection with off-balance sheet loan securitizations.  The Form 10-Q also

16   falsely described the Company's loan production by type.

17       373.   In the Form 10-Q, Defendants falsely reassured investors the Company's

18   Pay-Option ARMs were high credit quality:

19        Our underwriting standards specify that a borrower must qualify

20       for a pay-option loan at the loan's fully amortizing payment based on

21       fully indexed interest rates. . . .  Our pay-option investment loan portfolio

22       borrowers had, at the time the loans were originated, average FICO

23       scores (a measure of borrower creditworthiness) of 721 and original

24       loan-to-value and combined loan-to-values of 75% and 78%,

25       respectively.  ***We believe this product is an attractive portfolio***

26       ***investment*** as the higher credit risk inherent in pay-option loans is

27       balanced by higher expected returns relative to other first mortgage loan

28       products.

374.   Further, the Form 10-Q included SOX Certifications signed by Mozilo and Sieracki that were substantially identical to those set forth in ¶252.

375.   Defendants' statements in the August 7, 2006 Form 10-Q were materially false and misleading when made.  As set forth in greater detail in §IV.B-E, Defendants' statements concerning the types of loans produced and the value of prime loans held for investment were false and misleading because Countrywide misclassified subprime loans as prime loans.  Defendants could not reasonably believe Countrywide's Pay Option ARMs were an "attractive portfolio investment" and Defendants knew Countrywide did not abide by its underwriting standard and that many of its Pay Option ARMs were made to borrowers who could not afford these loans.  Further, the SOX Certifications signed by Mozilo and Sieracki were false and misleading because Countrywide's financial statements did not comply with GAAP and the Company did not maintain adequate disclosure controls and internal controls to report material risks taken by the Company in its lending practices and detect, prevent and/or report fraud.

**September 12, 2006 Equity Investor Forum**

376.   On September 12, 2006, Countrywide held an Equity Investor Forum in which Mozilo, Sambol and Sieracki participated.  Jim Furash ("Furash"), Countrywide's Senior Managing Director and President of Countrywide Bank, emphasized numerous times during the conference, without correction or explanation by Mozilo, Sambol or Sieracki, the "high quality" of loans that were held by Countrywide Bank:

> [W]e have built a very large, fast growing, and very efficient deposit franchise that has enabled Countrywide to invest in a ***top quality mortgage origination***. . . .  But essentially our model is investing ***in very low-risk assets today***, and a very low net interest mortgage.
>
> * * *

*[I]ncredibly strong asset quality at the bank*. I'd like to emphasize again the large, tangible, high quality balance sheet that we built. . . . *A very strong portfolio*. . . . So we're very pleased with the credit decisions that we're making and the returns that we are receiving as a result of those decisions.

377.   The statements referenced above during the September 12, 2006 conference call were materially false and misleading when made.  Countrywide Bank's balance sheet was primarily carrying Countrywide loans, including tens of billions of dollars of HELOCs and Pay Option ARMs, that were high risk assets because Countrywide had originated the loans without appropriately underwriting them and subject to extremely loose underwriting criteria as set forth herein.

**September 13, 2006 Fixed Income Investor Forum**

378.   On September 13, 2006, Countrywide hosted a Fixed Income Investor Forum in which Mozilo, Sambol, and Sieracki participated.  At the investor forum, Mozilo touted the Company's prudent lending practices as an industry role model: "We take seriously the role of a responsible lender for all of our constituencies. . . . To help protect our bond holder customers, *we engage in prudent underwriting guidelines* . . . ."

379.   At the September 13, 2006 investor forum, Sambol claimed Countrywide did not heavily participate in subprime loans because the Company did not want to match the irrational lending decisions made by other subprime lenders:

Our profile in the subprime market has been one where we have, for the most part, been on the sidelines. . . .  And subprime however, particularly in the third-party channels, the wholesale channel we are in the bottom half of the top 10.  And the reason for that is that – is that that market we view to have been subject to some irrational conduct.

1    So, we view the pricing to be somewhat irrational. ***We view***
2    ***what's happened on the credit front to be very liberal. And so, we***
3    ***opted not to fully participate***, and it's for that reason you haven't seen
4    growth in subprime volume as maybe the subprime industry has grown.

5    380.   At the same investor forum, Sieracki stated:

6    ***We're the last ones to think that we should be aggressive and***
7    ***take high risk, there's no change in our risk appetite here***, we're
8    simply perfecting and refining our capital structure and making sure the
9    excess capital doesn't get out of line. . . . I don't want anybody to get the
10   impression that there's been a change in our risk appetite or that we're
11   going to do anything aggressive here.

12   381.   At the investor forum, Furash discussed the adequacy of Countrywide's
13   loan loss reserves:

14   Despite the significant asset growth we've been able to outpace
15   that growth in our loan portfolio with the growth in our reserve. So
16   again I want to emphasize that ***we reserve a very conservative amount***
17   ***based on our expected losses***, and we've been able to outpace our asset
18   growth with our growth in our loan loss reserve provision. So
19   management and myself feel very comfortable that we are well reserved
20   for all sorts of economic cycles that we can be.

21   382.   Also on September 13, 2006, Mozilo participated in the Lehman Brothers
22   Financial Services Conference. With respect to Pay Option ARMs, he stated: "To
23   help protect our bondholder customers, ***we engage in prudent underwriting***
24   ***guidelines*** that include neg-am limits of the initial unpaid principal balance and
25   ***underwriting to the fully indexed, fully amortized rate***."

26   383.   Defendants' statements were false and misleading for the reasons set
27   forth in §IV.B-E. Countrywide had not engaged in prudent underwriting of its loans,
28   including its Pay Option ARMs. Moreover, as Mozilo knew as a result of the 4506

Audit report conducted by Countrywide's Quality Control department, over 1/3 of Pay Option ARM borrowers have overstated income by 50% or more.  Countrywide did not underwrite Pay Option ARMs to the fully indexed, fully amortized rate and knew many of its borrowers could not afford their loans at the fully indexed, amortized amount.  Countrywide had not refrained from the race to the bottom by making irrational lending decisions; in fact Countrywide had adopted the same underwriting standards as its subprime competitors through Countrywide's matching strategy. Countrywide's reserves were not conservatively based, as Defendants knew or recklessly disregarded that the Company's loan portfolio contained tens of billions of bad loans that would not perform in line with the Company's models.

**October 24, 2006 Earnings Release**

384.   On October 24, 2006, Countrywide issued a press release that announced the Company's financial results for the third quarter of 2006 (subsequently filed with the SEC).  The Company falsely reported net earnings of $648 million and EPS of $1.03 for the quarter, and falsely reported the value of the Company's assets (including MSR and LHI).  The press release falsely reported the Company's loan production by category of loans, falsely labeling non-prime loans as prime.

385.   The press release falsely reported: "The Bank invests primarily in high-quality residential mortgage loans sourced from the Loan Production sector and, to a lesser extent, the secondary market."

386.   In the press release, Defendants (in particular Mozilo) also falsely assured the marketplace that "we are bullish on the positive long-term growth prospects for the mortgage lending industry and Countrywide in particular, as a result of the proven power of our business model and our strategic positioning" – despite Defendants' knowledge that Countrywide had completely transformed its business model to capture market share by originating high-risk, exotic loans and abandoning sound underwriting practices.

387.   On a conference call held later that same day, in which Mozilo, Kurland, Garcia and Sieracki participated, the Company's senior management discussed the third quarter 2006 financial results and the fourth quarter and year end outlook. Specifically, Mozilo emphasized that the Company's asset valuation reserves and loan loss reserves were appropriate for the increase in delinquencies that occurred:

> The year-over-year increase in delinquencies and foreclosures are primarily the result of portfolio seasoning, product mix, and changing economic and housing market conditions. . . . The Company believes its asset valuation reserves credit losses are appropriate for the increases in delinquencies.

388.   The statements made by Defendants on October 24, 2006 were materially false and misleading when made for the reasons set forth in §IV.B-E.  Specifically, Countrywide's financial statements did not comply with GAAP.  Defendants failed to disclose the material fact that Countrywide loosened and abandoned sound underwriting practices to increase the volume of loans originated without regard to quality.  As a result, Defendants' representations that Countrywide's reserves were adequate or that its business model was "proven" and justified Defendants' "bullish" position on "long-term growth" were misleading.

**November 7, 2006 Form 10-Q**

389.   On November 7, 2006, Countrywide filed its Form 10-Q with the SEC. In the Form 10-Q, signed by Sambol and Sieracki, Countrywide again reported its false and misleading financial results for the third quarter of 2006.  The Form 10-Q falsely reported the Company's earnings, ALL, valuations of RIs (including impairment), valuations of MSRs, and falsely described its exposure related to R&Ws made in connection with off-balance sheet loan securitizations.  The Form 10-Q also falsely described the Company's loan production by type.

390.   In the Form 10-Q, Defendants falsely reassured investors the Company was actively and effectively managing its credit risk, even though it had recklessly

1  incurred massive credit risks by abandoning sound underwriting practices to increase
2  loan production:

3          We manage mortgage credit risk by underwriting our mortgage
4          loan production to secondary market standards and by limiting credit
5          recourse to Countrywide in our loan sales and securitization transactions.
6          We also manage credit risk in our investment loan portfolio *by retaining*
7          *high credit quality loans*, through pricing strategies designed to
8          compensate for the risk, by active portfolio, delinquency and loss
9          management and mitigation activities and by obtaining credit insurance
10         policies on selected pools of mortgage loans that provide partial
11         protection from credit losses.

12  391.   Defendants falsely reassured investors that the Company's Pay Option
13  ARMs were properly underwritten and any increased credit risk associated with the
14  produce was more than offset by its profitability:

15         Our underwriting standards specify that a borrower must qualify
16         for a pay-option loan at the loan's fully amortizing payment based on
17         fully indexed interest rates. . . . Our pay-option investment loan portfolio
18         borrowers had, at the time the loans were originated, average FICO
19         scores (a measure of borrower creditworthiness) of 721 and original
20         loan-to-value and combined loan-to-values of 75% and 78%,
21         respectively.  *We believe this product is an attractive portfolio*
22         *investment as the higher credit risk inherent in pay-option loans is*
23         *balanced by higher expected returns relative to other first mortgage*
24         *loan products*.

25  392.   Further, the Form 10-Q included SOX Certifications signed by Mozilo
26  and Sieracki that were substantially identical to those set forth in ¶252.

27  393.   Defendants' statements in the November 7, 2006 Form 10-Q were
28  materially false and misleading when made.  As set forth in greater detail in §IV.B-E,

Defendants' statements concerning the types of loans produced and the value of prime loans held for investment were false and misleading because Countrywide misclassified subprime loans as prime loans.   Defendants' statements that Countrywide managed credit risk by only retaining "high credit quality loans" were false and misleading.   And, Defendants' statements that Pay Option ARMs were an "attractive" asset were false.   As the Defendants knew, Countrywide's stated efforts to substantially increase market share could only be achieved by loosening the Company's underwriting guidelines, and abandoning sound underwriting practices, to increase loan volume without regard to loan quality and/or the borrower's ability to repay the loan.   Further, the SOX Certifications signed by Mozilo and Sieracki were false and misleading because Countrywide's financial statements did not comply with GAAP and the Company did not maintain adequate disclosure controls and internal controls to report material risks taken by the Company in its lending practices and detect, prevent and/or report fraud.

**January 30, 2007 Earnings Release**

394.   On January 30, 2007, Countrywide issued a press release that announced the Company's financial results for the fourth quarter and full year of 2006 (subsequently filed with the SEC).   The Company falsely reported net earnings of $622 million and EPS of $1.01 for the quarter, and falsely reported the value of the Company's assets (including MSR and LHI).   The press release falsely reported the Company's loan production by category of loans, falsely labeling non-prime loans as prime.

395.   The press release falsely reported: "The Bank invests primarily in high-quality residential mortgage loans sourced from the Loan Production sector and the secondary market."

396.   In the January 30, 2007 press release, Defendants (in particular Mozilo) falsely assured the marketplace Countrywide had not taken on substantial risk that would impact the Company if and when there was a downturn in the housing market:

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

As we have said in the past, it is our view that the most relevant way to measure performance and growth in our industry and in our business is to view performance from business cycle to business cycle rather than year over year. ***This is how Countrywide manages its franchise and we are well positioned and extremely optimistic about our prospects to continue generating growth and superior returns over future cycles***.

397.   On a conference call held later that same day, in which Mozilo, Sambol, Garcia and Sieracki participated, the Company's senior management discussed the fourth quarter and full year 2006 financial results and the fourth quarter and year end outlook. Specifically, Mozilo falsely emphasized that the Company had created loan loss reserves in excess of what GAAP required and was limited in its ability to further increase reserves by what GAAP allowed:

GAAP has its limitations on that issue and we are doing our best to expand our reserves in one form or another. And obviously you have cash reserves and the other is that you discount the assets and the third is that you can get pool insurance or MI insurance on the assets. ***We've I think exercised ourselves to the maximum*** in that regard and will continue to do so, by the way, throughout 2007 . . . .

