**DLA PIPER LLP (US)**
SHIRLI FABBRI WEISS (Bar No. 079225)
shirli.weiss@dlapiper.com
401 B Street, Suite 1700
San Diego, CA 92101-4297
Tel: (619) 699-2700 | Fax: (619) 699-2701

NICOLAS MORGAN (Bar No. 166441)
nicolas.morgan@dlapiper.com
1999 Avenue of the Stars, Suite 400
Los Angeles, CA 90067-6022
Tel: (310) 595-3000 | Fax: (310) 595-3300

DAVID PRIEBE (Bar No. 148679)
david.priebe@dlapiper.com
RAJIV DHARNIDHARKA (Bar No. 234756)
rajiv.dharnidharka@dlapiper.com
2000 University Avenue
East Palo Alto, CA 94303-2248
Tel: (650) 833-2000 | Fax: (650) 833-2001

Attorneys for Defendant ERIC P. SIERACKI

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION

CHILDREN'S HOSPITAL & MEDICAL CENTER FOUNDATION OF OMAHA, *et al.*,

*Plaintiffs*,

v.

COUNTRYWIDE FINANCIAL CORPORATION *et al.*,

*Defendants*.

No. CV 11-02056 MRP

**DEFENDANT ERIC P. SIERACKI'S NOTICE OF MOTION AND MOTION TO DISMISS**

| | |
|---|---|
| Date: | August 8, 2011 |
| Time: | 11:00 a.m. |
| Courtroom: | 12 |
| Judge: | Hon. Mariana R. Pfaelzer |

# NOTICE OF MOTION AND MOTION

TO ALL PARTIES AND THEIR COUNSEL OF RECORD:

PLEASE TAKE NOTICE THAT on August 8, 2011, at 11:00 a.m., or as soon thereafter as the matter may be heard, in the courtroom of the Honorable Mariana R. Pfaelzer, United States District Judge, 312 North Spring Street, Los Angeles, California, Eric P. Sieracki will and hereby does move for an order dismissing all claims against him alleged in Plaintiffs' Complaint.

Mr. Sieracki moves to dismiss by joining in the motions and grounds for dismissal in the separate motions filed by Countrywide Financial Corporation and the other defendants. Mr. Sieracki also moves on the basis that the Complaint fails to plead scienter as to him, as set forth separately herein, and therefore fails to state a claim on that basis. Fed. R. Civ. P. 12(b)(6).

Pursuant to Local Rule 7-3, counsel for Defendant discussed this motion with counsel for Plaintiffs by e-mail on May 12. Plaintiffs indicated that they would oppose the motion.

This motion is made based on this Notice of Motion; the accompanying Memorandum of Points and Authorities, *infra*; the accompanying Request For Judicial Notice, which includes the Declaration of David Priebe and Exhibits A through Q thereto; all papers, pleadings, documents, arguments of counsel, and other materials presented before or during the hearing on this motion; and any other evidence and argument the Court may consider.

Respectfully submitted,

May 20, 2011

DLA PIPER LLP (US)

By: /s/ David Priebe
Attorneys for Defendant ERIC SIERACKI

# TABLE OF CONTENTS


I. INTRODUCTION ..... 1

II. PERTINENT ALLEGATIONS ..... 2

III. THE COMPLAINT FAILS TO PLEAD A STRONG INFERENCE OF SCIENTER ON THE PART OF MR. SIERACKI ..... 3

- A. Mr. Sieracki's Stock Purchases And Absence Of Sales Negate Any Inference Of Scienter ..... 4
- B. The Public Disclosures Referenced In The Complaint Further Negate Scienter (As Well As Falsity And Loss Causation) ..... 5
  - 1. Pay Option ARMs ..... 6
    - a) Countrywide Disclosed The Special Risks Of Pay Option ARMs, Including Negative Amortization ..... 7
    - b) Countrywide Disclosed Mr. Mozilo's Expressed Opinion Regarding A Limited Historical Record ..... 10
  - 2. The December 7, 2006 Memorandum ..... 12
  - 3. The Allegations Regarding John McMurray ..... 14
- C. The Complaint Alleges No Specific Facts Supporting Scienter On The Part Of Mr. Sieracki ..... 16
  - 1. The Accounting Decisions Challenged By Plaintiffs Inherently Involved Matters Of Judgment ..... 16
  - 2. Mr. Mozilo's April 2006 E-Mail Regarding HSBC And Subprime Second Loans Do Not Plead Scienter ..... 18
  - 3. The March 12, 2007 CCRC Minutes Do Not Plead Scienter ..... 19

IV. THE COMPLAINT DOES NOT PLEAD FALSITY OR SCIENTER BASED ON OTHER ORAL STATEMENTS OR PRESS RELEASES .... 20

A. The Information Allegedly Provided On The July 26, 2005 Conference Call Is Not Alleged To Be False .................................... 20

B. The Statements Allegedly Made At The March 2006 Raymond James Conference Are Not Alleged To Be False .............................. 20

C. The Statements Allegedly Made At The March 2006 Piper Jaffray Conference Are Not Alleged To Be False ............................. 21

D. The Complaint Relies On Unsupported Spin On An Answer At A September 13, 2006 Investor Forum............................................. 21

E. The Alleged Statements At The March 6, 2007 Raymond James Conference Are Not Alleged To Be False ......................................... 22

F. The Alleged Liquidity Statements On The July 24, 2007 Call Are Not Alleged To Be False........................................................... 23

G. The August 2, 2007 Press Release Is Not Alleged To Be False........ 24

V. CONCLUSION ........................................................................................ 25

# TABLE OF AUTHORITIES

## CASES

*Belmont Holdings Corp. v. SunTrust Banks, Inc.*,
No. 1:09-cv-1185-WSD, 2010 3545389 (N.D. Ga. Sept. 10, 2010) .................. 17

*Brody v. Transitional Hospitals, Inc.*,
280 F.3d 997 (9th Cir. 2002) .................. 15

*Cooperman v. Individual, Inc.*,
No. Civ. A. 96-12272-DPW, 1998 WL 953726 (D. Mass. May 27, 1998), *aff'd*, 171 F.3d 43 (1st Cir. 1999) .................. 11

*Data Probe Acquisition Corp. v. Datalab, Inc.*,
722 F.2d 1 (2d Cir. 1983) .................. 11

*DiLeo v. Ernst & Young*,
901 F.2d 624 (7th Cir. 1990) .................. 17

*First National Bank v. Bellotti*,
435 U.S. 765 (1978) .................. 10

*First Nationwide Bank v. Gelt Funding Corp.*,
820 F. Supp. 89 (S.D.N.Y. 1993), *aff'd*, 27 F.3d 763 (2d Cir. 1994) .................. 17

*Hill v. Gozani*,
No. 0-1048, ___ F.3d ___, 2011 WL 924242 (1st Cir. Mar. 18, 2011) .................. 9

*In re Australia & New Zealand Banking Group Ltd. Sec. Litig.*,
No. 08 Civ. 11278 (DLC), 2009 WL 4823923 (S.D.N.Y. Dec. 14, 2009) .................. 9

*In re Bristol-Myers Squibb Sec. Litig.*,
312 F. Supp. 2d 549 (S.D.N.Y. 2004) .................. 5

*In re Downey Sec. Litig.*,
No. CV 08-3261-JFW, 2009 WL 2767670 (C.D. Cal. Aug. 21, 2009) .................. 22

*In re First Marblehead Corp. Sec. Litig.*,
639 F. Supp. 2d 145 (D. Mass. 2009) .................. 6