398.   Mozilo also falsely assured investors that Countrywide was not like sub-prime lenders who were then suffering major delinquencies and defaults, and going out of business as a result. Countrywide, unlike those sub-prime lenders, was committed to high credit quality and prudent lending, and therefore did not participate in the imprudent lending practices that characterized sub-prime originators who were going out of business. Mozilo misleadingly stated that other mortgage originators made high combined loan to value ("CLTV") loans to borrowers with bad credit, without disclosing that Countrywide did the same thing:

*[W]e backed away from the sub prime area because of our concern over credit quality.* And I think you're seeing the results of that with those competitors who took that product when we backed away.

So I think there's a couple – one is you're seeing two or three a day, there's probably 40 or 50 a day throughout the country going down in one form or another. And I expect that to continue throughout the year. I think that sub prime business was a business of you take inferior credit but you'd have, you'd require superior equity. And so people had to make a substantial down payment or if they had marginal credit.

Well, that all disappeared in the last couple of years and you get a 100% loan with marginal credit and that doesn't work and so – particularly if they have any kind of bumps like we have now in the deterioration of real estate values because people can't get out.

399.   The statements made by Defendants on January 30, 2007 were materially false and misleading when made for the reasons set forth in §IV.B-E. Specifically, Countrywide's financial statements did not comply with GAAP. Defendants failed to disclose the material fact that Countrywide loosened and abandoned sound underwriting practices to increase the volume of loans originated without regard to quality. Further, Countrywide was engaged in the same risky lending practices as subprime lenders and was making high CLTV loans to borrowers with poor credit. As a result, Defendants' representations that Countrywide did not engage in the same practices as subprime lenders, but had rather managed its business to prosper in a housing downturn, were false.

**March 1, 2007 Form 10-K**

400.   On March 1, 2007, Countrywide filed its Annual Report for 2006 with the SEC on Form 10-K (the "2006 Form 10-K). Mozilo signed the 2006 Form 10-K.

401.   In the 2006 Form 10-K, Countrywide again reported its false and misleading financial results for the fourth quarter and full year of 2006. The Form 10-

K falsely reported the Company's earnings, ALL, valuations of RIs (including impairment), valuations of MSRs, and falsely described its exposure related to R&Ws made in connection with off-balance sheet loan securitizations. The 2006 Form 10-K falsely described the Company's loan production by type, falsely characterizing non-prime loans as prime.

402. In the 2006 Form 10-K, Defendants emphatically reassured investors Countrywide was dedicated to originating quality mortgages:

> We rely substantially on the secondary mortgage market as a source of long-term capital to support our mortgage banking operations. Most of the mortgage loans that we produce in our Mortgage Banking Segment and Capital Markets Segment are sold in the secondary mortgage market, primarily in the form of MBS and ABS.

> Our strategy is to ensure our ongoing access to the secondary mortgage market by ***consistently producing quality mortgages*** and servicing those mortgages at levels that meet or exceed secondary mortgage market standards. We make significant investments in personnel and technology ***to ensure the quality of our mortgage loan production***.

403. In a section of the 2006 Form 10-K titled "Mortgage Credit Risk," the Company described its Credit Policy, portraying it as a tightly controlled and supervised process designed to produce high quality loans through a rigorous pre-loan screening procedure and post-loan auditing and appraisal and underwriting reviews:

> Loan Quality

> Our credit policy establishes standards for the determination of acceptable credit risks. Those standards encompass borrower and collateral quality, underwriting guidelines and loan origination standards and procedures.

Borrower quality includes consideration of the borrower's credit and capacity to pay. We assess credit and capacity to pay through the use of credit scores, application of a mortgage scorecard, and manual or automated underwriting.

We evaluate collateral quality through the use of appraisals, property inspections and/or automated valuation model.

Underwriting guidelines facilitate the uniform application of underwriting standards to all borrowers regardless of race, religion or ethnic background. Uniformity in underwriting also provides a means for measuring and managing credit risk.

*        *        *

Our underwriting guidelines for non-conforming mortgage loans, Prime Home Equity Loans, and Nonprime Mortgage Loans have been designed so that these loans are salable in the secondary mortgage market. We developed these guidelines to meet the requirements of private investors, rating agencies and third-party credit enhancement providers.

These standards and procedures encompass underwriter qualifications and authority levels, appraisal review requirements, fraud controls, funds disbursement controls, training of our employees and ongoing review of their work. We help to ensure that our origination standards are met by employing accomplished and seasoned management, underwriters and processors and through the extensive use of technology. We also employ proprietary underwriting systems in our loan origination process that improve the consistency of underwriting standards, assess collateral adequacy and help to prevent fraud, while at the same time increasing productivity.

COMPLAINT                                                129

We supplement our loan origination standards and procedures with a post-funding quality control process. Our Quality Control Department is responsible for completing loan audits that may consist of a re-verification of loan documentation, an underwriting and appraisal review, and, if necessary, a fraud investigation. We also employ a pre- and post-funding proprietary loan performance evaluation system. This system helps to identify fraud and poor performance of individuals and business entities associated with the origination of our loans. The combination of this system and our audit results allows us to evaluate and measure adherence to prescribed underwriting guidelines and compliance with laws and regulations.

404. In the 2006 Form 10-K, Defendants falsely reassured investors that the increase in nonperforming assets and the increase in the Company's allowance for credit losses was normal and nothing to be alarmed about because the Company only retained high quality loans and was in compliance with GAAP:

As our portfolio of investment loans has grown, our portfolio credit risk has also grown. Our allowance for credit losses was $269.2 million at December 31, 2006, an increase of 36% from December 31, 2005. The increase in our allowance for loan losses reflects prevailing real estate market and economic conditions and the seasoning of the Bank's investment loan portfolio. We expect the allowance for loan losses to increase, both in absolute terms and as a percentage of our loan portfolio as our loan portfolio continues to season and as current market conditions develop. However, *we believe that our investment criteria have provided us with a high quality investment portfolio and that our credit losses should stay within acceptable levels. We also believe our allowances and provisions for credit losses are adequate pursuant to generally accepted accounting principles*.

405.  Defendants falsely assured investors that Countrywide Bank only invested in high-quality mortgage assets: "Our Banking Operations continue to leverage the relationship with our Mortgage Banking Segment, sourcing ***high-quality mortgage assets*** for our investment portfolio through the Mortgage Banking Segment's existing production distribution channels, as well as through purchases of loans from non-affiliated lenders."

406.  Defendants falsely assured investors that the Company continually evaluated the credit quality of its loan portfolio and set adequate loan loss reserves based on historic loan performance – but Defendants failed to disclose the Company did not have historic data sufficient to assess the likely performance of its exotic loan portfolios (such as Pay Option ARMs and HELOCs) and that the allowance did not properly consider that Countrywide had abandoned sound underwriting practices:

> We continually assess the credit quality of our portfolios of loans held for investment to identify and provide for losses incurred.
>
> *     *     *
>
> We estimate the losses incurred in our homogeneous loan pools by estimating how many of the loans will default and how much of the loans' balances will be lost in the event of default.
>
> We estimate how many of our homogeneous loans will default based on the loans' attributes (occupancy, loan-to-value, borrower credit score, etc.) which is further broken down by present collection status (delinquency).  This estimate is based on our historical experience with our loan servicing portfolio.

407.  The 2006 Form 10-K falsely stated "we believe we have prudently underwritten" Countrywide's Pay Option ARMs.

408.  KPMG issued an audit report on management's assessment of the Company's internal control over financial reporting, in accordance with the standards

COMPLAINT                                                131

of the Public Company Accounting Oversight Board.  In a report dated February 28, 2007, KPMG stated:

> We conducted our audit in accordance with the standards of the Public Company Accounting Oversight Board (United States).
>
> *     *     *
>
> In our opinion, management's assessment that the Company maintained effective internal control over financial reporting as of December 31, 2006, is fairly stated, in all material respects . . . .
>
> We also have audited, in accordance with the standards of the Public Company Accounting Oversight Board (United States), the consolidated balance sheets of Countrywide Financial Corporation and subsidiaries as of December 31, 2006 and 2005, and the related consolidated statements of earnings, changes in shareholders' equity and comprehensive income and cash flows for each of the years in the three-year period ended December 31, 2006, and our report dated February 28, 2007, expressed an unqualified opinion on those consolidated financial statements.

409.   Further, the 2005 Form 10-K included SOX Certifications signed by Mozilo and McLaughlin that were substantially identical to those set forth in ¶252.

410.   Defendants' statements in the 2006 Form 10-K were materially false and misleading when made.  As set forth in greater detail in §IV.B-F, Countrywide's financial statements did not comply with GAAP.  Defendants' statements concerning the types of loans produced and the value of prime loans held for investment were false and misleading because Countrywide misclassified subprime loans as prime loans.  Defendants' extensive statements concerning Countrywide's policies and procedures to ensure the origination of high quality loans were false and misleading as the Company had abandoned sound underwriting practices to increase loan origination volume.  Further, the SOX Certifications signed by Mozilo and McLaughlin were

1   false and misleading because Countrywide's financial statements did not comply with

2   GAAP and the Company did not maintain adequate disclosure controls and internal

3   controls to report material risks taken by the Company in its lending practices and

4   detect, prevent and/or report fraud.

5   **March 6, 2007 Raymond James Institutional**
6   **Investors Conference**

7       411.   On March 6, 2007, Sieracki spoke at the Raymond James Institutional

8   Investors Conference.  During the conference, Sieracki falsely reassured investors that

9   Countrywide was different than monoline subprime lenders in that the Company had

10  been prudent in its subprime lending and did not have much exposure to poorly

11  performing subprime mortgages.  Sieracki stated:

12          As I mentioned earlier we've always been under-indexed [with respect to

13          subprime mortgages.]  There are some estimates that sub-prime is as

14          much as 20% of the market.  We're less than 10[% subprime].  ***We're***

15          ***not as aggressive as others on underwriting***.  That [monoline subprime

16          lender] model and correspondent model is the model at risk.

17      412.   Sieracki's statements were false and misleading.   Countrywide's

18  percentage of subprime loans was misleading because Countrywide utilized a

19  definition of "subprime" that was inconsistent with industry practices.  Moreover,

20  Countrywide's business model was at risk because the Company had been aggressive

21  in underwriting loans to persons that the Company knew would have difficulty

22  repaying.  Indeed, as a result of the Company's matching strategy, Countrywide's

23  underwriting guidelines were just as aggressive as subprime lenders and Countrywide

24  had abandoned sound underwriting practices.

25  **March 7, 2007 Morgan Stanley**
26  **Under the Hood Conference**

27      413.   On March 7, 2007, Sieracki spoke at the Morgan Stanley Under the Hood

28  Conference where he falsely reassured investors that Countrywide's Pay Option

ARMs were a "tested" product the Company was "very confident" about and the loans retained by Countrywide Bank were the best credit quality of the loans originated by Countrywide.  Sieracki stated:

> [O]n the pay options arms, this is a product where the consumer gets the privilege to make a payment less than the principal amortization and therefore they may have negative amortization. ***The concept that has been around for decades and frankly with some regional products in California was tested in the recession in California in the early 90's, defaults did not strike off the [chart], we have a good data point there. . . .*** And furthermore ***our bank has been able to be very selective*** about the loans that funded giving first look at all of the production of the largest originator in the world.

> * * *

> We are – ***we are very confident about that product***, you know we have 32 billion exposure out of our 200 billion in assets.  So, that's – that's pretty much the story on pay-options.

414.   Sieracki's statements were false and misleading for the reasons set forth in §IV.B-E.  Sieracki and the other Defendants were not confident in the credit quality of the Pay Option ARMs or Countrywide's ability to forecast delinquencies and defaults.  Indeed, as Mozilo recognized in 2006, Countrywide was "flying blind" on the Pay Option ARMs and had no idea how they would perform in a stressed environment.  Moreover, as Defendants knew, between 30-40% of the Pay Option ARMs on Countrywide Bank's balance sheet were originated pursuant to fraudulently inflated income amounts.  The Pay Option ARMs were, as Mozilo recognized, "inherently unsound" and had not been properly underwritten.

**March 13, 2007 CNBC and March 22, 2007
"Mad Money" Interviews**

415.   On March 13, 2007, CNBC reporter Maria Bartiromo interviewed Mozilo.  Mozilo misleadingly distanced the lending practices at Countrywide from those of subprime lenders, even though Mozilo knew that – like the mono-line subprime lenders he referenced – Countrywide had engaged in extremely risky lending practices that would soon result in much higher delinquencies and defaults:

> MOZILO: [T]he [companies] . . . that you see exposed [from the subprime market] at the moment would be the New Centuries, the NovaStars, and the Accredited Home Loans, and, those are monoline companies, subprime companies, that did well in the housing boom, in the bubble, but once the tide went out, you can see what's happened.  ***I think it's a mistake to apply what's happening to them to the more diversified financial services companies such as Countrywide***, Wells Fargo and others.  Certainly, a percentage of our business is subprime.  ***We had 7 percent of our*** [loan originations in subprime] . . . .
>
> BARTIROMO: Seven percent?  Angelo, so you've got seven percent of originations coming from the subprime area?
>
> MOZILO: That's correct.  And about .2 percent of our assets are in subprime.  So I think it's very important that this be kept in perspective.  So, for us, what our concern is, Maria, is not so much for Countrywide ***because we'll be fine.  In fact, this will be great for Countrywide at the end of the day because all the irrational competitors will be gone***.  So, you have to look over this valley you know to the horizon and it looks very positive for us.