*In re Foundry Networks, Inc. Sec. Litig.*,
No. C-00-4823-MMC, 2003 WL 22077729 (N.D. Cal. Aug. 29, 2003) .................. 17

*In re HomeBanc Corp. Sec. Litig.*,
706 F. Supp. 2d 1336 (N.D. Ga. 2010) .......... 5

*In re Hutchinson Tech., Inc. Sec. Litig.*,
536 F.3d 952 (8th Cir. 2008) .......... 16

*In re Kulicke & Soffa Indus., Inc. Sec. Litig.*,
697 F. Supp. 183 (E.D. Pa. 1988) .......... 11

*In re Lukens Inc. Shareholders Litig.*,
757 A.2d 720 (Del. Ch. 1999) .......... 12

*In re Syntex Corp. Sec. Litig.*,
95 F.3d 922 (9th Cir. 1996) .......... 19

*In re Vantive Corp. Sec. Litig.*,
283 F.3d 1079 (9th Cir. 2002) .......... 17

*In re Verifone Sec Litig.*,
11 F.3d 865 (9th Cir. 1993) .......... 12

*In re Wet Seal, Inc. Sec. Litig.*,
518 F. Supp. 2d 1148 (C.D. Cal. 2007) .......... 6

*In re Worlds of Wonder Sec. Litig.*,
35 F.3d 1407 (9th Cir. 1994) .......... 4-5, 5-6

*Lapiner v. Camtek, Ltd.*,
No. C 08-01327 MMC, 2011 WL 445849 (N.D. Cal. Feb. 2, 2011) .......... 5

*Local 295/Local 851 IBT Employer Group Pension Trust & Welfare Fund v. Fifth Third Bancorp*,
731 F. Supp. 2d 689 (S.D. Ohio. 2010) .......... 6, 17

*Metzler Inv. GmbH v. Corinthian Colls., Inc.*,
540 F.3d 1049 (9th Cir. 2008) .......... 11

*Miller v. Thane Int'l, Inc.*,
615 F.3d 1095 (9th Cir. 2010) .......... 14

*Oxford Asset Mgt, Ltd. v. Jaharis*,
297 F.3d 1182 (11th Cir. 2002) .......... 6

*Plumbers & Steamfitters Local 773 Pension Fund v. Canadian Imperial Bank of Commerce*,
694 F. Supp. 2d 287 (S.D.N.Y. 2010) ........ 5

*Ronconi v. Larkin*,
253 F.3d 423 (9th Cir. 2001) ........ 19

*Rubke v. Capital Bancorp Ltd.*,
551 F.3d 1156 (9th Cir. 2009) ........ 3

*Securities & Exch. Comm'n v. Hoover*,
903 F. Supp. 1135 (S.D. Tex. 1995) ........ 14

*SRM Global Fund Ltd. P'ship v. Countrywide Fin. Corp.*,
No. 09 Civ. 5064 (RMB), 2010 WL 2473595 (S.D.N.Y. June 17, 2010) ........ 10

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
551 U.S. 308 (2007) ........ 3

*TSC Indus., Inc. v. Northway, Inc.*,
426 U.S. 438 (1976) ........ 19

*Tuchman v. DSC Comm'ns Corp.*,
14 F.3d 1061 (5th Cir. 1994) ........ 10

*Waterford Township General Employees Retirement Sys. v. Suntrust Banks, Inc.*,
No. 1:09-CV-617-TWT, 2010 WL 3368922 (N.D. Ga. Aug. 19, 2010) ........ 16

*Zucco Partners, LLC v. Digimarc Corp.*,
552 F.3d 981 (9th Cir. 2009) ........ 10-11

**STATUTES**

15 U.S.C. § 78u-4(b)(2) ........ passim

## COUNTRYWIDE FINANCIAL CORPORATION SEC FILINGS

Form 10-Q for Second Quarter 2005 filed August 8, 2005 .......... 7, 8, 9

Form 10-Q for Third Quarter 2005 filed November 8, 2005 .......... 8, 9

Form 8-K filed October 27, 2005, attached press release announcing unaudited financial results for Third Quarter 2005 .......... 8

Form 10-K for Fiscal Year 2005 filed March 1, 2006 .......... 7, 8, 9, 10

Form 10-Q for First Quarter 2006 filed May 9, 2006 .......... 8, 9, 18

Form 8-K filed July 25, 2006, attached press release announcing unaudited financial results for Second Quarter 2006 .......... 8

Form 10-Q for Second Quarter 2006 filed August 7, 2006 .......... 8, 9

Form 8-K filed October 24, 2006, attached press release announcing unaudited financial results for Third Quarter 2006 .......... 8

Form 10-Q for Third Quarter 2006 filed November 7, 2006 .......... 8, 9

Form 8-K filed January 30, 2007, attached press release announcing unaudited financial results for Fourth Quarter 2006 .......... 8, 12, 15

Form 10-K for Fiscal Year 2006 filed March 1, 2007 .......... 8, 9, 10, 13, 15, 18

Form 8-K filed March 12, 2007, attached press release announcing operational results for February 2007 .......... 19-20

# MEMORANDUM OF POINTS AND AUTHORITIES

## I. INTRODUCTION

Eric Sieracki ("Sieracki") joins in the motions to dismiss Plaintiffs' Complaint (the "Complaint" or "Com.") filed by Countrywide Financial Corporation ("Countrywide" or "CFC") and the other individual defendants.

Sieracki moves and writes separately to show that the Complaint does not allege specific facts giving rise to a strong inference of scienter against him. To the contrary, judicially noticeable facts negate any inference of scienter. These judicially noticeable facts start with his stock purchases and lack of stock sales during the time period at issue in the Complaint. Sieracki <u>purchased</u> and <u>held</u> stock and sold no stock during the lengthy time period in which he served as CFC's Chief Financial Officer and signed its periodic SEC filings. By purchasing and holding, Sieracki suffered a multimillion dollar loss in value. It is counterintuitive and not reasonable to infer that Sieracki would have engaged in this multi-year pattern of purchases-without-sales when and if he had known but was concealing facts that would have meant the stock he was purchasing and holding was overvalued in the market and would suffer a dramatic demise. Rather than alleging a plausible case of fraud, Plaintiffs urge the Court to infer that Sieracki engaged in irrational behavior against his own economic interests. *See* Section III(A), *infra*.

The Complaint offers nothing to outweigh the common sense conclusion that Sieracki's stock purchases and lack of sales negate scienter. To the contrary, the Complaint itself supplies additional facts weighing against an inference of scienter: it references the public disclosures made by Countrywide's management which disclosed the very risks and conditions referenced in the internal documents that the Complaint cites as "undisclosed facts" in a futile attempt to plead scienter. Such disclosures are inconsistent with an inference that management, including Sieracki, intended to conceal, and hence these facts also negate scienter. Indeed, these disclosures show that Plaintiffs' story that Countrywide concealed the risks and

consequences of loans that Plaintiffs characterize as "risky" or "exotic" until April or July 2007 is demonstrably false. *See* Section III(B), *infra*.

Compounding the Complaint's allegations that weigh against scienter and the judicially noticeable facts that do the same is the added fact that the accounting decisions Plaintiffs challenge inherently involved matters of judgment. Even Plaintiffs' spin on those judgments do not give rise to a strong inference of scienter. *See* Section III(C), *infra*. Considered as a whole and with the judicially noticed record, the Complaint's allegations fail to plead a strong inference of scienter or even a plausible case against Sieracki. The Complaint also challenges oral statements made by Sieracki, and a press release regarding liquidity, but fails to allege facts showing that these statements were false. *See* Section IV, *infra*.