416.   Mozilo's statements were false and misleading for the reasons set forth in §IV.B-E and because, as Mozilo knew, among other things, Countrywide had abandoned sound underwriting practices and originated billions of dollars of

1   extremely risky loans – and in that respect Countrywide was very much like subprime

2   lenders then going bankrupt.

3   **April 26, 2007 Earnings Release**

4       417.   On April 26, 2007, Countrywide issued a press release that announced

5   the Company's financial results for the first quarter of 2007 (subsequently filed with

6   the SEC). The Company falsely reported net earnings of $434 million and EPS of

7   $0.72 for the quarter, and falsely reported the value of the Company's assets

8   (including MSR and LHI). The press release also falsely reported the Company's loan

9   production by category of loans, falsely labeling non-prime loans as prime.

10       418.   The press release falsely reported: "The Bank invests primarily in high-

11   quality residential mortgage loans sourced from the Loan Production sector and the

12   secondary market."

13       419.   On a conference call held later that same day to discuss the first quarter

14   financial results, in which Mozilo, Sambol, Garcia and Sieracki participated, Mozilo

15   again tried to distance Countrywide from the meltdown in the subprime loan industry.

16   Mozilo assured the marketplace that problems within the subprime loan market

17   (growing delinquencies and defaults, mortgage fraud, repurchase requests, etc.) were

18   not impacting Countrywide and the vast majority of loans Countrywide originated:

19           [T]here has been a lot of talk about contagion or spillover from

20           subprime to Alt-A and so we thought we would comment a little bit on

21           that market and Countrywide's views and exposure to Alt-A. First of all,

22           by way of description, Alt-A generally consists of loans to prime credit

23           borrowers unlike subprime . . . who don't qualify for traditional prime

24           programs due to a variety of things; reduced documentation most notably

25           and/or other layering of risk factors, maybe higher LTVs and higher loan

26           amounts.

27                             \*      \*      \*

28

As it relates to Alt-A, the conclusion there is that, ***at least for Countrywide, there has not been any material impact or spillover into Alt-A or for that matter into our prime business***.

420.   During the April 26, 2007 conference call, Sambol declared that "of course, Countrywide has the liquidity and the capital and the infrastructure to take advantage of the structural changes that are taking place in this market."

421.   The statements made by Defendants on April 26, 2007 were materially false and misleading when made for the reasons set forth in §IV.B-E.  Specifically, Countrywide's financial statements did not comply with GAAP.  Defendants failed to disclose the material fact that Countrywide loosened and abandoned sound underwriting practices to increase the volume of loans originated without regard to quality.  Further, Defendants misleadingly differentiated Countrywide from subprime lenders even though they knew Countrywide's loans, including its Alt-A and prime loans, suffered the same material defects witnessed in other lenders' subprime portfolios.  Also, Defendants knew, contrary to their statements, that Countrywide's business model and access to liquidity were highly dependent on generating quality loans, which the Company was not and had not been doing.   Assertions that Countrywide had the "liquidity and the capital" to build the business in a market-downturn were misleading for failure to disclose these material facts.

**April 26, 2007 AFSA 7th Finance Industry Conference**

422.   On April 26, 2007, Countrywide participated at the AFSA 7th Finance Industry Conference for International Fixed-Income Investors.  At that conference, Jennifer Sandefur ("Sandefur"), Senior Managing Director and Treasurer, attempted to distinguish Countrywide from subprime mortgage lenders.

There's been a significant amount of turmoil in the market recently as a result of the nonprime mortgage sector.  We strategically manage that. ***We're essentially a prime mortgage originator***.  We have

$400 million in residual investments on our balance sheet. **We have a very conservative liquidity profile which insulates us from market events like the subprime origination market events**.

. . . [D]uring the time that we acquired the bank in 2006, we originated over $2 trillion in mortgages in the United States, prime **and a small amount of subprime** and we put about **$73 billion of very prime mortgages on our own balance sheet**.

423.   At the same conference, Sandefur again emphasized Countrywide's high quality mortgages:

Again, **over 90% of Countrywide loan origination volume is prime quality. Less than 9% of our production is subprime. . . . The nonprime loans are all held for investment and sold into securitizations with none of those going on our bank's balance sheet**.

A little bit more about the bank. Again, and the **high credit quality of that portfolio that we selected. Very low interest rate risk**.

424.   Sandefur expressly distanced Countrywide from the underwriting and the plight of subprime lenders. Sandefur falsely stated Countrywide was unlike those subprime lenders that loosened their standards:

"[M]any of the players that originated . . . [subprime] loans and loosened these standards as they were kind of gasping for breath at the very end of the run in the refi boom, I think lowered a lot of the underwriting standards which caused a lot of these delinquency problems. A lot of these smaller players are exiting the business willingly in many cases and unwillingly in some cases.

* * *

**I'd like to differentiate Countrywide here**.

425.   At the same conference, Sandefur commented on the adequacy of Countrywide's allowance account for loan losses due to the pristine nature of its portfolio:

> Allowances for loan losses which are really a 12 month perspective look at potential losses, we've booked at $229 million for '06. Actual net charge-offs for the bank portfolio were only $34 million. ***So very conservative allowances for loan losses at very small actual charge offs given the very pristine nature of this portfolio***. . . . So, again, the point here, ***not subprime.  Very, very prime***.  Kind of the opposite of subprime.

426.   The statements referenced above and made at the April 26, 2007 Fixed Income Conference were materially false and misleading when made.  Countrywide's characterization of its loan origination as over 90% prime was false and misleading. Countrywide was the same as many subprime companies that had lowered underwriting standards to drive up loan volume, indeed, Countrywide employed a matching strategy that forced the Company to take loans that only the most aggressive subprime lenders would take.  The $73 billion of loans on Countrywide's balance sheet was not "very prime" but rather riddled with fraud, exceptions and excessive risk layering, among other factors, that made the loans highly likely to become delinquent and/or default.

**May 9, 2007 Form 10-Q**

427.   On May 9, 2007, Countrywide filed its Form 10-Q with the SEC.  In the Form 10-Q, signed by Sambol and Sieracki, Countrywide again reported its false and misleading financial results for the first quarter of 2007.  The Form 10-Q falsely reported the Company's earnings, ALL, valuations of RIs (including impairment), valuations of MSRs, and falsely described its exposure related to R&Ws made in connection with off-balance sheet loan securitizations.  The Form 10-Q also falsely described the Company's loan production by type.

428.   In the Form 10-Q, Defendants falsely reassured investors that Countrywide structured its operations to ensure consistent production of quality mortgages:

> Nearly all of the mortgage loans that we originate or purchase in our Mortgage Banking and Capital Markets Segments are sold into the secondary mortgage market primarily in the form of securities, and to a lesser extent as whole loans.  In connection with such sales, we have liability under the representations and warranties we make to purchasers and insurers of the loans.   In the event of a breach of such representations and warranties, we may be required to either repurchase the mortgage loans with the identified defects or indemnify the investor or insurer.  In such cases, we bear any subsequent credit loss on the mortgage loans.  Our representations and warranties are generally not subject to stated limits.  However, our contractual liability arises only when the representations and warranties are breached.  We attempt to limit our risk of incurring these losses ***by structuring our operations to ensure consistent production of quality mortgages*** and servicing those mortgages at levels that meet or exceed secondary mortgage market standards.  We make significant investments in personnel and technology to ***ensure the quality of our mortgage loan production***.

429.   Defendants falsely reassured investors that the Company's Pay Option ARMs were properly underwritten and any increased credit risk associated with the produce was more than offset by its profitability:

> We manage the credit risk relating to pay-option ARM loans through a variety of methods, including active borrower communications both before and after funding, ***through our underwriting standards*** and through the purchase of mortgage insurance.  Our underwriting standards conform to those required to make the pay-option ARM loans salable

into the secondary market at the date of funding, including a requirement that the borrower meet secondary market debt-service ratio tests based on the borrower making the fully amortizing loan payment and assuming the loan's interest rate is fully indexed.

430.    In the Form 10-Q, Defendants reassured investors Countrywide did not have any liquidity concerns – but Defendants failed to disclose that the Company's access to liquidity was significantly jeopardized by its reckless lending practices: "The substantial majority of our assets continue to experience ample liquidity in the marketplace.  As such, we do not expect the reduction in liquidity for nonprime loans to have a significant adverse effect on our ability to effectively meet our financing requirements." Similarly, Defendants stated – without disclosing the Company's true lending practices: "We believe we have adequate financing capacity to meet our currently foreseeable needs."

431.    Further, the Form 10-Q included SOX Certifications signed by Mozilo and Sieracki that were substantially identical to those set forth in ¶252.

432.    Defendants' statements in the May 9, 2007 Form 10-Q were materially false and misleading when made.  As set forth in greater detail in §IV.B-E, Defendants' statements concerning the types of loans produced and the value of prime loans held for investment were false and misleading because Countrywide misclassified subprime loans as prime loans.  Countrywide's financial results were not accurate and  had failed to take into consideration the Company's bad loans.  The Company's operations were not structured to "ensure consistent production of quality loans" but, rather, the Company was disregarding its practices and procedures to originate loans that did not comport with the Company's guidelines.  Countrywide did not have "ample" liquidity to meet its financing requirements, as the Company's lending practices jeopardized its access to financing.  Further, the SOX Certifications signed by Mozilo and Sieracki were false and misleading because Countrywide's financial statements did not comply with GAAP and the Company did not maintain

1  adequate disclosure controls and internal controls to report material risks taken by the

2  Company in its lending practices and detect, prevent and/or report fraud.

3      **C.**    **The Risks Concealed by Defendants Materialize, Causing Countrywide's Stock Price to Collapse, Yet Defendants**

4                **Continue to Conceal the Full Truth from Investors**

5      433.  Defendants engaged in a complex series of misrepresentations and

6  omissions over a long period of time.  Defendants concealed from investors both the

7  likelihood and extent of the risks associated with Countrywide abandoning sound

8  underwriting practices to increase loan volume.  These risks – which included, among

9  other things, massive delinquencies and defaults, reduced earnings, and an inability to

10  access liquidity and the secondary loan market – ultimately materialized and caused

11  Countrywide's stock price to be dramatically reduced.

12      434.  Defendants did not simply admit to their fraud or reveal the full truth to

13  the markets.  Rather, Defendants continued to conceal the truth and defraud investors

14  even once Defendants began to leak corrective information to the market.

15  Accordingly, revelations of the truth were interspersed with fraudulent false

16  statements that maintained the artificial inflation in the stock for months.

17      435.  Defendants and other sources leaked corrective information to the market

18  beginning no later than July 16, 2007, and lasting through the end of November 2007,

19  through which the market learned the true financial condition of Countrywide.

20  ///

21  ///

22  ///

23  ///

24  ///

25  ///

26  ///

27  ///

28  ///

**The July 16, 2007 Form 8-K**

436. On July 16, 2007, Countrywide issued a press release and filed a Form 8-K with the SEC in which Countrywide purported to report June 2007 operational results. While the report stated loan fundings had increased by 4% from June of the prior year, Sambol is quoted as revealing to the market that "delinquencies and defaults continue to rise" and the Company published specific details. For example, foreclosures (as a percentage of unpaid principal amount) had more than doubled from June 2006.

437. Commenting on the growing delinquencies and defaults, Stuart Plesser, an analyst at Standard & Poor's, stated: "It's definitely a worrying trend."

438. Friedman Billings Ramsey & Co. analyst Paul Miller cut his 2007 profit forecast for Countrywide to $3.20 from $3.80 per share and slashed his share-price target to $36 from $42, citing, among other things, "rising delinquencies."

439. Countrywide's growing delinquencies and defaults were a foreseeable result of Countrywide's undisclosed abandonment of sound underwriting practices. As a result of this disclosure, Countrywide's stock price declined from $36.26 to $34.84 on heavy volume.

**July 24, 2007 Earnings Release**

440. On July 24, 2007, Countrywide filed a Form 8-K and issued a press release announcing its financial results for the second quarter of 2007. The Company admitted "delinquencies and defaults continued to rise across all mortgage product categories" and, as a result, "the Company increased credit-related costs in the quarter, primarily related to its investments in prime home equity loans." Specifically, delinquencies of HELOCs had increased from 1.77% as of June 30, 2006 to 4.56% as of June 30, 2007.

441. As a result of Countrywide's growing delinquencies and defaults, which were a foreseeable result of Countrywide abandoning sound underwriting practices, the Company was being forced to take substantial new charges and loan loss

provisions.  These charges and provisions partially revealed to investors that the quality of Countrywide's loans, especially its purportedly "prime" loans, was weaker than had previously been represented and that the quality of the loans would impair Countrywide's ability to report strong earnings.  The report disclosed, for example, that Countrywide had reserved $293 million for loan losses, compared to just $61.9 million in comparable loan loss reserves the prior year.  Countrywide attributed $181 million of the increased loan loss reserve to HELOCs in the Company's held-for-investment portfolio.  In addition, Countrywide wrote down the value of "residual securities collateralized by prime home equity loans" by $388 million.  These "residual securities" were retained by Countrywide after other securities relating to the prime home equity loans at issue were sold.  As a result of these charges and adjustments, Countrywide reported reduced second quarter earnings of 81 cents per share, down from $1.15 per share one year earlier.