## II. PERTINENT ALLEGATIONS

Sieracki was Chief Financial Officer of Countrywide from April 2005 until its merger with Bank of America in July 2008. Com. ¶ 39. As CFO, Sieracki was one of the signatories to some of the periodic SEC filings challenged in the Complaint, starting in May 2005. The Complaint does not allege that Sieracki signed SEC filings or made any challenged statements prior to May 2005.

The Complaint admits that investors knew that as far back as March 2004, Countrywide was originating an increasing number of loans that Plaintiffs call "exotic." Com. ¶ 49. Plaintiffs nevertheless claim that Countrywide's SEC filings and quarterly earnings press releases concealed the risks of those loans and reported inaccurate financial statements. The Complaint also challenges statements allegedly made by Sieracki at investor conferences between July 26, 2005 and July 24, 2007; and a August 2, 2007 press release quoting Sieracki regarding liquidity.

## III. THE COMPLAINT FAILS TO PLEAD A STRONG INFERENCE OF SCIENTER ON THE PART OF MR. SIERACKI

Plaintiffs must plead particular facts supporting a strong inference of scienter. 15 U.S.C. § 78u-4(b)(2). This entails pleading specific facts which give rise to an inference that is "powerful or cogent" and "cogent and compelling." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 323-324 (2007). Specific facts must be pleaded on an individualized, defendant-by-defendant basis; that is, must be based on facts showing what that person, not someone else, knew. *Rubke v. Capital Bancorp Ltd.*, 551 F.3d 1156, 1166 (9th Cir. 2009) (allegations about a non-employee director who allegedly made false statements to shareholders did not plead that "*the defendants* in this case had the requisite mental state.") (emphasis in original). Even if the allegations of a complaint suggest a powerful, cogent and compelling inference of scienter as required by *Tellabs* (which is not the case here), if there are also anti-scienter inferences that may be derived from the complaint and from matters of judicial notice, the inference of scienter must be at least as compelling as the anti-scienter inference. *Tellabs*, 551 U.S. at 325.

Applying these standards, the judicially noticeable record shows that in the same time frame that Sieracki supposedly was deceiving investors about Countrywide's financial results, loan risks, and access to liquidity, Sieracki purchased Countrywide stock and held onto those shares and his other holdings—which eventually resulted in a considerable loss to him. No person who believed that Countrywide's public statements were false or that its prospects were bleak would have engaged in this purchase-and-hold behavior. The Complaint also refers to public disclosures by Countrywide and its management (including Sieracki) of the very risks and conditions that Plaintiffs allege were concealed. In contrast to these facts weighing against an inference of scienter, the Complaint fails to allege any specific facts that were known to Sieracki at the time he made a public statement that contradicted his public statement.

### A. Mr. Sieracki's Stock Purchases And Absence Of Sales Negate Any Inference Of Scienter

Sieracki served as Countrywide's CFO for over four years, from April 2005 until July 2008. He never sold a share of Countrywide stock during this period. Rather, Sieracki purchased stock on three occasions during this period by exercise of options, but did not sell the shares at the time of acquisition or at any other time:

| *Date* | *Shares acquired but not sold* | *Closing price* | *Market value of shares acquired but not sold* |
|---|---|---|---|
| May 26, 2005 | 31,062 | $36.65 | $1,138,422 |
| July 11, 2006 | 60,000 | $38.08 | $2,284,800 |
| May 31, 2007 | 13,806 | $38.94 | $537,605 |

Sieracki suffered a loss in value of nearly $20 million by not selling his holdings on the date of his last stock purchase-without-sale, and retaining his holdings until CFC was acquired at $4.25 per share and ceased to be an independent company.[1]

Common sense tells us that fraud cannot plausibly be attributed to a person who purchases and holds during the time he supposedly is misleading investors and is supposedly aware that the stock in which he is investing is artificially inflated. The only reasonable inference to be drawn from Sieracki's purchase-and-hold pattern is that he believed that Countrywide's disclosures (which would have been reflected in the price of the stock he was consistently buying) did not understate its risk or inflate its prospects. Courts consistently have agreed that retaining stock holdings weighs against any inference of scienter. In *In re Worlds of Wonder Securities Litigation*, 35 F.3d 1407 (9th Cir. 1994), the court granted summary judgment for defendants on §10(b) claims against company officers and others, paying special heed to the pattern of net stock holding which rebutted any inference

[1] The stock information in this section was reported on Forms 4 and a proxy statement filed with the SEC. They are attached as Exhibits A to D to the Declaration of David Priebe, which accompanies the Request For Judicial Notice.

of scienter. As the court reasoned: "if, as Plaintiffs allege, the Officers knew that WOW was heading for financial disaster, they probably would have bailed out of their substantial holdings. Each of the Officer Defendants, by contrast, held onto most of their WOW stock and incurred the same large losses as did the Plaintiffs themselves." *Id.* at 1424-25. As another court reasoned in dismissing a securities fraud complaint, where an individual defendant increases his or her holdings during the class period, this is "a fact wholly inconsistent with fraudulent intent." *In re Bristol-Myers Squibb Sec. Litig.*, 312 F. Supp. 2d 549, 561 (S.D.N.Y. 2004). Numerous other cases concur.[2]

The implausibility of inferring scienter given Sieracki's stock behavior is magnified by the context of the Complaint's allegations. The Complaint alleges that Sieracki knew that Countrywide lacked access to liquidity due to the nature of the loans it was originating under policies that had been in place since at least March 2004. Yet Sieracki never sold a share of stock during the three year period in which he signed SEC filings at issue in this case (starting in May 2005). It would have been irrational for Sieracki to have acquired-but-not-sold stock for such a lengthy period if he knew or believed in the existence of the alleged adverse facts.

### B. The Public Disclosures Referenced In The Complaint Further Negate Scienter (As Well As Falsity And Loss Causation)

Countrywide's public disclosures of the very matters Sieracki is alleged to have concealed also weigh heavily against an inference of scienter. *See Worlds of*

[2] *See Lapiner v. Camtek, Ltd.*, No. C 08-01327 MMC, 2011 WL 445849, *8, *10 (N.D. Cal. Feb. 2, 2011) (no scienter because CFO during much of relevant period did not sell any stock); *In re HomeBanc Corp. Sec. Litig.*, 706 F. Supp. 2d 1336, 1359 (N.D. Ga. 2010) ("Here, Defendants retained their stock even as the price of HomeBanc's stock collapsed during the class period. It is counterintuitive to think that one would fraudulently inflate a stock price without a concomitant intent to sell the stock at an artificially high price."); *accord*, *Plumbers & Steamfitters Local 773 Pension Fund v. Canadian Imperial Bank of Commerce*, 694 F. Supp. 2d 287, 299 (S.D.N.Y. 2010) ("It is nonsensical to impute dishonest motives to the Individual Defendants when each of them suffered significant losses in their stock holdings and executive compensation.").

*Wonder*, 35 F.3d at 1425 (if a company's "officers were bent on committing fraud, it is not likely that they would have provided such detailed risk disclosure.").[3] In this motion, we concentrate on the disclosures of the risks and challenges that the Complaint alleges were mentioned in internal communications to Sieracki; the motions of Countrywide and the other defendants present additional disclosures. These disclosures put the lie to Plaintiffs' assertions that Sieracki intended to conceal the riskiness of loans originated or held by Countrywide until the "truth" about these matters was supposedly suddenly first revealed in April or July 2007. As such, the disclosures negate not only scienter, but also falsity and loss causation.