442.  During a conference call that day, July 24, 2007, Countrywide indicated for the first time that it may have classified some loans to borrowers with FICO scores as low as 500 as "prime" – far below the industry norm of requiring a borrower to have a minimum FICO score of 660 in order for a loan to the borrower to be classified as "prime."  During the call, Countrywide acknowledged that a hypothetical "prime" loan in which the borrower had a 500 FICO score was "over 30 times more likely to be seriously delinquent than a prime loan with an 800 FICO, holding all other variables constant."  Later in the same conference call, McMurray admitted: "There is a belief by many that prime FICOs stop at 620.  That is not the case."

443.  During the July 24, 2007 conference call, Defendants revealed that, as of the end of the second quarter of 2007, 80% of Countrywide's Pay-Option ARM loans were actually low documentation loans.  According to the Stifel Nicolaus analyst covering Countrywide, he "had at the time no idea that … four out of five loans in the pay option bank portfolio were . . . stated income.  That just – that seems much, much higher than we would have expected."  This was material to investors.

444.   Defendants also revealed during the July 24, 2007 call, that many of the charge-offs and delinquencies in the home equity portfolio were due to "higher CLTV and the higher CLTV reduced documentation loans." As Sambol elaborated:  "Many of those stem from the higher concentration of piggyback financing that we did and that we have in the port[folio] stemming from what was occurring in the market."  As McMurray explained during the call:  "In many cases, piggyback transactions were done as a substitute for mortgage insurance.  I point this out because it is an important difference between our HELOC business compared to traditional HELOC business." And, as McMurray also stated on the conference call, "leverage at origination matters. More leverage means more serious delinquencies."

445.   Analysts were surprised by Countrywide's disclosures.  The Stifel Nicolaus analyst has testified he was "very surprised by the disclosures in the bank's portfolio" because Countrywide had "always characterized the bank as, as being prime, high quality loans, and the disclosures [on July 24] suggested otherwise."

446.   As a result of the July 24, 2007 disclosures, Countrywide's stock price declined on July 24, 2007 by approximately 10.5%, from $34.06 to $30.50, on volume of 51,249,500 shares, as compared to volume of 12,730,800 shares the prior trading day.  Countrywide's stock continued to drop to $30.07 on the following day, again on high volume, as the market digested Defendants' disclosure.

447.   Even though the foreseeable results of Defendants' risky lending practices were beginning to materialize, Defendants did not disclose the full extent to which the Company had abandoned sound underwriting practices or the extent of the risks posed by the bad loans on the Company's balance sheet (or which the Company had sold/securitized but would be put back to Countrywide).

448.   Defendants continued to maintain the artificial inflation in Countrywide's stock price by failing to disclose, among other things:

(a)   Defendants knew, but did not disclose, the large percentage of loans originated by Countrywide pursuant to exceptions or that Countrywide knew

---

COMPLAINT                                    145

1   loans originated pursuant to exceptions to Countrywide's underwriting policies, even

2   purportedly prime loans, had exhibited astoundingly poor performance;

3          (b)   Defendants knew, but failed to disclose, that the Pay Option ARMs

4   on Countrywide's balance sheet posed a massive risk to the Company, and that

5   defaults and delinquencies were likely to grow dramatically.  Countrywide did not

6   have a reasonable basis for establishing reserves or projecting losses for its Pay

7   Option ARMs, as the product (as originated by Countrywide) was not time-tested.

8   Countrywide knew borrowers "comprehensively" did not understand the loans and,

9   according to an internal Countrywide study, at least 25% of Pay Option ARMs

10  borrowers could not afford the fully amortized payments;

11         (c)   Defendants knew, but did not disclose, that an extremely high

12  percentage of Countrywide's stated income loans included fraudulently inflated

13  income amounts.  For example, Countrywide Bank internally recognized that one-

14  third (33%) of the reduced documentation loan products, including Pay Option ARMs,

15  held for investment by Countrywide Bank had income overstated by fifty percent

16  (50%) or more – and these findings were communicated to, among others, Sambol;

17         (d)   Defendants knew, but failed to reveal, that for years Countrywide

18  employed a "matching strategy" by which Countrywide ceded its own underwriting

19  standards to those employed by the most aggressive lenders in the business, and did so

20  without employing the mitigating factors utilized by such other lenders; and

21         (e)   Defendants knew, but failed to reveal, that the Company's

22  reserves, and process for setting reserves, were inadequate and employed a backward-

23  looking methodology that was improper in light of the Company's abandonment of

24  sound underwriting practices.

25         449.   Although Defendants revealed some corrective information to the market

26  on July 24, 2007 concerning Countrywide's lending practices and the quality of its

27  loans, Defendants continued to make affirmative false and misleading statements

28  concealing the truth from investors.

COMPLAINT                                   146

450.   Although Countrywide substantially increased credit-related costs during the quarter, Countrywide's July 24, 2007 earnings release reported earnings and other financial results that did not comply with GAAP.  The Company falsely reported net earnings of $485 million and EPS of $0.81 for the quarter, and falsely reported the value of the Company's assets (including MSR and LHI).

451.   On the analyst conference call on July 24, 2007, Mozilo and Sambol falsely stated that the amount of mortgage fraud that Countrywide had witnessed was "de minimis" even though Defendants knew an extremely large percentage of Countrywide's stated income loans were fraudulent.  In responding to a question by Samuel Crawford of Citigroup concerning "how important fraud has been," Mozilo stated (and Sambol expressly agreed):

> I think the primary issue has been the issue of speculation rather than fraud.  I'm not saying there has not been some fraud in the traditional – where people, crooks got involved in a totally fraudulent transaction, straw buyers and that kind of thing. ***I think that appears to be de minimis***.

452.   Mozilo also falsely stated that the growing mortgage crisis would allow Countrywide to leverage its strong liquidity position and increase earnings in the long-term – which he knew to be a misleading statement given the Company's precarious liquidity position and rapidly growing delinquency and default rate:

> Notwithstanding current environment factors and their near-term impact on earnings, we believe that the Company is well positioned to capitalize on opportunities during this transitional period in the mortgage business, which we believe will enhance the Company's long-term earnings growth prospects.  We expect to leverage the strength of Countrywide's capital liquidity positions, superior business model, and best in class workforce to emerge in a superior competitive position coming out of the current housing downcycle.

453.   Similarly, Sieracki falsely reassured investors the Company did not face any liquidity constraints:

> I can give you some overview comments on our liquidity, but we're certainly not going to have any issues funding the Company.  We have a very conservative liquidity management philosophy, we have adequate diversified and reliable sources of liquidity available.
>
> *     *     *
>
> So we have abundant excess capital in terms of equity and we have tremendous liquidity sources to fund ourselves through this situation.  And we feel very, very comfortable about liquidity scenario overall.

454.   The statements referenced above in ¶¶451-453 were materially false and misleading when made as detailed in §IV.B-E.  Among other things, Defendants knew a substantial portion of the Company's loans was originated on the basis of fraudulent applications that materially overstated the borrower's income, and, as a result, delinquencies and defaults were then growing at a rapid rate.  Defendants knew Countrywide's liquidity position was precarious as the Company's loans were becoming delinquent and defaulting at a high and growing rate, which, among other things, jeopardized the Company's access to the secondary markets. Countrywide did not have a "conservative liquidity management philosophy" as the Company's access to financing was jeopardized by its risky lending practices.

**The August 2-3, 2007 Disclosures**
**Concerning Liquidity**

455.   From August 1, 2007, through August 3, 2007, investors became increasingly concerned about Countrywide's liquidity in light of Countrywide's risky lending practices.  Indeed, on August 1, 2007, the annual cost of protecting $10 million of Countrywide bonds against possible default for five years was $172,000, but increased to $213,000 on August 2, 2007, and $328,000 on August 3, 2007. The

concealed risks associated with Countrywide abandoning sound underwriting practices were materializing in the form of a heightened likelihood of being shut out of the secondary market and not having access to capital – and ultimately bankruptcy.

456. Acknowledging the bankruptcy speculation, on August 2, 2007, Countrywide issued a press release, quoting Sieracki, in which Defendants made false and misleading statements in an effort to alleviate investor concerns and conceal the true risk that Countrywide would suffer a liquidity crisis.   According to Countrywide's press release:

> "Countrywide has longstanding and time-tested funding liquidity contingency planning," said Eric P. Sieracki, Chief Financial Officer. "These planning protocols were designed to encompass a wide variety of conditions, including recent secondary market volatility.  Our liquidity planning proved highly effective earlier during 2007 when market concerns first arose about subprime lending, and remains so today.  We place major emphasis on the adequacy, reliability and diversity of our funding sources. . . ."

> Sieracki continued, "Our mortgage company has significant short-term funding liquidity cushions and is supplemented by the ample liquidity sources of our bank."

457. Defendants' statement was false and misleading for the reasons alleged in ¶454.

458. Defendants' August 2, 2007 press release misled Plaintiffs, who believed the press release to be truthful.

459. Despite Countrywide's August 2, 2007 press release, which fraudulently attempted to conceal Countrywide's liquidity crisis, the market as a whole continued to be concerned that Countrywide's lending practices would cause the Company to suffer a liquidity crisis.

COMPLAINT                                             149

460.   On July 31, 2007, Countrywide stock closed at $28.17.  Because of speculation that Countrywide's lending practices would cause the Company to suffer a liquidity crisis, Countrywide's stock dropped by $3.17, on heavy volume over three days, to close at $25 on August 3, 2007

**The August 9, 2007 Form 10-Q**

461.   After the stock market closed on August 9, 2007, Countrywide filed with the SEC the Company's Form 10-Q quarterly report for the quarter ended June 30, 2007.  The Form 10-Q surprised the investing public by noting the existence of "unprecedented market conditions" bearing on Countrywide's liquidity, and by further noting: "While we believe we have adequate funding liquidity, the situation is rapidly evolving and the impact on the Company is unknown."   Further, Defendants disclosed:  "Since the Company is highly dependent on the availability of credit to finance its operations, disruptions in the debt markets or a reduction in our credit ratings, could have an adverse impact on our earnings and financial condition, particularly in the short term."

462.   On the heels of the August 9, 2007 Form 10-Q, on August 13, 2007 (two trading days after the Form 10-Q release) Merrill Lynch issued an analyst report indicating that Countrywide, because of its liquidity problems, could go bankrupt.

463.   The concealed risks associated with Countrywide abandoning sound underwriting practices were materializing in the form of a heightened likelihood of being shut out of the secondary market and not having access to capital – and ultimately bankruptcy.  As a result, Countrywide's stock price declined from its close on August 9, 2007 at $28.66, to close at $27.86 on August 10, 2007, and then close at $26.61 on August 13, 2007 (the next trading day).

464.   While the August 9, 2007 Form 10-Q acted as a partial corrective disclosure indicating the Company's heightened risk of suffering a liquidity crisis as a result of its improper lending practices, the Form 10-Q also contained false and

1  misleading statements – and concealed the full truth from investors – so as to maintain
2  Countrywide's fraudulently inflated stock price.

3      465.   The August 9, 2007 Form 10-Q failed to disclose the full truth known to
4  Defendants.  The August 9, 2007 Form 10-Q failed to disclose that McMurray, on
5  August 8, 2007 sent a qualified certification to the Company's SOX officer.
6  McMurray believed Countrywide's disclosures were incomplete; he had suggested
7  language to be included in the Form 10-Q, but Sambol and Sieracki rejected his
8  request.

9      466.   Despite McMurray's refusal to sign off on the Company's Form 10-Q
10 SOX Certification, the Form 10-Q included SOX Certifications signed by Mozilo and
11 Sieracki that were substantially identical to those set forth in ¶252.

12     467.   Further, in the Form 10-Q, Defendants falsely reported Countrywide's
13 financial results and that Countrywide had adequate funding liquidity to accommodate
14 marketplace changes:

15          ***We believe we have adequate funding liquidity to accommodate***
16          ***these marketplace changes in the near term. . . .***  We also believe that
17          the challenges facing the industry should ultimately benefit Countrywide
18          as the mortgage lending industry continues to consolidate.

19     468.   Defendants' statements in Countrywide's August 9, 2007 Form 10-Q
20 were materially false and misleading when made for the reasons set forth in ¶¶454 and
21 465.  The Company's financial results did not comply with GAAP, the Company did
22 not have adequate internal controls as required by SOX, and, as Defendants then
23 knew, the Company's risky lending practices made it highly likely that delinquencies
24 and defaults would grow and the Company would face a liquidity crisis.

25 **August 14, 2007 Form 8-K**

26     469.   On August 14, 2007, before the market opened, Countrywide issued a
27 press release and filed a Form 8-K releasing its monthly operational data for July
28 2007.  In this report Countrywide disclosed that by the end of July 2007, its rate of

COMPLAINT                                    151

1    delinquency as a percentage of unpaid principal balance had increase by
2    approximately 35% to 4.89%, compared to a 3.61% rate as of July 31, 2006.
3    Countrywide also disclosed that, similarly, by the end of July 2007, its rate of pending
4    foreclosures as a percentage of unpaid principal balance had more than doubled to
5    1.04%, compared to 0.46% as of July 31, 2006.

6         470.   Countrywide's August 14, 2007 Form 8-K surprised the markets.  Indeed,
7    *The Los Angeles Times* reported: "In a grim report that helped send mortgage stocks
8    reeling, No. 1 home lender Countrywide Financial Corp. said Tuesday that
9    foreclosures and delinquencies jumped in July to the highest levels in more than five
10   years."