**1. <u>Pay Option ARMs</u>**

Many of the allegations referring to Sieracki concern a type of loan called "pay option ARMs." The Complaint alleges that during the June 28, 2005 meeting of the Corporate Credit Risk Committee attended by Sieracki, senior management discussed the fact that borrowers with this product were likely to have "payment shock," with increases of payments between 65-108%; and that it was reported that 60-70% of borrowers were paying only the minimum payment and thus incurring negative amortization. Com. ¶¶ 125, 312. The Complaint also alleges that Countrywide's CEO, Angelo Mozilo, sent two internal e-mails in May 2006 raising questions with the product. *Id.* ¶ 128. It further alleges that in an e-mail dated September 26, 2006, Mr. Mozilo opined that Countrywide was "flying blind" about the pay options held in the portfolio of Countrywide Bank (the "Bank") to some

---

[3] *See also Local 295/Local 851 IBT Employer Group Pension Trust & Welfare Fund v. Fifth Third Bancorp*, 731 F. Supp. 2d 689, 727 (S.D. Ohio. 2010) ("Also cutting strongly against a finding of scienter is the fact that much of the information Plaintiffs claim was concealed was actually reported."); *In re First Marblehead Corp. Sec. Litig.*, 639 F. Supp. 2d 145, 155-56, 163 (D. Mass. 2009) (detailed disclosures in securitization prospectuses "negate any inference of scienter."); *Oxford Asset Mgt, Ltd. v. Jaharis*, 297 F.3d 1182, 1193 (11th Cir. 2002) (claim that company misrepresented safety of drug negated by the "candid statements" about patient adverse reactions in prospectus); *In re Wet Seal, Inc. Sec. Litig.*, 518 F. Supp. 2d 1148, 1164-65 (C.D. Cal. 2007) (risk disclosures negate scienter).

extent due to the lack of historical experience with the product in a potential time of economic stress, and recommended that the loans be sold. *Id.* ¶¶ 134-135.

None of these allegations contribute to scienter (or falsity). To the contrary, all of the matters referenced in these communications were disclosed to investors, and there are no allegations that Sieracki did not believe that pay option ARMs had been prudently underwritten or represented a threat to the Bank.

### a) Countrywide Disclosed The Special Risks Of Pay Option ARMs, Including Negative Amortization

As noted above, the Complaint operates under the theory that Countywide concealed the risks of the "exotic" loans it increasingly was originating. Com. ¶ 49. If Plaintiffs mean to refer to pay option ARMs to support this theory (as apparently is the case), they are woefully mistaken.

In fact, Countrywide called special attention to the risks of pay option ARMs—starting as far back as the 10-Q for the very first quarter for which Sieracki was CFO. The Second Quarter 2005 10-Q disclosed that pay options presented a "higher credit risk" for the Bank's portfolio because "[w]hen the monthly payments for pay-option loans eventually increase, borrowers may be less likely to pay the increased amounts and, therefore, more likely to default on the loan, than a borrower using a normal amortizing loan." It also stated that Countrywide's "exposure to this higher credit risk is increased by any negative amortization that has accrued with respect to such loan." Q205 10-Q at 30 (PD 31).[4] The 10-K for Fiscal Year 2005 repeated these disclosures. 2005 10-K at 42 (PD 68). It also disclosed that pay options "provide borrowers with the option to make fully amortizing, interest-only, or 'negative-amortizing' payments." *Id.* at 41 (PD 67).

---

[4] This brief refers to Countrywide's periodic filings by quarter and year; *e.g.*, the Second Quarter 2006 10-Q is "Q206 10-Q" and the Fiscal Year 2005 10-K is "2005 10-K." All are attached as exhibits to the Priebe Declaration, and pin cites are cross-referenced to pages of that Declaration as "PD <page>."

The 10-Qs for the First, Second, and Third Quarters 2006 elaborated on these disclosures, stating that pay options "differ from 'traditional' monthly-amortizing loans" by providing an option to make negative-amortizing payments. Q106 10-Q at 35 (PD 77); Q206 10-Q at 37 (PD 110); Q306 10-Q at 39-40 (PD 142-143).

Countrywide did not just disclose these factors as hypotheticals. It disclosed them as reality, in periodic filings and in quarterly earnings press releases attached to 8-Ks. The statistics Countrywide disclosed showed that an increasing percentage of pay option loans in the Bank's portfolio had at least some negative amortization, and that the total amount of negative amortization was increasing:

| *Public disclosure* | *PD* | *Total pay options in portfolio* | *Principal amount of loans with neg. amortization* | *Accumulated negative amortization* |
|---|---|---|---|---|
| Aug. 8, 2005 Q205 10-Q | 34 | $15.0 billion | $2.8 billion | $5.9 million |
| Oct. 27, 2005 8-K | 45 | $20 billion | $7.9 billion | $25.5 million |
| Nov. 8, 2005 Q305 10-Q | 62 | $21.9 billion | $7.8 billion | $25.4 million |
| Mar. 1, 2006 2005 10-K | 71 | $26.1 billion | $13.9 billion | $74.7 million |
| May 9, 2006 Q106 10-Q | 81 | $30.9 billion | $20.7 billion | $168.7 million |
| July 25, 2006 8-K | 92 | $34.2 billion | $25.0 billion | $301 million |
| Aug. 7, 2006 Q206 10-Q | 112 | $34.2 billion | $25.0 billion | $300.7 million |
| Oct. 24, 2006 8-K | 135 | $35.3 billion | $29.5 billion | $471.3 million |
| Nov. 7, 2006 Q306 10-Q | 146 | $35.3 billion | $29.5 billion | $471.3 million |
| Jan. 30, 2007 8-K | 172 | $32.7 billion | $28.9 billion | $653.9 million |
| Mar. 1, 2007 2006 10-K | 215 | $32.7 billion | $28.9 billion | $653.9 million |

Plaintiffs' assertion that Countrywide misrepresented risk by concealing that pay option ARMs had been originated using little or no documentation also fails. In fact, Countrywide disclosed that "substantially all of the pay-option loans we originate are underwritten based on 'reduced documentation' standards whereby the

loan applicant's income is based on representations provided by the borrower." *See* Q206 10-Q at 37 (PD 110), Q306 10-Q at 40 (PD 143). The periodic filings also disclosed other risk characteristics of the pay options in the Bank's portfolio, including their FICO scores, loan-to-value ratios, and delinquency rates. *See* Countrywide Mem. §§ II(B)(4), (5). These disclosures undermine the allegations that Countrywide misrepresented that the pay option ARMs in the portfolio had a high initial credit quality. *See, e.g.*, Com. ¶¶ 331, 362. The Complaint admits that this statement was explained by reference to the FICO and loan-to-value statistics for the loans—statistics the Complaint does not challenge. Based on this data, investors could assess the riskiness of the loans for themselves. *In re Australia & New Zealand Banking Group Ltd. Sec. Litig.*, No. 08 Civ. 11278 (DLC), 2009 WL 4823923, *14 (S.D.N.Y. Dec. 14, 2009) (alleged omission that bank never described lack of internal controls over lending "is irrelevant once [the bank's] actual exposure to its lending counterparties was disclosed to the market.").