11        471.   The concealed risks associated with Countrywide abandoning sound
12   underwriting practices were materializing in the form of increased defaults and
13   delinquencies.  Countrywide's reported high rates of delinquencies and foreclosures
14   partially corrected Defendants' prior misrepresentations about the quality of
15   Countrywide's loan origination and underwriting standards and served as a partial
16   corrective disclosure with respect to aspects of Countrywide's financial reporting,
17   including Countrywide's loan loss reserves and its reported assets.  Countrywide's
18   stock closed down on August 14, 2007 by approximately 8.1% from $26.61 to $24.46,
19   on high volume of almost 36 million shares.

20   **The August 15, 2007 Merrill Lynch Report**

21        472.   On August 15, 2007, Merrill Lynch surprised the markets by following
22   up on its August 13, 2007 analyst report that had expressed concerns about
23   Countrywide's liquidity.  The August 15, 2007 report downgraded Countrywide from
24   "buy" to "sell" based on Countrywide's liquidity problems.  On August 17, 2007, an
25   article in *The Wall Street Journal* summarized the impact of the August 15 Merrill
26   Lynch analyst report on Countrywide's stock:

27              When Merrill Lynch & Co. analyst Kenneth Bruce put a surprise
28        "sell" rating on Countrywide Financial Corp. this week, the stock fell

COMPLAINT                                152

1      13%.  Many on Wall Street clearly felt he knew what he was talking

2      about: ***He used to work at the troubled mortgage lender.***

3          473.   The concealed risks associated with Countrywide abandoning sound

4  underwriting practices were materializing in the form of a heightened likelihood of

5  being shut out of the secondary market and not having access to capital – and

6  ultimately bankruptcy.  As a consequence of the partial corrective disclosures on

7  August 15, 2007, Countrywide common stock fell by approximately 13% that day,

8  from $24.46 to $21.29, on volume of 118,552,500 shares, as compared to volume of

9  25,846,800 shares the prior trading day.

10         474.   Like the partial corrective disclosures before it, the August 15, 2007

11  Merrill Lynch report did not reveal the full extent of the Defendants' fraudulent

12  conduct.

13  **The August 16, 2007 Credit**
    **Facility Draw Down**

14

15         475.   On August, 16, 2007, Countrywide announced that it drew its ***entire***

16  ***$11.5 billion*** credit facility to "supplement" its cash position.  The credit facility that

17  Countrywide drew on, in its entirety, was perceived by many in the market to be in the

18  nature of a emergency fund to be used only as a last resort, or a close to last resort,

19  source of liquidity.   As a result, all three major credit rating agencies issued

20  downgrades with regard to Countrywide securities.  Moody's sharply downgraded

21  Countrywide's debt rating to Baa3 from A3, just one notch above junk grade.  Fitch

22  sharply downgraded Countrywide's long-term issuer default rating two notches to

23  BBB+ from A, just two notches above junk grade.  S&P downgraded Countrywide to

24  A- from A.

25         476.   The concealed risks associated with Countrywide abandoning sound

26  underwriting practices were materializing in the form of a liquidity crisis, and an

27  increased risk of bankruptcy.

28

477.   Countrywide's stock declined by approximately 11% on August 16, 2007, from $21.29 to $18.95, on extraordinary volume of 201,476,900 shares.

478.   Like the partial corrective disclosures before it, the August 16, 2007 drawdown of Countrywide's credit facility did not reveal the full extent of the Defendants' fraudulent conduct.

**Countrywide's Cash Infusion
and Mozilo's Media Blitz**

479.   On August 22, 2007, after the market closed, Countrywide and Bank of America announced Bank of America would invest $2 billion in Countrywide.  In return for its investment, Bank of America received a non-voting convertible Countrywide preferred security yielding 7.25% annually and convertible to common stock at $18 per share (nearly $4 below the close on August 22, 2007).

480.   On August 23, 2007, Maria Bartiromo interviewed Mozilo on CNBC. During the interview, Mozilo again falsely assured the market place that the Company was not at risk of suffering a bankruptcy and falsely asserted that the August 15, 2007 Merrill Lynch analyst report was completely baseless and without merit:

> Well, first of all let me comment [on a] couple of things.  One is the, just the irresponsible behavior on part that analyst from Merrill Lynch to, yell fire in a very crowded theater in [an] environment where you had panic already setting in the overall markets unrelated to Countrywide.  Was ***totally irresponsible and baseless. . . .  Has no basis whatsoever.***
>
> *        *        *
>
> ***I can tell you there is no more chance for bankruptcy today for Countrywide than it was six months ago, two years ago, when the stock was $45 a share.  [We] are a very solid company***.

481.   Also on August 23, 2007, Neil Cavuto of Fox News interviewed Mozilo. Mozilo responded to a question regarding Countrywide's lending practices by falsely

asserting Countrywide practiced prudent loan underwriting and only lent to borrowers
it believed could repay the loans.  In fact, Mozilo knew from Countrywide's own
internal reports that many of its loans were originated to people who had a high
likelihood of not being able to repay for various reasons, including that the borrower
did not know how he/she could pay the fully indexed loan amount or the borrower had
lied on the loan application to qualify for the loan.  Mozilo stated:

> We're lending the money.  It would be foolhardy for us to lend money to someone, A, by duping them, and, secondly, to think that we wouldn't be paid back.  ***We never make a loan where we think that we're creating a situation where we couldn't be paid back.  We try to underwrite these loans prudently***.

482.   Similarly, Mozilo again falsely refuted the Merrill Lynch analyst's report
and proclaimed that Countrywide did not face liquidity concerns or a heightened risk
of bankruptcy:

> CAVUTO: All right, so no hint of bankruptcy?
>
> MOZILO: No.  That – that was – I must say that the individual that put that out from Merrill Lynch was – it was a total – ***it was an irresponsible act,*** which, obviously, there's no consequences for people saying words like that.  We had a very strong financial statement when he put that out.  ***There was no basis for that analysis.  It was terribly flawed.***
>
> And it caused pain for a lot of people, particularly our senior depositors, who have their life savings at Countrywide Bank.  ***Countrywide Bank is one of the best capitalized banks in the country today***, and, yet, he put that word out there irresponsibly.  And a lot of people suffered.

483.   Mozilo's statements referenced above were materially false and
misleading when made.  Specifically, Countrywide had aggressively put borrowers in

---

COMPLAINT                                    155

loans they could not afford, which Defendants knew.  Further, Countrywide faced substantial risk of bankruptcy as its delinquencies and defaults grew and the Company was shut out of the secondary mortgage market and could not access capital.

**August 24, 2007 Ratings Downgrade**

484.   On August 24, 2007, Fitch Ratings downgraded CHL servicer ratings with respect to a series of loan categories and placed the ratings on "Rating Watch Evolving" status, a signal that the ratings could be cut again. In its press release announcing the downgrades, Fitch noted "the continued pressure on CHL's liquidity position and financial flexibility" as well as "delinquency" challenges.

485.   The concealed risks associated with Countrywide abandoning sound underwriting practices were materializing in the form of growing delinquencies, an impending liquidity crisis, and an increased risk of bankruptcy.

486.   Countrywide's stock declined by approximately 4.6% on August 24, 2007, from $22.02 to $21.00, on high volume of 66,189,400 shares.

**September 7, 2007 Workforce Cuts**

487.   After the market closed on Friday, September 7, 2007, Countrywide announced a plan to lay off between "10,000 to 12,000 [employees] over the next three months representing up to 20 percent of its current workforce."  As the Company and the market recognized, Countrywide's prior business model was broken. Countrywide would all but eliminate the origination of exotic loan products to focus upon conventional home loans that could be sold to Fannie Mae and Freddie Mac in the secondary market.

488.   In addition to the disclosure that Countrywide had given up on its prior business model to focus on conforming loans, on September 10, 2007, analysts at Merrill Lynch and UBS cut their profit estimates on worries over the Company's ability to make new loans.

489.   The market reacted to Countrywide's September 7, 2007 announcement on Monday, September 10, 2007, the next trading day.  Countrywide's stock fell 5.5% on September 10, from $18.21 to $17.21, on high volume.

**September 11, 2007**

490.   The concealed risks associated with Countrywide abandoning sound underwriting practices continued to materialize.  As Countrywide's defaults and delinquencies mounted, and the Company was increasingly being shut out of the secondary mortgage market and unable to continue its previous business model, the Company's financial condition became dire.

491.   On September 11, 2007, *The New York Post* reported on the continuing financial difficulties faced by Countrywide.  The Company was "desperate." According to the report, the Company was scrambling to put together a bailout package before it had to repay billions of debt.

> Countrywide Financial Corp. is putting together another multi-billion dollar bailout plan as the nation's largest home lender continues to struggle amid the global credit crunch and declines in the housing market, *The Post* has learned.
>
> *            *            *
>
> "***Countrywide is in desperate need of cash right now to continue funding mortgages and the credit markets are still largely closed to them***," said one source familiar with the company.
>
> *            *            *
>
> Countrywide, which handles one of every five new U.S. mortgages, has been hurt by falling home prices and record foreclosures. ***The company has billions in medium-term debt coming due in about 90 days and needs to cash to continue operating.***

492.   Upon investors' growing concerns as the true risks of Countrywide's lending practices were made apparent, Countrywide's stock dropped to a close of $16.88 on September 11, 2007, on high volume of over 82 million shares.

**October 11, 2007 Disclosures of**
**Mozilo's Fraudulent Insider Sales**

493.   On October 11, 2007, *The New York Times* ran a story by noted columnist Gretchen Morgenson, focusing investor scrutiny on Mozilo's stock sales and whether he had sold on the basis of inside information:

> The Securities and Exchange Commission has been asked to investigate stock sales made by Angelo R. Mozilo, chief executive of the mortgage lender Countrywide Financial, in the months before its shares plummeted amid the deepening mortgage crisis.
>
> In an Oct. 8 letter to the S.E.C. chairman, Christopher Cox, the state treasurer of North Carolina, Richard H. Moore, questioned changes Mr. Mozilo made to his arranged stock selling program, adjustments that allowed him to increase significantly his sales of Countrywide shares.
>
> After starting a plan in October 2006, Mr. Mozilo twice raised the number of shares that could be sold: once in December 2006, when Countrywide stock was $40.50, and again in February, when it hit a high of $45.03.  He has had gains of $132 million since starting the October 2006 plan and expects to sell his remaining shares by the end of the week, a move that will generate millions more.

494.   Upon growing investor scrutiny of Mr. Mozilo's integrity and faith in Countrywide's business, Countrywide's stock dropped from a prior close at $18.80, to close at $18.28 on October 11, 2007, on high volume.

**October 17, 2007 Disclosure**
**SEC Investigating Mozilo**

495.   Shortly after the Gretchen Morgenson article in *The New York Times* about Mozilo's insider trading, on October 17, 2007 and October 18, 2007, media

reports disclosed that the SEC had begun an informal investigation into the insider sales made by Mozilo. On October 18, 2007, Countrywide stock closed at $16.51 per share, down from a close of $18.09 on October 16, 2007.

**October 24, 2007 Wall Street Journal Article**

496. Before the markets opened on Wednesday, October 24, 2007, *The Wall Street Journal* published a major article that constituted a further partial revelation to the investing public of the truth regarding Countrywide's loan origination and underwriting practices:

An analysis prepared for *The Wall Street Journal* by UBS AG shows that 3.55% of option ARMs originated by Countrywide in 2006 and packaged into securities sold to investors are at least 60 days past due. That compares with an average option-ARM delinquency rate of 2.56% for the industry as a whole and is the highest of six companies analyzed by UBS.

497. *The Wall Street Journal* also reported:

Among option ARMS held in its own portfolio, 5.7% were at least 30 days past due as of June 30, the measure Countrywide uses. That's up from 1.6% a year earlier. Countrywide held $27.8 billion of option ARMs as of June 30, accounting for about 41% of the loans held as investments by its savings bank. An additional $122 billion have been packaged into securities sold to investors, according to UBS.

498. According to the article, "***the deteriorating performance of option ARMs is evidence that lax underwriting that led to problems in subprime loans is showing up in the prime market***, where defaults typically are minimal."

499. *The Wall Street Journal* article quoted UBS analyst Shumin Li, who stated that "at Countrywide 'they were giving these loans to **riskier and riskier borrowers**.'"

---

COMPLAINT                                    159

1    500.   On October 23, 2007, Countrywide stock closed at $15.05 per share,

2    down from a close of $15.68 on October 22, 2007.  On October 24, Countrywide's

3    stock price fell by 8.1%, from $15.05 to $13.83 on volume of 66,182,900 shares, as

4    compared to 29,945,200 shares the prior trading day.

5    **October 26, 2007 Earnings Release**

6    501.   On October 26, 2007, before the stock market opened, Countrywide

7    issued a press release and filed a Form 8-K reporting its financial results for the third

8    quarter of 2007, including a quarterly loss of $1.2 billion, or $2.85 per share.  The

9    Company reported a $1 billion write-down of its loans and MBSs; an increase in loan

10   loss provisions to $934 million, compared to $293 million in the prior quarter and $38

11   million in the third quarter of 2006; and an increase in the provisions for R&Ws to

12   $291 million, compared to $79 million in the prior quarter and $41 million in the third

13   quarter of 2006.