The 2006 10-K expanded on these risk disclosures. Referencing pay option ARMs, it stated: "While we believe that we have prudently underwritten these loans, <u>such loans present additional risks</u>." 2006 10-K at 106 (PD 217) (emphasis added). The 10-K then presented a slew of additional risks, including the risks of negative amortization, reset, payment shock, and an increased risk of loss in the event of default. *Id.* at 106-107 (PD 217-218). Countrywide's qualification for its support of pay option ARMs as a "belief," followed immediately by fulsome risk disclosures, constitute disclosure choices inconsistent with scienter. *Hill v. Gozani*, No. 0-1048, ___ F.3d ___, 2011 WL 924242, *7 (1st Cir. Mar. 18, 2011) (affirming dismissal where company's positive statements were characterized as "belief" and immediately followed by cautionary language).[5]

---

[5] The 10-K also disclosed that "in deciding whether to extend credit to borrowers under certain loan programs, we assume that the information provided by a customer is accurate and complete and <u>we do not independently verify that information</u>." 2006 10-K at 38 (PD 212) (emphasis added).

**b) Countrywide Disclosed Mr. Mozilo's Expressed <u>Opinion Regarding A Limited Historical Record</u>**

Countrywide also disclosed the very matter about which Mr. Mozilo had expressed concern in his September 26 e-mail: lack of historical experience with pay option ARMs. The 10-Ks for Fiscal Years 2005 and 2006 disclosed that "due to the lack of significant historical experience at Countrywide, the credit performance of these loans has not been established for the Company." *See* 2005 10-K at F-36 (PD 72); 2006 10-K at 107 (PD 218). One federal court already has held that as a matter of law, the 2006 disclosure refutes any argument that the content of Mr. Mozilo's e-mail was concealed from investors. *SRM Global Fund Ltd. P'ship v. Countrywide Fin. Corp.*, No. 09 Civ. 5064 (RMB), 2010 WL 2473595, **8-10 (S.D.N.Y. June 17, 2010). This decision is well reasoned and correct. The securities laws do not require corporations to use particular adjectives or words that may be urged by plaintiffs. *Tuchman v. DSC Comm'ns Corp.*, 14 F.3d 1061, 1069 (5th Cir. 1994).

The nature of Mr. Mozilo's e-mails buttresses the point that they do not plead scienter on the part of Sieracki. Courts recognize that in any large organization, there will be a spectrum of opinions. *First National Bank v. Bellotti*, 435 U.S. 765, 785 n.22 (1978) ("Corporations, like individuals or groups, are not homogeneous," and do not have a monolithic view). The existence of a spectrum of opinions about pay option ARMs or any other product is a sign of a healthy organization, not securities fraud. Hence, it is not securities fraud for there to be differences of opinion in a company and for the company not to publish the most negative opinion. Thus, in *Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981 (9th Cir. 2009), where a complaint alleged that management openly questioned the formulae used by the company's internal accounting system to account for software development costs, the court reasoned that this established at best disagreement and questioning within the company, not that the auditors had counseled against using

the system or that management admitted that its use of the system was wrong. Such disagreement was "far from the deliberate, conscious recklessness required for a strong inference of scienter…" *Id.* at 999.[6]

Here, the Complaint does not allege that anyone determined that the issues raised by Mr. Mozilo's e-mails warranted selling the pay option ARMs in the Bank's portfolio (or led to the conclusion that the value of the loans could not be ascertained). The Complaint itself makes this point in a misguided effort to accuse Sieracki of making false statements. It alleges that at a March 7, 2007 Morgan Stanley conference, Sieracki stated the Bank had been selective about the pay option ARMs it had funded and was "very confident about that product…" Com. ¶ 413. But the Complaint admits that Sieracki also stated that the Bank had "32 billion exposure out of our 200 billion in assets" in pay option ARMs. *Id.* The retention of this multibillion dollar exposure is consistent with a belief in pay option ARMs, not the opposite. Moreover, the Complaint alleges that at the same conference, Sieracki explained that "this is a product where the consumer gets the privilege to make a payment less than the principal amortization and therefore they may have negative amortization." *Id.* In Sieracki's view—consistent with Countrywide's repeated disclosures—negative amortization was an inherent risk characteristic of pay option ARMs, not a signal of problems.

---

[6] *See also Metzler Inv. GmbH v. Corinthian Colls., Inc.*, 540 F.3d 1049, 1068-69 (9th Cir. 2008) (statements of ex-employees about revenue recognition "point only to disagreement and questioning"); *Data Probe Acquisition Corp. v. Datalab, Inc.*, 722 F.2d 1, 5 (2d Cir. 1983) (reversing judgment predicated upon the erroneous assumption that "boards of directors have monolithic viewpoints," all of which must be disclosed); *In re Kulicke & Soffa Indus., Inc. Sec. Litig.*, 697 F. Supp. 183, 188 (E.D. Pa. 1988) (dismissing fraud claim asserting that a company made optimistic statements, even though one officer had expressed concerns that the company's business would suffer a downturn); *Cooperman v. Individual, Inc.*, No. Civ. A. 96-12272-DPW, 1998 WL 953726, *10 (D. Mass. May 27, 1998) (no duty to disclose dispute between CEO / director and other directors over future direction of company), *aff'd*, 171 F.3d 43, 52 (1st Cir. 1999).

In the end, Plaintiffs' argument devolves to an assertion that Countrywide was required to disclose that someone had asked about a course of action that the company had decided not to take. Such a duty is foreign to the securities laws. Imposing such a duty would remove any limits to the duty to disclose, as every company's management vets opinions and as every company faces business choices every day and hence makes decisions not to undertake some courses of action. *See In re Verifone Sec Litig.*, 11 F.3d 865, 869 (9th Cir. 1993) (no duty to disclose alternative internal forecasts); *accord*, *In re Lukens Inc. Shareholders Litig.*, 757 A.2d 720, 736 (Del. Ch. 1999) ("requiring disclosure of every material event that occurred *and* every decision not to pursue another option would make proxy statements so voluminous that they would be practically useless.").

**2. The December 7, 2006 Memorandum**

Another example of how Countrywide's public disclosures undermine the Complaint's assertions of scienter concerns a December 7, 2006 memorandum from Mr. Mozilo. Com. ¶ 114. The memorandum allegedly noted the relatively poor performance of subprime loans that had been originated in 2006, and opined that delinquencies on those loans were expected to rise. Plaintiffs spin this as an undisclosed expansion in loan standards that would lead to adverse consequences.

The judicially noticeable record demonstrates otherwise. The Complaint admits that Countrywide held quarterly investor conference calls after reporting unaudited financial results. The next call after the December 7 memorandum was on January 30, 2007. Com. ¶ 397. Earlier that day, Countrywide issued a press release (which was attached to an 8-K and is referenced in the Complaint) which warned that Countrywide was "preparing for increased borrower delinquencies and continued credit deterioration" and that the industry "will experience…increased defaults and foreclosures…" Jan. 30, 2007 8-K (PD 160) (emphasis added). On the call, in response to a question as to whether Countrywide's guidance for 2007 "reflect your expectations for increased delinquencies and continued credit

deterioration," Sieracki said that it did: "…we also expect this loan season…that <u>delinquencies will go up</u>. And so that's typically baked into our probability models as well." Another officer, COO David Sambol, disclosed that "a <u>liberal credit environment over the last several years</u> all of which is now–as rates are going up, as credit is tightening, <u>is going to contribute in our view to continued pressure on delinquencies and defaults</u> and associated <u>credit risk</u>." Priebe Decl. Ex. O at 27-28 (PD 205-206) (emphasis added).