14   502.   Defendants, however, did not simply report Countrywide's poor

15   performance, but also issued a series of false statements, in both the press release and

16   during an earnings conference call that day, that reassured the investing public and

17   sent Countrywide's stock price up that day by an extraordinary 32.4% to close at

18   $17.30.   Among other things, Defendants projected that Countrywide would be

19   profitable in 2008 and again falsely stated the Company had sufficient capital,

20   liquidity and financing capacity for its operating needs and its growth needs.

21   **November 9, 2007 Form 10-Q**

22   503.   On November 9, 2007, Countrywide filed its Form 10-Q report for the

23   third quarter of 2007, ended September 30, 2007.

24   504.   In the Form 10-Q, Defendants admitted what the market already

25   understood, that Countrywide's dire financial condition was due in large part to poorly

26   performing loans, especially HELOCs and Pay Option ARMs.  Had Defendants

27   insisted that Countrywide utilize sound underwriting practices, as they had told the

28

market, the Company would not have been in the dire financial condition it faced in and around November 9, 2007.

**November 15, 2007 – November 21, 2007**
**Bankruptcy Speculation**

505.   During the period from November 15, 2007 through November 21, 2007, speculation that Countrywide would have to file for bankruptcy substantially increased.

506.   Investor concerns about Countrywide's liquidity and potential for filing for bankruptcy grew so significant that Countrywide stock dropped to $8.21 (a decline of 20%) in intra-day trading on November 20, 2007.  Countrywide issued a false and misleading statement denying it was facing bankruptcy, which propped up the stock and Countrywide shares rebounded to only decline by 2.7%, closing at $10.28.

507.   Despite Countrywide's reassurances, Countrywide shares continued to drop on November 21, 2007, as investors weighed the likelihood of whether Countrywide would file for bankruptcy.

508.   The concealed risks associated with Countrywide abandoning sound underwriting practices were materializing.   As Countrywide's defaults and delinquencies mounted, the Company was increasingly being shut out of the secondary mortgage market and unable to continue its previous business model.

509.   Shares of Countrywide dropped everyday between November 15 and November 21, 2007.  After closing at $13.72 on November 14, 2007, Countrywide closed at only $9.42 on November 21, 2007 – down $3.95 or 30%.

**November 26, 2007**

510.   On November 26, 2007, *The Wall Street Journal* reported that, because of Countrywide's loan delinquencies and defaults, it could no longer raise money in the private market, but rather had become dependent upon quasi-governmental aid to stay afloat:

When Countrywide Financial Corp. Chief Executive Angelo Mozilo needs cash to fund home loans these days, he doesn't look to investment banks in New York or London.

He relies mainly on the quasigovernmental Federal Home Loan Bank in Atlanta.

\*    \*    \*

***The Atlanta home loan bank has helped to keep Countrywide in business since mid–August, when investors' fears over default risk shut off mortgage lenders' ability to raise money through commercial paper or other short-term borrowings.*** Countrywide has replaced that funding mainly by tapping the Atlanta bank, where its borrowings totaled $51.1 billion as of Sept. 30, up 77% from three months earlier.

511.   In a November 26, 2007 letter to the Chairman of the Federal Housing Finance Board, Senator Charles E. Schumer ("Schumer"), a member of the Senate's Banking Committee, wrote: "At a time when Countrywide's mortgage portfolio is deteriorating drastically," the system's "exposure to Countrywide poses an unreasonable risk." As Schumer succinctly explained:  "Countrywide is treating the Federal Home Loan Bank system like its personal ATM."

512.   Following up on his letter, Senator Schumer's office explained in a press release that the Atlanta Federal Reserve Bank's exposure to Countrywide put it at substantial risk because of Countrywide's poor underwriting of risky loans. "Countrywide has posted $62 billion worth of loans as collateral" and this is "a potentially dangerous level of exposure considering ***Countrywide's track record in poor underwriting and predatory lending practices in recent years***."

513.   Schumer backed up his representation with statistics supporting his contention that "Countrywide's collateral poses a higher risk than other banks." For example, Schumer noted "that 89 percent of their 2006 originations of option ARMs did not conform to the joint banking regulators' guidance, which increases the

1  likelihood that Countrywide is pledging loans deemed unsuitable or predatory by the
2  regulators as collateral for FHLB advances."

3  514.   The concealed risks associated with Countrywide abandoning sound
4  underwriting practices had materialized.   As Countrywide's defaults and
5  delinquencies mounted, the Company had in fact been shut out of the secondary
6  mortgage market and unable to continue its previous business model, without
7  government assistance.

8  515.   Shares of Countrywide closed the day down over 10% to $8.64 from a
9  previous close of $9.65.

10  **Post-Relevant Period Disclosures**

11  516.   On January 11, 2008, Bank of America agreed to purchase Countrywide
12  for $7.16 per share (in Bank of America shares).

13  517.   On January 29, 2008, Countrywide reported fourth quarter 2007 financial
14  results.  The Company reported a loss of $422 million for the quarter, and a loss for
15  the year of $704 million.  The Company admitted to "greater than expected increases
16  in delinquency rates during the quarter" and that it had to take a provision for credit
17  losses of $924 million.  Further Countrywide had to take an impairment of on
18  residuals of $831 million – which was primarily related to the Company's RIs from
19  prime junior-lien home equity securitizations.

20  518.   On June 4, 2009, the SEC brought a civil action against Mozilo, Sieracki
21  and Sambol for securities fraud alleging "these senior executives misled the market by
22  falsely assuring investors that Countrywide was primarily a prime quality mortgage
23  lender which had avoided the excesses of its competitors."

24  519.   On October 15, 2010, the SEC reached a settlement with Mozilo, Sambol
25  and Sieracki.  According to the SEC press release:

26      The Securities and Exchange Commission today announced that
27      former Countrywide Financial CEO Angelo Mozilo will pay a record
28      $22.5 million penalty to settle SEC charges that he and two other former

---

Countrywide executives misled investors as the subprime mortgage crisis emerged. The settlement also permanently bars Mozilo from ever again serving as an officer or director of a publicly traded company.

*Mozilo's financial penalty is the largest ever paid by a public company's senior executive in an SEC settlement.* Mozilo also agreed to $45 million in disgorgement of ill-gotten gains to settle the SEC's disclosure violation and insider trading charges against him, for a total financial settlement of $67.5 million that will be returned to harmed investors.

Former Countrywide chief operating officer David Sambol agreed to a settlement in which he is liable for $5 million in disgorgement and a $520,000 penalty, and a three-year officer and director bar. Former chief financial officer Eric Sieracki agreed to pay a $130,000 penalty and a one-year bar from practicing before the Commission.

520. The SEC's press release quoted the Director of the SEC's Division of Enforcement as stating:

Mozilo's record penalty is the fitting outcome for a corporate executive who deliberately disregarded his duties to investors by concealing what he saw from inside the executive suite – a looming disaster in which Countrywide was buckling under the weight of increasing risky mortgage underwriting, mounting defaults and delinquencies, and a deteriorating business model.

## VI.   LOSS CAUSATION

521. Defendants engaged in a complex series of misrepresentations and omissions over a long period of time. Defendants concealed from investors both the likelihood and extent of the risks associated with Countrywide abandoning sound underwriting practices to increase loan volume. These risks – which included, among other things, massive delinquencies and defaults, reduced earnings, and an inability to

access liquidity and the secondary loan market – ultimately materialized and caused Countrywide's stock price to be dramatically reduced (as set forth in §V.B-C).

522. As a direct and proximate result of Defendants' material misrepresentations, omissions and conduct as alleged herein, Plaintiffs purchased Countrywide common stock at prices far exceeding its true worth.

523. As a direct and proximate result of Defendants' material misrepresentations, omissions and conduct as alleged herein, Plaintiffs were damaged when the market value of Countrywide common stock declined upon disclosures, beginning no later than July 16, 2007, revealing Countrywide's previously undisclosed risky lending activities, violations of GAAP, and true financial condition – certain of which disclosures are set forth in §V.C.

524. Defendants' false and misleading statements concealed Countrywide's true business model, financial condition and creditworthiness and, by doing so, artificially inflated the price of Countrywide common stock. Defendants' false and misleading statements concealed factors concerning the material risk that Countrywide's financial condition would be materially weakened and/or Countrywide would suffer a liquidity crisis as a result of its undisclosed risky lending practices and inadequate reserves for loan losses. These undisclosed material risks materialized, causing the market value of Countrywide common stock to plummet to the detriment of Plaintiffs.

525. As a direct and proximate result of Defendants' material misrepresentations, omissions and conduct as alleged herein, Plaintiffs have been damaged by their purchase of Countrywide common stock.

## VII.   INAPPLICABILITY OF THE STATUTORY SAFE HARBOR

526. The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint. The statements alleged to be false and misleading concerned statements of existing or historical fact or conditions. To the extent that any of the

statements alleged to be false and misleading may be deemed to be forward-looking statements, Defendants are nevertheless liable for those statements because they were not identified as forward-looking statements.  Even if the statements were identified as forward-looking, the statements were material and were not accompanied by meaningful cautionary language identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements and, at the time each of those statements was made, Defendants had actual knowledge that the particular forward-looking statement was false or the forward-looking statement was authorized and/or approved by an officer of Countrywide who knew that the statement was false when made.  Further, to the extent that any of the statements set forth above were accurate when made, they became inaccurate or misleading because of subsequent events, and Defendants failed to update those statements that later became inaccurate and/or did not disclose information that undermined the validity of those statements.

## VIII.  CLAIMS FOR RELIEF

### COUNT I

#### Against All Defendants for Violations of §10(b) of the Securities Exchange Act of 1934 and SEC Rule 10b-5

527.   Plaintiffs incorporate by reference each of the substantive paragraphs of this Complaint.

528.   Plaintiff Children's Hospital & Medical Center Foundation of Omaha does not assert a claim for violations of §10(b) against Defendant KPMG.

529.   Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about the business, business practices, performance, operations and future prospects of Countrywide, as specified herein.

530.   Defendants: (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business which operated as a fraud and deceit in an effort to maintain an artificially high market price for Countrywide common stock in violation of §10(b) of the Securities Exchange Act of 1934 and Rule 10b-5, promulgated thereunder.

531.   Defendants also: (i) deceived the investing public, including Plaintiffs, as alleged herein; (ii) artificially inflated and maintained the market price of Countrywide's common stock; and (iii) caused Plaintiffs to purchase Countrywide's common stock at an artificially inflated price.

532.   Each of the Individual Defendants' primary liability, and controlling person liability, arises from the following facts: (i) each of the Individual Defendants was a high-level executive and/or director at the Company; (ii) each of the Individual Defendants, by virtue of his responsibilities and activities as a senior executive officer and/or director of the Company, was privy to and participated in the creation, development and reporting of the Company's financial performance, projections and/or reports; and (iii) each of the Individual Defendants was aware of the Company's dissemination of information to the investing public, which each knew or disregarded with severe recklessness was materially false and misleading.

533.   The Individual Defendants, because of their positions with the Company, possessed the power and authority to control the contents of Countrywide's publicly disseminated information.  Each Individual Defendant was provided with copies of the Company's reports, press releases and documents alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected.  Because of their positions and access to material non-public information available to them, each of the Individual Defendants knew that the adverse facts alleged herein had not been disclosed to, and were being

1  concealed from, the public, and that the positive representations which were being

2  made were then materially false and misleading.

3       534.   KPMG was responsible for issuing false and misleading audit reports and

4  opinions alleged herein and having engaged in a plan, scheme and course of conduct

5  designed to deceive Plaintiffs by virtue of having prepared, approved, signed and/or

6  disseminated documents which contained untrue statements of material fact and/or

7  omitted facts necessary to make the statements therein not misleading.

8       535.   As set forth above, Defendants had actual knowledge of the

9  misrepresentations and omissions of material facts alleged herein, or acted with

10 reckless disregard for the truth by failing to ascertain and disclose such facts, even

11 though such facts were available.  Defendants' material misrepresentations and/or

12 omissions were done knowingly or recklessly and for the purpose and effect of

13 concealing Countrywide's adverse operating and financial condition from the

14 investing public and supporting the artificially inflated price of its common stock.  As

15 alleged herein, Defendants had actual knowledge of the misrepresentations and

16 omissions alleged, or were reckless in failing to obtain such knowledge by

17 deliberately refraining from taking those steps necessary to discover whether those

18 statements were false or misleading.

19      536.   As a result of the fraudulent activities of Defendants described above, the

20 market price of Countrywide common stock was artificially inflated.  In ignorance of

21 the fact that the market price of Countrywide common stock was artificially inflated,

22 and relying directly or indirectly on the false and misleading statements made by

23 Defendants, or upon the integrity of the market in which Countrywide common stock

24 traded at the time when such statements were made, Plaintiffs acquired Countrywide

25 common stock at artificially high prices and were damaged thereby, as evidenced by,

26 among other factors, the stock price declines identified herein that released the

27 artificial inflation from Countrywide common stock.  At the time of the alleged

28 misrepresentations and omissions, Plaintiffs were unaware of their falsity, and

believed the false statements to be true.  Had Plaintiffs known the true nature of the operations of Countrywide and the non-compliance with federal law, Plaintiffs would not have purchased or otherwise acquired Countrywide common stock.

537.   Plaintiffs actually read (and/or listened to) and relied upon Defendants' false and misleading statements as set forth herein.