The next periodic SEC filing (the 2006 10-K filed March 1, 2007) expanded on these points. Most notably, it explicitly disclosed the point about 2006 vintage subprime loans referenced in the alleged December 7 memorandum: "In 2007, we have observed a decline in credit performance (as adjusted for age) in the non-prime loans we produced, especially those funded in 2006." *Id.* at 126 (PD 222). It also noted that "changing borrower profiles and higher combined loan-to-value ratios contributed to the increased nonprime delinquency" in Countrywide's large loan servicing portfolio. *Id.* at 114 (PD 220). And it disclosed that the increased delinquencies and defaults already had led to an increase in loan loss reserves for the Bank's portfolio, and that these adverse conditions would continue in the future: "The increase in our nonperforming assets and the increase in the allowance for loan losses reflect prevailing real estate market and economic conditions and the seasoning of our investment loan portfolio. We expect the level of nonperforming assets and credit losses to increase, both in absolute terms and as a percentage of our loan portfolio as our loan portfolio seasons and as current market conditions develop." *Id.* at 108 (PD 219).

Thus, management (including Sieracki) publicly disclosed the information regarding vintage 2006 subprime loans contained in the alleged December 7 memorandum. These disclosures also undermine Plaintiffs' assertion that Countrywide's July 16, 2007 press release reporting June 2007 operational results somehow surprised the market by reporting that "delinquencies and defaults

continue to rise." Com. ¶ 436. At the start of 2007, Countrywide had predicted that delinquencies and defaults would rise. Moreover, Countrywide constantly published delinquency and default statistics, allowing investors to see this information in real time.

**3. The Allegations Regarding John McMurray**

The Complaint also refers to John McMurray, Countrywide's Chief Risk Officer. Significantly, the Complaint does not allege that Mr. McMurray objected to any SEC filing as false or misleading. Rather, it alleges that he suggested that disclosures be made in a January 2007 e-mail to Sieracki and in August 2007. Com. ¶¶ 147, 149. Mr. McMurray supposedly believed that the Second Quarter 2007 10-Q filed August 9, 2007 was "incomplete" without the latter suggestions. *Id.* ¶ 465; *see also id.* (alleging that 10-Q did not include "full truth" for lack of Mr. McMurray's text); *id.* ¶ 146 (alleging earlier suggestions from Mr. McMurray, not to Sieracki, that "more information" be disclosed).

These allegations are deficient as a matter of law. Alleging that someone suggests edits to a company's SEC disclosures does not automatically suffice to allege that a material change was warranted, and further does not make rejection of the edits an indicator of scienter. *See Securities & Exch. Comm'n v. Hoover*, 903 F. Supp. 1135, 1144-46 (S.D. Tex. 1995) (proposed change from disclosing approximately 10% decline in earnings to disclosing 10%-12% decline in earnings was not material, especially in context of company's prior disclosures). The contrary propositions cannot be true, because under the federal securities laws, materiality is assessed by an objective standard (the perspective of a reasonable investor), not a subjective standard (one person's opinions). *Miller v. Thane Int'l, Inc.*, 615 F.3d 1095, 1102 (9th Cir. 2010). Here, the proposed edits are not even alleged, much less shown to be material. Moreover, just as there is no duty to disclose internal opinions, there is no duty to incorporate every person's alleged edits into SEC filings. If such a duty existed, it would require everyone in a large

company to have a monolithic view about disclosures, lest the company be subject to virtually constant claims of securities fraud if every person's every comment was not included. That would be absurd.

The allegations also fail as a matter of law because the securities laws do not require "more information" or "complete" disclosure. *Brody v. Transitional Hospitals, Inc.*, 280 F.3d 997, 1006 (9th Cir. 2002), rejected the assertion that when a company makes a disclosure on a particular topic, its disclosure must be "complete and accurate." There is no duty to disclose "more."

Tellingly, the Complaint does not allege the contents of the text that Mr. McMurray allegedly proposed, nor does it compare his proposed disclosures to the actual text of the SEC filings at issue. Hence, it is impossible to conclude that Mr. McMurray's proposed disclosures were required in order to render the SEC filings not false or misleading, or that the SEC filings were false or misleading as a result of the alleged rejection of Mr. McMurray's text. Plaintiffs urge the Court to speculate that Mr. McMurray requested a material, required disclosure and was declined with the intent and for the purpose of defrauding investors. Acceptance of such a fact-free theory would make a mockery of the requirement to plead specific facts supporting a strong inference of scienter.

Finally, Countrywide disclosed what Mr. McMurray allegedly opined in a January 2007 email should be disclosed. Plaintiffs allege the e-mail explained "that Countrywide's delinquencies would increase in the future due to a weakening real estate market and what McMurray characterized as credit guidelines that were 'wider than they have ever been.'" Com. ¶ 147. But Countrywide disclosed these matters in the same month—January 2007—and thereafter. As shown above, on January 30, Countrywide issued a press release and held a conference call in which management (including Sieracki) predicted that delinquencies and defaults would increase, due in part to an industry-wide expansion of underwriting guidelines. The subsequent 2006 10-K continued and elaborated on these points. *See* Section

III(B)(2), *supra*. Plaintiffs also allege that Mr. McMurray opined that Countrywide should disclose "widened underwriting guidelines" in a particular section of the draft Q207 10-Q, and that his suggestions to this effect were taken by the deputy CFO to Sieracki and Mr. Sambol, who directed her not to include them in the Form 10-Q as eventually filed. Com. ¶¶ 148-149. But Countrywide already had disclosed the existence and effects of the past expansion of industry-wide origination guidelines, well before the August 2007 10-Q. Whatever text Plaintiffs ask the Court to speculate that Mr. McMurray may have wanted to add—once again, the Complaint does not allege what it was—"widened underwriting guidelines" was not and could not have been concealed by August 2007.

## C. The Complaint Alleges No Specific Facts Supporting Scienter On The Part Of Mr. Sieracki

The Complaint cites no "confidential witnesses" who accuse Sieracki of anything or who speak to the preparation of Countrywide's financial statements. The allegations regarding the remaining internal documents not already addressed above do not plead that Sieracki knew information that rendered false any public statement he made.

### 1. The Accounting Decisions Challenged By Plaintiffs Inherently Involved Matters Of Judgment

The financial statements under Sieracki's watch were never restated, and the Complaint alleges no internal communication to Sieracki that even so much as questions their preparation or contents. Rather, the only party that claims that the statements were wrong is Plaintiffs. *In re Hutchinson Tech., Inc. Sec. Litig.*, 536 F.3d 952, 960 (8th Cir. 2008) (dismissing claims where company "has never restated its financials, and there are no people, documents, or sources that say [its] numbers were false").[7] Moreover, as Countrywide's brief explains, the Complaint

---

[7] *See also Waterford Township General Employees Retirement Sys. v. Suntrust Banks, Inc.*, No. 1:09-CV-617-TWT, 2010 WL 3368922, *2 (N.D. Ga. Aug. 19,

does not properly allege facts showing that the statements were false.

Plaintiffs' challenge to the financial statements suffers further infirmities with respect to scienter for two reasons. First, the matters of which Plaintiffs complain involve matters of judgment and opinion, not the violation of clear-cut accounting rules. Plaintiffs question the setting of loan loss reserves and the valuation of loan-related assets. Com. ¶ 153. That the setting of reserves involves opinion and judgment that may be second-guessed in hindsight is a factor that counsels against drawing an inference of scienter. *See First Nationwide Bank v. Gelt Funding Corp.*, 820 F. Supp. 89, 95 (S.D.N.Y. 1993) ("[T]he taking of loan loss reserves is based on managerial guesswork about the future."), *aff'd*, 27 F.3d 763 (2d Cir. 1994).[8] And an assertion that an increase in reserves "admits" that past reserve levels were wrong (*see, e.g.*, Com. ¶ 191) is the classic example of fraud by hindsight. *See DiLeo v. Ernst & Young*, 901 F.2d 624, 626-28 (7th Cir. 1990).