538.   Plaintiffs are entitled to the presumption of reliance established by the fraud-on-the-market doctrine.  At all times relevant to this Complaint, the market for Countrywide common stock was an efficient market.  Countrywide common stock was listed and actively traded on a highly efficient and automated market; Countrywide filed periodic public reports with the SEC; Countrywide was followed by numerous securities analysts employed by leading brokerage firms and investment banks who wrote reports about the Company; and, Countrywide regularly issued press releases, which were carried by national and international news wires, and which were publicly available and entered into the public marketplace.  As a result, the market for Countrywide equity securities promptly digested current information regarding Countrywide from all publicly-available sources and reflected such information in the Countrywide common stock price.

539.   Plaintiffs are also entitled to the presumption of reliance established by the *Affiliated Ute* doctrine as Defendants failed to disclose material known facts to the market concerning Countrywide's mortgage underwriting and credit risk exposure.

540.   The market prices for Countrywide common stock declined materially upon the various public disclosures of the true facts that had been misrepresented or concealed as alleged herein.

541.   As a direct and proximate result of the alleged wrongful conduct, Plaintiffs suffered damages in connection with their purchase of Countrywide common stock.

542.   By virtue of the foregoing, Defendants violated §10(b) of the Securities Exchange Act of 1934 and Rule 10b-5, promulgated thereunder.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**COUNT II**

**Against the Individual Defendants for Violations of
§20(a) of the Securities Exchange Act of 1934**

543.   Plaintiffs incorporate by reference each of the substantive paragraphs of this Complaint.

544.   During the Relevant Period, Mozilo participated in the operation and management of the Company, and conducted and participated, directly and indirectly, in the conduct of Countrywide's business affairs.   Because of Mozilo's senior positions, he knew the adverse non-public information about Countrywide's business practices and false financial statements.

545.   As an officer of a publicly owned company, Mozilo had a duty to disseminate accurate and truthful information with respect to Countrywide's financial condition and results of operations, and to correct promptly any public statements issued by Countrywide which had become materially false or misleading.

546.   Because of Mozilo's position of control and authority as a senior officer and director of Countrywide, Mozilo was able to, and did, control the contents of the various reports, press releases and public filings which Countrywide disseminated in the marketplace during the Relevant Period concerning the Company's results of operations.   Throughout the Relevant Period, Mozilo exercised his power and authority to cause Countrywide to engage in the wrongful acts complained herein. Mozilo, therefore, was a "controlling person" of Countrywide within the meaning of §20(a) of the Exchange Act.  In this capacity, he participated in the unlawful conduct alleged which artificially inflated the market price of Countrywide common stock.

547.   During the Relevant Period, Sambol participated in the operation and management of the Company, and conducted and participated, directly and indirectly, in the conduct of Countrywide's business affairs.   Because of Sambol's senior positions, he knew the adverse non-public information about Countrywide's business practices and false financial statements.

---

548.   As an officer of a publicly owned company, Sambol had a duty to disseminate accurate and truthful information with respect to Countrywide's financial condition and results of operations, and to correct promptly any public statements issued by Countrywide which had become materially false or misleading.

549.   Because of his position of control and authority as a senior officer of Countrywide, Sambol was able to, and did, control the contents of the various reports, press releases and public filings which Countrywide disseminated in the marketplace during the Relevant Period concerning the Company's results of operations. Throughout the Relevant Period, Sambol exercised his power and authority to cause Countrywide to engage in the wrongful acts complained herein.  Sambol, therefore, was a "controlling person" of Countrywide within the meaning of §20(a) of the Exchange Act.  In this capacity, he participated in the unlawful conduct alleged which artificially inflated the market price of Countrywide common stock.

550.   During the Relevant Period, Sieracki participated in the operation and management of the Company, and conducted and participated, directly and indirectly, in the conduct of Countrywide's business affairs.  Because of Sieracki's senior positions, he knew the adverse non-public information about Countrywide's business practices and false financial statements.

551.   As an officer of a publicly owned company, Sieracki had a duty to disseminate accurate and truthful information with respect to Countrywide's financial condition and results of operations, and to correct promptly any public statements issued by Countrywide which had become materially false or misleading.

552.   Because of his position of control and authority as a senior officer of Countrywide, Sieracki was able to, and did, control the contents of the various reports, press releases and public filings which Countrywide disseminated in the marketplace during the Relevant Period concerning the Company's results of operations. Throughout the Relevant Period, Sieracki exercised his power and authority to cause Countrywide to engage in the wrongful acts complained herein.  Sieracki, therefore,

was a "controlling person" of Countrywide within the meaning of §20(a) of the Exchange Act.  In this capacity, he participated in the unlawful conduct alleged which artificially inflated the market price of Countrywide common stock.

553.   As set forth herein, and without conceding the necessity of such pleading, the Individual Defendants knew the statements issued by Countrywide during the Relevant Period were materially false and misleading.

554.   By reason of the above conduct, Mozilo, Sambol, and Sieracki are each jointly and severally liable pursuant to §20(a) of the Exchange Act for Countrywide's primary violations of the Exchange Act as alleged herein.

## COUNT III

### Against All Defendants for Violations of §18 of the Securities Exchange Act of 1934

555.   Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein, except allegations that Defendants made the untrue statements of material facts and omissions intentionally or recklessly.  For the purposes of this claim, Plaintiffs assert only strict liability and negligence claims and expressly disclaim any claim of fraud or intentional misconduct.

556.   This claim is asserted against all Defendants for violations of §18 of the Exchange Act.

557.   Plaintiff Children's Hospital & Medical Center Foundation of Omaha does not assert a claim for violations of §18 against Defendant KPMG.

558.   As set forth above, Defendants made or caused to be made statements that were, at the time and in light of the circumstances under which they were made, false or misleading with respect to material facts, in documents filed with the SEC by Countrywide, including the Company's filings on Forms 8-K, 10-K and 10-Q, and Proxy Statements, during the Relevant Period.

559.   In connection with the purchase of Countrywide common stock, Plaintiffs and/or their agents specifically read and relied upon the alleged false and

1  misleading statements contained in the Company's SEC filings, including the
2  Company's filings on Forms 8-K, 10-K and 10-Q, and Proxy Statements, during the
3  Relevant Period.  For instance, Plaintiffs and/or their agents read and relied upon
4  Defendants' statements concerning Countrywide's underwriting standards, the quality
5  of loan products being originated, internal controls, the quality of the assets held for
6  investment, the adequacy of reserves, and the reported financial statements, among
7  other things, as alleged to be false and misleading in §V.B-C.  Plaintiffs and/or their
8  agents relied upon the false and misleading statements in the SEC filings not knowing
9  that they were false and misleading.

10      560.   The reliance by Plaintiffs and/or their agents was reasonable.

11      561.   When the truth began to emerge about the false and misleading
12  statements and omissions in the Company's documents and reports filed with the
13  SEC, the resulting drop in the value of Countrywide common stock significantly
14  damaged Plaintiffs.

15      562.   As a direct and proximate result of Defendants' wrongful conduct,
16  Plaintiffs suffered damage in connection with their purchases of Countrywide
17  common stock.

18      563.   By virtue of the foregoing, Countrywide, the Individual Defendants and
19  KPMG violated §18 of the Exchange Act.

20                        **COUNT IV**

21        **Against All Defendants for Common Law Fraud**

22      564.   Plaintiffs incorporate by reference each of the substantive paragraphs of
23  this Complaint.

24      565.   Plaintiff Children's Hospital & Medical Center Foundation of Omaha
25  does not assert a claim for common law fraud against Defendant KPMG.

26      566.   As alleged herein, Defendants made or participated in making material
27  misrepresentations and omissions with knowledge of their falsity or with utter
28

1  disregard and recklessness as to whether the representations and omissions were true
2  or false.

3      567.   Defendants   intended   for   Plaintiffs   to   rely   upon   the   material
4  misrepresentations and omissions alleged herein.

5      568.   Plaintiffs justifiably relied on the material misrepresentations and
6  omissions alleged herein.

7      569.   Plaintiffs were unaware of the falsity of Defendants' misrepresentations
8  and   omissions   alleged   herein   and   would   not   have   relied   on   Defendants'
9  misrepresentations and omissions if they had known the misrepresentations were
10  false.

11      570.   Plaintiffs were injured as a direct and proximate result of their justifiable
12  reliance on the material misrepresentations and omissions alleged herein.

13      571.   Plaintiffs suffered damages caused by their reliance on the material
14  misrepresentations and omissions alleged herein, in an amount that will be determined
15  according to proof at trial.

16                              **COUNT V**

17          **Against Countrywide and the Individual Defendants**
                  **for Negligent Misrepresentation**
18

19      572.   Plaintiffs incorporate by reference each of the substantive paragraphs of
20  this Complaint except allegations that Countrywide and the Individual Defendants
    made the untrue statements of material facts and omissions intentionally or recklessly.
21  For the purposes of this claim, Plaintiffs assert only negligence claims and expressly
22  disclaim any claim of fraud or intentional misconduct.
23
24      573.   Countrywide had a legal duty to provide shareholders, including
    Plaintiffs, with correct information concerning the Company's mortgage underwriting
25  practices, credit risk, and financial results.
26
27      574.   The Individual Defendants, as officers and a director of Countrywide,
28  had a legal duty to provide shareholders, including Plaintiffs, with correct information

1  concerning the Company's mortgage underwriting practices, credit risk, and financial
2  results.

3      575.   Countrywide and the Individual Defendants made false and misleading
4  statements to shareholders, including Plaintiffs, concerning, among other things, the
5  Company's mortgage underwriting practices, credit risk, and financial results.

6      576.   Countrywide and the Individual Defendants knew, or should have known,
7  that their statements to shareholders, including Plaintiffs, were false and misleading.

8      577.   Countrywide's   and   the   Individual   Defendants'   statements   to
9  shareholders, including Plaintiffs, concerning the Company's mortgage underwriting
10 practices, credit risk, and financial results, were made for a serious purpose, and these
11 Defendants knew that shareholders, including Plaintiffs, desired this information for a
12 serious purpose, *i.e.*, to make multi-million dollar investment decisions. Accordingly,
13 Countrywide's and the Individual Defendants' statements were a substantial factor in
14 Plaintiffs' decision to purchase Countrywide common stock.

15     578.   Plaintiffs intended to rely and act upon Countrywide's and the Individual
16 Defendants' false and misleading statements, and did in fact reasonably rely upon
17 Countrywide's and the Individual Defendants' false and misleading statements to
18 Plaintiffs' detriment.

19     579.   The market prices for Countrywide common stock declined materially
20 upon the various public disclosures of the true facts that had been misrepresented or
21 concealed as alleged herein.

22     580.   As a direct and proximate result of the alleged wrongful conduct,
23 Plaintiffs suffered damages in connection with their purchase of Countrywide
24 common stock.

25 **IX.   PRAYER FOR RELIEF**

26     WHEREFORE, Plaintiffs pray for judgment as follows:

27     A.   Requiring Defendants to pay damages sustained by Plaintiffs by reason
28 of the acts and transactions alleged herein.

COMPLAINT                                    175

1    B.    Awarding Plaintiffs prejudgment interest and post-judgment interest as
2 allowed pursuant to statutory and common law, as well as their reasonable attorneys'
3 fees, expert fees and other costs.

4    C.    Awarding such other and further relief as the Court may deem just and
5 proper.

6 **X.    JURY TRIAL DEMAND**

7    Plaintiffs demand a trial by jury.

8 DATED: March 10, 2011                      DIETRICH SIBEN THORPE LLP
                                             EDWARD P. DIETRICH (176118)
9                                            MATTHEW P. SIBEN (223279)
                                             DAVID A. THORPE (216498)
10                                           SHAWN M. HAYS (137971)

11

12

13                                           DAVID A. THORPE

14                                           2173 Salk Avenue, Suite 250
                                             Carlsbad, CA 92008
15                                           Telephone: 760/579-7368
                                             Facsimile: 760/579-7369
16
                                             *Attorneys for Plaintiffs Children's*
17                                           *Hospital & Medical Center Foundation of*
                                             *Omaha, Hastings College Foundation,*
18                                           *Peter Kiewit Foundation, Weitz Value*
                                             *Fund, Weitz Partners Value Fund, Weitz*
19                                           *Hickory Fund, Weitz Balanced Fund,*
                                             *Research Fund, Partners III Opportunity*
20                                           *Fund, and Heider Weitz Partnership*

21

22

23

24

25

26

27

28

COMPLAINT                        176

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

### NOTICE OF ASSIGNMENT TO UNITED STATES MAGISTRATE JUDGE FOR DISCOVERY

This case has been assigned to District Judge S. James Otero and the assigned discovery Magistrate Judge is Alicia G. Rosenberg.

The case number on all documents filed with the Court should read as follows:

## CV11- 2056 SJO (AGRx)

Pursuant to General Order 05-07 of the United States District Court for the Central District of California, the Magistrate Judge has been designated to hear discovery related motions.

All discovery related motions should be noticed on the calendar of the Magistrate Judge

================================================

**NOTICE TO COUNSEL**

*A copy of this notice must be served with the summons and complaint on all defendants (if a removal action is filed, a copy of this notice must be served on all plaintiffs).*

Subsequent documents must be filed at the following location:

| | | |
|---|---|---|
| **[X] Western Division**<br>312 N. Spring St., Rm. G-8<br>Los Angeles, CA 90012 | **[ ] Southern Division**<br>411 West Fourth St., Rm. 1-053<br>Santa Ana, CA 92701-4516 | **[ ] Eastern Division**<br>3470 Twelfth St., Rm. 134<br>Riverside, CA 92501 |

Failure to file at the proper location will result in your documents being returned to you.