Second, the Complaint does not plead that Countrywide failed to take the characteristics of its loans into account in preparing its financial statements. The Complaint alleges nothing about how the financial statements were prepared, and instead merely assumes that Countrywide deliberately violated accounting rules. This fact-free assumption cannot suffice under the Reform Act. *See In re Vantive Corp. Sec. Litig.*, 283 F.3d 1079, 1089 (9th Cir. 2002); *In re Foundry Networks, Inc. Sec. Litig.*, No. C-00-4823-MMC, 2003 WL 22077729, *11 (N.D. Cal. Aug.

---

2010) (dismissing claim alleging fraudulently low loan loss reserves where "[t]he Plaintiffs does not allege that anyone—other than the Plaintiffs—has said that [the bank] should restate its financial reports….").

[8] *See also Belmont Holdings Corp. v. SunTrust Banks, Inc.*, No. 1:09-cv-1185-WSD, 2010 3545389, *6 (N.D. Ga. Sept. 10, 2010) ("Whether [a bank] had adequate reserves for its predicted loan losses generally is not a matter of objective fact, but rather a statement of [the bank's] opinion regarding what portion of its loan portfolio would be uncollectable."); *Local 295/Local 851 IBT Employer Group Pension Trust and Welfare Fund*, 731 F. Supp. 2d at 724-25 ("Moreover, accounting for loan loss reserves is not the sort of simple accounting concept the violation of which creates an inference of scienter").

29, 2003). Moreover, the documents cited in the Complaint show that Countrywide did increase loan loss reserves (both in absolute and percentage terms) to reflect the performance of loans retained in the Bank. For example, the 2006 10-K explained: "The Banking Operation's provision for loan losses increased by $72.4 million during 2006 compared to 2005. This increase reflects increased delinquencies and loss levels resulting from seasoning of loans acquired during the past years of rapid portfolio growth, as well as prevailing real estate and market conditions." 2006 10-K at 63 (PD 214) (emphasis added). Likewise, Plaintiffs allege that CFC failed to increase the reserve for representations and warranty obligations (Com. ¶ 191), but in the First Quarter 2006 alone, the reserve was increased by 60%, from $169.8 million to $271.9 million. Q106 10-Q at 60 (PD 82).

### 2. Mr. Mozilo's April 2006 E-Mail Regarding HSBC And Subprime Second Loans Do Not Plead Scienter

The Complaint also alleges that April 13, 2006, Mr. Mozilo sent an e-mail expressing displeasure with a subcategory of loans (subprime second mortgages) that had been sold to and then repurchased from one company, HSBC. Com. ¶ 111.

This allegation fails to plead scienter on the part of Sieracki. The Complaint alleges nothing about the magnitude or significance of the loans addressed by Mr. Mozilo. It does not allege the value of the loans, the percentage of Countrywide's business they represented, or anything else that would indicate that Mr. Mozilo had raised any objectively significant issues in the context of Countrywide's public statements. It is Plaintiffs' burden, at the pleading stage, to allege specific facts about the loans addressed in Mr. Mozilo's e-mail that rendered a statement in an SEC filing false or materially misleading by omission, such that it could constitute deliberate recklessness for Sieracki not to include those facts. The absence of any allegations addressing the magnitude of the alleged facts about HSBC or subprime second loans means that the Complaint does not meet this burden. As far as can be told, Mr. Mozilo was referring to a trivial portion of Countrywide's multibillion

loan business for which no disclosure was required. *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 448-40 (1976) (management need not "bury the shareholders in an avalanche of trivial information.").

Apart from this factor, even if Mr. Mozilo had opined that there were issues in how the loans addressed in his e-mail had been handled, there was no duty to disclose his personal opinion (as explained above) and it is not fraud for a disclosure not to be made while a company is addressing the issue (assuming it was an issue at all). "Problems and difficulties are the daily work of business people. That they exist does not make a lie out of any alleged false statement." *Ronconi v. Larkin*, 253 F.3d 423, 434 (9th Cir. 2001). Hence, companies are allowed to attempt to remedy their problems and assume their efforts will be successful by the time a disclosure event arrives. Thus, in *In re Syntex Corporation Securities Litigation*, the court held that even if a pharmaceutical company knew of the problems in its drug testing procedure alleged by plaintiffs, it could conclude that it would fix the problems and obtain FDA approval on schedule, and hence that it could not be liable for not disclosing the problems when it learned of them. 95 F.3d 922, 930 (9th Cir. 1996). Mr. Mozilo's raising of issues or concerns is nothing more than that; it does not create a disclosure event.

### 3. <u>The March 12, 2007 CCRC Minutes Do Not Plead Scienter</u>

The Complaint also alleges that at a March 12, 2007 CCRC meeting, it was stated that nearly 12% of loans were rated as severely unsatisfactory or high risk. Com. ¶ 120. The Complaint does not explain the significance of the 12% metric or what it means for a loan to be assessed as severely unsatisfactory or high risk. Moreover, on the <u>same</u> <u>day</u>, Countrywide lodged its operations report for February 2007 on EDGAR. Priebe Decl. Ex. Q. It stated that "[t]he nonprime lending industry is currently experiencing significant volatility and instability" and that "[a]s a result, many nonprime competitors have recently exited the market and other lenders have suggested their continued viability is in question." It disclosed that

"[a]ggressive industry underwriting guidelines and lower home price appreciation have resulted in increasing delinquencies and defaults." And it warned that "as a result of investor concerns about nonprime loan performance, yield requirements have increased and secondary market liquidity has been reduced. These factors will adversely impact residual valuations and gains on sale of nonprime loans until market conditions improve." PD 222. These are hardly the disclosures one would expect from a company that was intent on concealing mortgage market turmoil, the past industry-wide expansion in guidelines, or delinquencies and defaults.

## IV. THE COMPLAINT DOES NOT PLEAD FALSITY OR SCIENTER BASED ON OTHER ORAL STATEMENTS OR PRESS RELEASES

In this section, we demonstrate the additional deficiencies of the allegations regarding oral statements allegedly made by Sieracki at investor conferences and in an August 2, 2007 press release regarding liquidity.

### A. The Information Allegedly Provided On The July 26, 2005 Conference Call Is Not Alleged To Be False

The Complaint alleges that on a July 26, 2005 conference call, Sieracki stated that Countrywide "operate[s] at the very top end of the nonprime credit spectrum..." Com. ¶ 315. The Complaint does not allege facts showing that this statement was false. The falsity allegations regarding the July 26 conference refer to pay option ARMs, not nonprime loans or the "nonprime credit spectrum." *Id.* ¶ 316. The Complaint does not plead the context of this truncated quotation, and hence does not explain what was meant by the alleged phrase "nonprime credit spectrum."

### B. The Statements Allegedly Made At The March 2006 Raymond James Conference Are Not Alleged To Be False

The Complaint alleges that on March 8, 2006, Sieracki falsely denied that Countrywide had increased market share by loosening its underwriting standards. Comp. ¶ 349. But the alleged text of his statement as quoted in the Complaint does not support this spin. It states that Sieracki did not attribute Countrywide's market

share gain over the prior four years (a period that preceded the Relevant Period) to any status as a "price leader." The Complaint does not allege that Countrywide was in fact a price leader, and it does not allege that Sieracki referred to origination standards at all. The Complaint also alleges that Sieracki falsely stated that Countrywide had grown due to its capabilities in funding loans. *Id*. ¶ 350. This allegation refutes itself. If Countrywide had lacked access to the liquidity required to fund loans, it would not have been able to fund the increasing amount of loans and gain the market share that the Complaint alleges it gained.