DIETRICH SIBEN THORPE L.
EDWARD P. DIETRICH
MATTHEW P. SIBEN
DAVID A. THORPE
SHAWN M. HAYS
2173 SALK AVENUE, SUITE 250
CARLSBAD, CA 92008

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| Children's Hospital & Medical Center Foundation of Omaha (Additional Plaintiffs listed on Attachment A) | CASE NUMBER |
|---|---|
| PLAINTIFF(S) v. Countrywide Financial Corporation, Angelo R. Mozilo, David Sambol, Eric P. Sieracki, and KPMG LLP | **CV11 02056 SJO(AGRx)** |
| DEFENDANT(S). | **SUMMONS** |

TO:  DEFENDANT(S): Countrywide Financial Corporation, Angelo R. Mozilo, David Sambol, Eric P. Sieracki, and KPMG LLP

A lawsuit has been filed against you.

Within __21__ days after service of this summons on you (not counting the day you received it), you must serve on the plaintiff an answer to the attached ☑ complaint ☐ _____ amended complaint ☐ counterclaim ☐ cross-claim or a motion under Rule 12 of the Federal Rules of Civil Procedure. The answer or motion must be served on the plaintiff's attorney, David A. Thorpe, Esq. _____, whose address is 2173 Salk Avenue, Suite 250, Carlsbad, CA 92008 _____. If you fail to do so, judgment by default will be entered against you for the relief demanded in the complaint. You also must file your answer or motion with the court.

Clerk, U.S. District Court

Dated: MAR 1 0

By: _____
CHRISTOPHER POWERS
Deputy Clerk

*(Seal of the Court)*

1181

*[Use 60 days if the defendant is the United States or a United States agency, or is an officer or employee of the United States. Allowed 60 days by Rule 12(a)(3)].*

# Attachment A to Summons

## **Additional Plaintiffs**

Hastings College Foundation, Peter Kiewit Foundation, Weitz Value Fund, Weitz Partners Value Fund, Weitz Hickory Fund, Weitz Balanced Fund, Research Fund, Partners III Opportunity Fund, and Heider Weitz Partnership

**UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA**

CIVIL COVER SHEET

| I (a) PLAINTIFFS (Check box if you are representing yourself ☐) | DEFENDANTS |
|---|---|
| Children's Hospital & Medical Center Foundation of Omaha (Additional Plaintiffs Listed on Attachment A) | Countrywide Financial Corporation, Angelo R. Mozilo, David Sambol, Eric P. Sieracki, and KPMG LLP |

| (b) Attorneys (Firm Name, Address and Telephone Number. If you are representing yourself, provide same.) | Attorneys (If Known) |
|---|---|
| DIETRICH SIBEN THORPE LLP<br>DAVID A. THORPE<br>2173 SALK AVENUE, SUITE 250<br>CARLSBAD, CA 92008  (760) 579-7368 | |

**II. BASIS OF JURISDICTION** (Place an X in one box only.)

☐ 1 U.S. Government Plaintiff  ☒ 3 Federal Question (U.S. Government Not a Party)

☐ 2 U.S. Government Defendant  ☐ 4 Diversity (Indicate Citizenship of Parties in Item III)

**III. CITIZENSHIP OF PRINCIPAL PARTIES** - For Diversity Cases Only
(Place an X in one box for plaintiff and one for defendant.)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business in this State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business in Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

**IV. ORIGIN** (Place an X in one box only.)

☒ 1 Original Proceeding  ☐ 2 Removed from State Court  ☐ 3 Remanded from Appellate Court  ☐ 4 Reinstated or Reopened  ☐ 5 Transferred from another district (specify):  ☐ 6 Multi-District Litigation  ☐ 7 Appeal to District Judge from Magistrate Judge

**V. REQUESTED IN COMPLAINT: JURY DEMAND:** ☒ Yes  ☐ No (Check 'Yes' only if demanded in complaint.)

**CLASS ACTION under F.R.C.P. 23:** ☐ Yes  ☒ No  **☐ MONEY DEMANDED IN COMPLAINT: $**_____

**VI. CAUSE OF ACTION** (Cite the U.S. Civil Statute under which you are filing and write a brief statement of cause. Do not cite jurisdictional statutes unless diversity.)

Securities Exchange Act of 1934, 15 U.S.C. §§78j and 78t(a), for securities fraud

**VII. NATURE OF SUIT** (Place an X in one box only.)

| OTHER STATUTES | CONTRACT | TORTS PERSONAL INJURY | TORTS PERSONAL PROPERTY | PRISONER PETITIONS | LABOR |
|---|---|---|---|---|---|
| ☐ 400 State Reapportionment | ☐ 110 Insurance | ☐ 310 Airplane | ☐ 370 Other Fraud | ☐ 510 Motions to | ☐ 710 Fair Labor Standards Act |
| ☐ 410 Antitrust | ☐ 120 Marine | ☐ 315 Airplane Product Liability | ☐ 371 Truth in Lending | Vacate Sentence | ☐ 720 Labor/Mgmt. Relations |
| ☐ 430 Banks and Banking | ☐ 130 Miller Act | ☐ 320 Assault, Libel & Slander | ☐ 380 Other Personal Property Damage | Habeas Corpus | ☐ 730 Labor/Mgmt. |
| ☐ 450 Commerce/ICC Rates/etc. | ☐ 140 Negotiable Instrument | ☐ 330 Fed. Employers' Liability | ☐ 385 Property Damage Product Liability | ☐ 530 General | Reporting & Disclosure Act |
| ☐ 460 Deportation | ☐ 150 Recovery of Overpayment & | ☐ 340 Marine | BANKRUPTCY | ☐ 535 Death Penalty | ☐ 740 Railway Labor Act |
| ☐ 470 Racketeer Influenced and Corrupt | Enforcement of Judgment | ☐ 345 Marine Product Liability | ☐ 422 Appeal 28 USC 158 | ☐ 540 Mandamus/ Other | ☐ 790 Other Labor Litigation |
| Organizations | ☐ 151 Medicare Act | ☐ 350 Motor Vehicle | ☐ 423 Withdrawal 28 USC 157 | ☐ 550 Civil Rights | ☐ 791 Empl. Ret. Inc. Security Act |
| ☐ 480 Consumer Credit | ☐ 152 Recovery of Defaulted Student Loan (Excl. | ☐ 355 Motor Vehicle Product Liability | CIVIL RIGHTS | ☐ 555 Prison Condition FORFEITURE / | PROPERTY RIGHTS |
| ☐ 490 Cable/Sat TV | Veterans) | ☐ 360 Other Personal Injury | ☐ 441 Voting | PENALTY | ☐ 820 Copyrights |
| ☐ 810 Selective Service | ☐ 153 Recovery of Overpayment of | ☐ 362 Personal Injury- Med Malpractice | ☐ 442 Employment | ☐ 610 Agriculture | ☐ 830 Patent |
| ☒ 850 Securities/Commodities/ Exchange | Veteran's Benefits | ☐ 365 Personal Injury- Product Liability | ☐ 443 Housing/Acco- mmodations | ☐ 620 Other Food & Drug | ☐ 840 Trademark |
| ☐ 875 Customer Challenge 12 USC 3410 | ☐ 160 Stockholders' Suits | ☐ 368 Asbestos Personal Injury Product | ☐ 444 Welfare | ☐ 625 Drug Related Seizure of | SOCIAL SECURITY |
| ☐ 890 Other Statutory Actions | ☐ 190 Other Contract | Liability | ☐ 445 American with Disabilities - | Property 21 USC 881 | ☐ 861 HIA (1395ff) |
| ☐ 891 Agricultural Act | ☐ 195 Contract Product Liability | IMMIGRATION | Employment | ☐ 630 Liquor Laws | ☐ 862 Black Lung (923) |
| ☐ 892 Economic Stabilization Act | ☐ 196 Franchise | ☐ 462 Naturalization Application | ☐ 446 American with Disabilities - | ☐ 640 R.R. & Truck | ☐ 863 DIWC/DIWW (405(g)) |
| ☐ 893 Environmental Matters | REAL PROPERTY | ☐ 463 Habeas Corpus- Alien Detainee | Other | ☐ 650 Airline Regs | ☐ 864 SSID Title XVI |
| ☐ 894 Energy Allocation Act | ☐ 210 Land Condemnation | ☐ 465 Other Immigration Actions | ☐ 440 Other Civil Rights | ☐ 660 Occupational Safety /Health | ☐ 865 RSI (405(g)) |
| ☐ 895 Freedom of Info. Act | ☐ 220 Foreclosure | | | ☐ 690 Other | FEDERAL TAX SUITS |
| ☐ 900 Appeal of Fee Determi- nation Under Equal | ☐ 230 Rent Lease & Ejectment | | | | ☐ 870 Taxes (U.S. Plaintiff or Defendant) |
| Access to Justice | ☐ 240 Torts to Land | | | | ☐ 871 IRS-Third Party 26 USC 7609 |
| ☐ 950 Constitutionality of State Statutes | ☐ 245 Tort Product Liability | | | | |
| | ☐ 290 All Other Real Property | | | | |

**CV11 02056**

**FOR OFFICE USE ONLY:** Case Number: _____

AFTER COMPLETING THE FRONT SIDE OF FORM CV-71, COMPLETE THE INFORMATION REQUESTED BELOW.

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA
CIVIL COVER SHEET

**VIII(a). IDENTICAL CASES:** Has this action been previously filed in this court and dismissed, remanded or closed? ☑ No  ☐ Yes
If yes, list case number(s): _____

**VIII(b). RELATED CASES:** Have any cases been previously filed in this court that are related to the present case? ☐ No  ☑ Yes
If yes, list case number(s): CV 07-05295 MRP (MANx)

**Civil cases are deemed related if a previously filed case and the present case:**

(Check all boxes that apply)  ☑ A.  Arise from the same or closely related transactions, happenings, or events; or

☑ B.  Call for determination of the same or substantially related or similar questions of law and fact; or

☑ C.  For other reasons would entail substantial duplication of labor if heard by different judges; or

☐ D.  Involve the same patent, trademark or copyright, and one of the factors identified above in a, b or c also is present.

**IX. VENUE:** (When completing the following information, use an additional sheet if necessary.)

(a)  List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which EACH named plaintiff resides.
☐   Check here if the government, its agencies or employees is a named plaintiff. If this box is checked, go to item (b).

| County in this District:* | California County outside of this District; State, if other than California; or Foreign Country |
|---|---|
| | Nebraska |

(b)  List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which EACH named defendant resides.
☐   Check here if the government, its agencies or employees is a named defendant. If this box is checked, go to item (c).

| County in this District:* | California County outside of this District; State, if other than California; or Foreign Country |
|---|---|
| Los Angeles | |

(c)  List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which EACH claim arose.
Note: **In land condemnation cases, use the location of the tract of land involved.**

| County in this District:* | California County outside of this District; State, if other than California; or Foreign Country |
|---|---|
| Los Angeles | |

* **Los Angeles, Orange, San Bernardino, Riverside, Ventura, Santa Barbara, or San Luis Obispo Counties**
Note: In land condemnation cases, use the location of the tract of land involved .

X. SIGNATURE OF ATTORNEY (OR PRO PER): _David A. Thorpe_          Date  3/10/11

Notice to Counsel/Parties:  The CV-71 (JS-44) Civil Cover Sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law. This form, approved by the Judicial Conference of the United States in September 1974, is required pursuant to Local Rule 3-1 is not filed but is used by the Clerk of the Court for the purpose of statistics, venue and initiating the civil docket sheet. (For more detailed instructions, see separate instructions sheet.)

Key to Statistical codes relating to Social Security Cases:

| Nature of Suit Code | Abbreviation | Substantive Statement of Cause of Action |
|---|---|---|
| 861 | HIA | All claims for health insurance benefits (Medicare) under Title 18, Part A, of the Social Security Act, as amended. Also, include claims by hospitals, skilled nursing facilities, etc., for certification as providers of services under the program. (42 U.S.C. 1935FF(b)) |
| 862 | BL | All claims for "Black Lung" benefits under Title 4, Part B, of the Federal Coal Mine Health and Safety Act of 1969. (30 U.S.C. 923) |
| 863 | DIWC | All claims filed by insured workers for disability insurance benefits under Title 2 of the Social Security Act, as amended; plus all claims filed for child's insurance benefits based on disability. (42 U.S.C. 405(g)) |
| 863 | DIWW | All claims for widows or widowers insurance benefits based on disability under Title 2 of the Social Security Act, as amended. (42 U.S.C. 405(g)) |
| 864 | SSID | All claims for supplemental security income payments based upon disability filed under Title 16 of the Social Security Act, as amended. |
| 865 | RSI | All claims for retirement (old age) and survivors benefits under Title 2 of the Social Security Act, as amended. (42 U.S.C. (g)) |

**CIVIL COVER SHEET**

# Attachment A to Civil Cover Sheet

## **Additional Plaintiffs**

Hastings College Foundation, Peter Kiewit Foundation, Weitz Value Fund, Weitz Partners Value Fund, Weitz Hickory Fund, Weitz Balanced Fund, Research Fund, Partners III Opportunity Fund, and Heider Weitz Partnership