### C. The Statements Allegedly Made At The March 2006 Piper Jaffray <u>Conference Are Not Alleged To Be False</u>

The Complaint alleges that on March 21, 2006, Sieracki falsely described the loan portfolio held by the Bank by setting forth exactly what it consisted of (40% pay option ARMS, 30% hybrids, 20% HELOCs and 10% fixed-rate seconds). Com. ¶ 351. The Complaint does not allege that these statistics were false. This undermines the allegation that Sieracki's alleged statements that the portfolio had an "extreme[ly] conservative nature" with a "very, very conservative lending strategy" were false due to the presence of pay option ARMs and HELOCs. *Id*. ¶ 352. Sieracki and Countrywide disclosed the presence of these loans in the portfolio, and their credit risk characteristics (such as average FICO scores and loan-to-value ratios), in the periodic SEC filings. *See* Section III(B)(1)(a), *supra*.

### D. The Complaint Relies On Unsupported Spin On An Answer At A <u>September 13, 2006 Investor Forum</u>

The Complaint asserts that at a September 13, 2006, Fixed Income Investor Forum, Sieracki said: "We're the last ones to think that we should be aggressive and take high risk, there's no change in our risk appetite here, we're simply perfecting and refining our capital structure and making sure the excess capital doesn't get out of line . . . . I don't want anybody to get the impression that there's been a change in our risk appetite or that we're going to do anything aggressive

here." Com. ¶ 380. The Complaint alleges that this statement was false due to "irrational lending decisions" and other alleged deficiencies in loan origination standards (*id.* ¶ 383), but the Complaint fails to allege that Sieracki's statement had anything to do with these topics whatsoever. Sieracki was not speaking about mortgage loans at all. He was asked about and spoke to the capital structure of Countrywide, not loan origination standards or loan origination risk.

### E. The Alleged Statements At The March 6, 2007 Raymond James Conference Are Not Alleged To Be False

The Complaint alleges that at the March 6, 2007 Raymond James Institutional Investors Conference, Sieracki stated: "As I mentioned earlier we've always been under-indexed [with respect to subprime mortgages.] There are some estimates that sub-prime is as much as 20% of the market. We're less than 10[% subprime]. We're not as aggressive as others on underwriting. That [monoline subprime lender] model and correspondent model is the model at risk." Com. ¶ 411. The Complaint alleges that this was false because Countrywide utilized a definition of "subprime" that was inconsistent with industry practices. *Id.* ¶ 412. But there was no industry definition of these terms, and hence the allegation fails. *In re Downey Sec. Litig.*, No. CV 08-3261-JFW, 2009 WL 2767670, *7 (C.D. Cal. Aug. 21, 2009) (quoting June 2007 industry publication, "the term 'subprime' is not consistently defined in the marketplace or among individual institutions."). The Complaint also alleges that the statement was false because "Countrywide's underwriting guidelines were just as aggressive as subprime lenders and Countrywide had abandoned sound underwriting practices." *Id.* ¶ 412. But the March 6 conference took place after the secondary market for subprime-backed securities had been disrupted and monoline subprime lenders had exited the market—as Countrywide itself disclosed in the 2006 10-K filed on March 1 and the monthly operations report filed on March 12. *See* Sections III(B)(2), III(C)(3), *supra*. The Complaint does not allege what Countrywide's nonprime origination

standards were at the time of the March 6 statement. The Complaint also ignores that Sieracki made a comparison to monoline subprime lenders and the correspondent model. Monoline lenders were companies that dealt nearly exclusively in loans explicitly characterized as subprime; even in Plaintiffs' wildest flights of rhetoric, they do not and cannot accuse Countrywide of that. Nor can Plaintiffs validly assert that Countrywide used a correspondent origination model.

### F. The Alleged Liquidity Statements On The July 24, 2007 Call Are <u>Not Alleged To Be False</u>

The Complaint alleges that on a July 24, 2007 conference call, Sieracki stated: "we're certainly not going to have any issues funding the Company. We have a very conservative liquidity management philosophy, we have adequate diversified and reliable sources of liquidity available. [¶] So we have abundant excess capital in terms of equity and we have tremendous liquidity sources to fund ourselves through this situation. And we feel very, very comfortable about liquidity scenario overall." Com. ¶ 453. The Complaint alleges that Sieracki "knew Countrywide's liquidity position was precarious" and that its liquidity management philosophy was not conservative because its supposed "risky lending practices" jeopardized its access to the secondary market. *Id.* ¶ 454.

The Complaint alleges no facts to support these assertions, and reality demonstrates that they are absurd. The Complaint asserts that these "risky lending practices" had been undertaken since March 2004. Yet the Complaint admits that despite this supposed ongoing threat, Countrywide continued to fund a multi***trillion*** dollar loan business for over <u>four</u> years: the remainder of 2004, 2005, 2006, the first seven months of 2007 leading up to the July 24 call, and the succeeding months of 2007 through July 2008, until Countrywide's merger with the Bank of America. It is inconceivable that Countrywide could have funded trillions of dollars in mortgage loans without access to liquidity. It is inconceivable that if Sieracki knew that Countrywide lacked access to liquidity, he would have

purchased and held stock for such a lengthy period.[9]

### G. The August 2, 2007 Press Release Is Not Alleged To Be False

The Complaint challenges an August 2, 2007 press release quoting Sieracki: "Countrywide has longstanding and time-tested funding liquidity contingency planning"; that the liquidity planning had proven highly effective earlier during 2007; and that Countrywide's mortgage company "has significant short-term funding liquidity cushions and is supplemented by the ample liquidity sources of our bank." Com. ¶ 456. But the Complaint does not explain or allege how the liquidity statements were false when made. It does not allege what Countrywide's actual position was with respect to liquidity sources or plans at the time of the statements. It does not allege any facts showing that the sources of liquidity that were represented to exist did not in fact exist. It does not allege that Countrywide was unable to fund its short-term liquidity needs as of August 2. And it does not allege that Countrywide's liquidity planning had not proven effective earlier in 2007. To the contrary, that Countrywide even existed on August 2 to make the challenged press release when other loan originators had fallen by the wayside for lack of liquidity supports the truth of the press release.

Moreover, the Complaint acknowledges that the 10-Q for the Second Quarter 2007, filed seven days later, warned of "unprecedented market conditions" bearing on Countrywide's liquidity, that "disruptions in the debt markets or a reduction in our credit ratings, could have an adverse impact on our earnings and financial condition, particularly in the short term," and that "the situation is rapidly evolving and the impact on the Company is unknown." Com. ¶ 461. These are hardly the disclosures of a company and management intent on concealing challenging liquidity conditions.

---

[9] Moreover, Plaintiffs apparently are unaware that in August 2007, the entire secondary market for non-GSE securitizations essentially froze. The Complaint contains no particularized allegations that this was connected to anything specific to Countrywide or the loans it originated.

## V. **CONCLUSION**

The Complaint does not state a claim against Mr. Sieracki, and should be dismissed.

Respectfully submitted,

May 20, 2011

DLA PIPER LLP (US)

By: /s/ David Priebe

Attorneys for Defendant ERIC SIERACKI